1

2

3                          **UNITED STATES DISTRICT COURT**

4                          **EASTERN DISTRICT OF CALIFORNIA**

5

6   **JEREMY R. LUSK,**                              **CASE NO. 1:17-cv-00762-AWI-EPG**

7                     **Plaintiff,**

8             **v.**                                 **ORDER ON PLAINTIFF'S SECOND-
                                                     AMENDED MOTION FOR**
                                                     **PRELIMINARY APPROVAL**
9   **FIVE GUYS ENTERPRISES LLC; AND
    ENCORE FGBF, LLC,**
10                                                   (Doc. No. 61)
                      **Defendants.**
11

12

13          In this class action lawsuit, Jeremy Lusk is suing Five Guys Enterprises LLC and Encore

14   FGBF, LLC, on grounds that they violated federal and California consumer reporting laws,

15   California wage-and-hour laws, and California unfair competition law.  Although the parties have

16   reached a proposed class settlement, the Court has twice denied Lusk's motions under Federal

17   Rule of Civil Procedure 23(e) for preliminary approval of the settlement and conditional

18   certification of the putative class.  Lusk now moves a third time for such relief.  For the reasons

19   discussed below, the Court will also deny this motion.

20

21                                     **<u>BACKGROUND</u>**

22          Lusk filed his lawsuit in state court on May 2, 2017.  Doc. No. 1.  After Defendants

23   removed the action, Lusk filed a first-amended complaint.  Doc. No. 13 ("FAC").  Therein, Lusk

24   pleaded the following twelve class claims:  (1) failure to make a proper disclosure, in violation of

25   the federal Fair Credit Reporting Act, 15 U.S.C. § 1681b(b)(2)(A); (2) failure to provide a proper

26   summary of rights, in violation of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681d(a)(1) and

27   1681g(c); (3) failure to make a proper disclosure, in violation of California's Investigative

28   Consumer Reporting Agencies Act, Cal. Civ. Code § 1786.16(a)(2)(B); (4) failure to make a

proper disclosure, in violation of California's Consumer Credit Reporting Agencies Act, Cal. Civ. Code § 1785.20.5(a); (5) failure to provide meal periods or compensation in lieu thereof, in violation of Cal. Labor Code §§ 226.7, 512, and 1198, and California Industrial Welfare Commission Wage Order 5-2001 ("Wage Order 5"); (6) failure to provide rest periods or compensation in lieu thereof, in violation of Cal. Labor Code §§ 226.7 and 1198, and Wage Order 5; (7) failure to pay earned wages, including overtimes wages, in violation of Cal. Labor Code §§ 204, 223, 510, 1194, 1197, and 1198, and Wage Order 5; (8) failure to reimburse for necessary gas and mileage expenditures, in violation of Cal. Labor Code § 2802(a); (9) failure to provide accurate itemized wage statements, in violation of Cal. Labor Code § 226; (10) failure to pay separation wages, in violation of Cal. Labor Code §§ 201–203; (11) violations of California's unfair competition law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq.; and (12) entitlement to civil penalties under California's Private Attorney General Act ("PAGA"), Cal. Lab. Code § 2698 et seq.

After conducting some discovery, the parties participated in mediation and reached a proposed agreement for a class-wide settlement. Doc. No. 29.  Lusk next moved for preliminarily approval of the proposed settlement and conditional certification of the putative class for settlement purposes only.  Doc. No. 36.  The Court denied Lusk's "first motion," concluding that he had failed to demonstrate that the proposed settlement was fair and warranted class treatment. Doc. No. 43.  Thereafter, Lusk again moved the Court for preliminary approval and conditional certification.  Doc. No. 52.  The Court denied Lusk's "second motion," explaining that his motion described the terms of the proposed settlement and class notice in ways that conflicted with the terms in the proposed settlement and class notice that were attached as its exhibits.  Doc. No. 55 at 8–9.  Lusk has now moved for preliminary approval and conditional certification for a third time. Doc. No. 61 ("Motion").[1]  With his "third motion," Lusk submits a supporting declaration from counsel, which itself comes with attached copies of the recently revised class settlement, class

---

[1] In this order, citations to specific page numbers of Document No. 61 will refer to the pdf pagination of that document, and not the pagination used in the motion itself.

1  notice, and class member claim form proposals.  Doc. No. 62-1.[2]

2

3                              **LEGAL STANDARD**

4          Federal Rule of Civil Procedure 23(e) requires judicial review and approval of any class

5  settlement.  This process generally involves three stages.  In the first, the parties move for

6  "preliminary approval" of the proposed settlement and, if necessary, "conditional certification" of

7  the class.  4 William B. Rubenstein, Newberg on Class Actions § 13:16 (5th ed.).  If the court

8  grants this threshold relief, the second and third stages require (1) the provision of notice to the

9  class members, along with an opportunity for them to object to or opt out of the proposed

10  settlement, and (2) a "final approval" determination (and actual class certification, if necessary)

11  following a fairness hearing.  Id.

12          To secure preliminary approval and condition certification, the parties must provide

13  sufficient information for the court to determine that it "will likely be able to" grant final approval

14  of the settlement under Rule 23(e)(2) and certify the class for a judgment on the settlement.  Fed.

15  R. Civ. P. 23(e)(1)(B).  As to the first determination, Rule 23(e)(2) states that a binding class

16  settlement may be approved only on finding that it is "fair, reasonable, and adequate."  Fed. R.

17  Civ. P. 23(e)(2).  As to the second determination, a class may be certified if it meets the four

18  prerequisites under Rule 23(a) and at least one of the three categories of class actions under Rule

19  23(b).  Fed. R. Civ. P. 23(a)–(b).

20          The court's role in the class settlement process is an important one, as "the parties that are

21  present and settling the case—class counsel, the class representatives, and the defendants—are

22  proposing to compromise the rights of absent class members."  Newberg on Class Actions

23  § 13:40.  To ensure the interests of the absent class members are properly safeguarded, the "judge

24  must adopt the role of a skeptical client and critically examine the class certification elements, the

25  proposed settlement terms, and procedures for implementation."  Id. (quoting Manual for Complex

26

27  _____

28  [2] These separate documents are all found at the same docket number.  Doc. No. 62-1 at 1–21 ("Setarah Decl."); 23–45
   ("Proposed Settlement"); 47–52 ("Settlement Notice"); and 54–55 ("Claim Form").  Where applicable, this order will
   refer to the specific paragraph numbering used in counsel's declaration and the proposed settlement.

1  Litigation § 21.61 (4th ed.)).

2

3  **<u>DISCUSSION</u>**

4      The Court will deny Lusk's latest motion because Lusk has not provided sufficient

5  information showing that the proposed settlement is likely to be approved as "fair, reasonable, and

6  adequate" upon certification of the class under Rule 23.  The Court will deny the motion without

7  prejudice, and address its continuing concerns in detail such that Lusk may account for these

8  matters in a subsequent motion for preliminary approval and conditional certification.

9

10      **A.**    **Preliminary Approval**

11      As noted above, at the preliminary approval stage, the court need only determine that the

12  proposed settlement is "likely" to be finally approved under Rule 23(e)(2).  Rule 23(e)(2) itself

13  provides that a court may approve a class-binding settlement only on finding that the settlement is

14  "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  Before making such a finding, courts

15  must consider whether:  (1) the class representative and counsel have adequately represented the

16  class; (2) the proposal was negotiated at arm's length; (3) the relief provided for the class is

17  adequate in light of the costs, risks, and delay of trial and appeal; the effectiveness of any

18  proposed method of distributing relief to the class, including the method of processing class-

19  member claims; the terms of any proposed award of attorney's fees, including timing of payment;

20  and any agreement made in connection with the proposal; and (4) the proposal treats class

21  members equitably relative to each other.  <u>Id.</u>; <u>see also</u> <u>In re Bluetooth Headset Prods. Liab. Litig.</u>,

22  654 F.3d 935, 946 (9th Cir. 2011) (quoted source omitted) (enumerating additional non-exhaustive

23  factors that are to be considered for purposes of granting final approval of a class settlement).

24      While Rule 23(e) does not mandate that courts consider these same factors for purposes of

25  determining whether preliminary approval is warranted, doing so often proves useful given the

26  role these factors play in final approval determinations.  The court may also consider any other

27  topic that it regards as pertinent to determining whether the proposed settlement is fair, reasonable,

28  and adequate.  <u>See</u> Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment.

Naturally, the showing of fairness of a proposal will vary from case to case.  Bluetooth Headset Prods. Liab. Litig., 654 F.3d at 946.  Where a settlement has been negotiated before certification, however, there exists "an even greater potential for a breach of fiduciary duty owed the class during settlement," which means "such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair."  Id.

## 1.      Adequacy of Class Relief

The relief obtained by the class is often described as the most important part of a class settlement.  Carlin v. DairyAmerica, Inc., 380 F. Supp. 3d 998, 1011 (E.D. Cal. 2019).  To determine whether proposed relief is fair and reasonable, the court compares the amount that will be recovered with the estimated value of the class claims if they were to be successfully litigated. Id. (cited source omitted).  As part of this comparison, the court must gauge the relative strength of the plaintiff's case as "[e]ven a fractional recovery of the possible maximum recovery amount may be fair and adequate in light of the uncertainties of trial and difficulties in proving the case." Millan v. Cascade Water Servs., Inc., 310 F.R.D. 593, 611 (E.D. Cal. 2015) (collecting cases approving settlements that were assumed to be fractions of the maximum potential recovery); see also In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 459 (9th Cir. 2000) ("It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." (quoted source omitted)).

Turning to the matter at hand, the proposed class settlement indicates that Defendants will pay $1,200,000 to a settlement class of approximately 2,206 persons who worked as hourly, non-exempt employees of Defendants at any time between August 22, 2013, and the date that preliminary approval is granted.  Proposed Settlement, ¶¶ 4, 5, 13, 24.  In exchange for their payment of this "gross settlement amount," Defendants will be fully released from liability for all claims in this lawsuit and any other claims that have been or could have been raised based on the allegations of this action (excluding those claims of class members who properly "opt out").  Id., ¶¶ 18, 19.  From the gross settlement amount, Lusk will receive up to $15,000 and his counsel will

receive up to $300,000 for fees and $20,000 for costs as compensation for their prosecution of this lawsuit.  Id., ¶¶ 14(a)–(c).  The gross settlement amount will also provide the third-party claims administrator with up to $30,000 for fees and expenses, and cover a payment of $100,000 in civil penalties under PAGA, of which $75,000 will be awarded to the State of California (with the remaining $25,000 reserved for the class).  Id., ¶ 14(d)–(e).  With these amounts deducted, the putative class will be entitled to the remainder of the gross settlement amount, also referred to as the "net settlement amount."  Id., ¶¶ 14, 15.  As Lusk represents in his motion, simple math using the figures above allocates approximately $760,000 for class member distribution or an average gross recovery of $344.51 per class member.  Motion at 10.[3]

As to an estimated value of the class claims, Lusk posits in his motion that, based on a review of payroll and timekeeping data provided by Defendants, the class would recover approximately $15,724,423.74 if he were to prevail on all of the claims.  Motion at 19.  Lusk separates this figure into the following claim-specific amounts:

- $896,979.96 (excluding interest) for the meal period claim
- $1,961,913.96 (excluding interest) for the rest period claim
- $1,478,619.90 (excluding interest) for the unpaid wages claim
- $295,617.12 (excluding interest) for the expenditure reimbursement claim
- $1,213,000.00 for the wage statement claim
- $3,376,792.80 for the separation wages claim
- $6,501,500.00 in civil penalties for the PAGA claim

Motion at 18–19.

Notwithstanding the maximum potential recovery, Lusk focuses on a sub-total potential recovery that excludes the PAGA amount in full:  that is, $9,222,923.74.  Lusk contends that the gross settlement amount ($1,200,000) will be an "excellent result" compared to other approved settlements within the Ninth Circuit, as it is "just a little over 13%" of this sub-total.  Motion at 19.

---

[3] According to the proposal, Defendants' share of any payroll tax attributable to class members' recovery will be paid from the gross settlement amount.  Proposed Settlement, ¶ 17.  Thus, presumably (although unnoted in Lusk's motion), the class distribution figures will be reduced based on this amount as well.

1    In denying Lusk's first motion, the Court concluded that Lusk failed to demonstrate that the

2    proposed settlement agreement offered adequate relief to the class.  As part of that problem, the Court

3    explained, Lusk had not stated how case-specific facts and evidence gave rise to particular risks

4    affecting recovery on individual class claims.  Doc. No. 43 at 10–13.  In his third motion, Lusk

5    attempts to cure this deficiency by describing certain risks related to the above-listed claims.

6    While some of these efforts are largely sufficient, the Court still has considerable qualms about

7    Lusk's analysis regarding the PAGA claim and the absence of analysis regarding other class

8    claims and theories of liability that have been pleaded and are subject to release under the

9    proposed settlement.  The Court is also concerned that Lusk's entire risk assessment is affected by

10   an unaddressed issue regarding the applicable class period.  Each of these matters will be

11   discussed in turn.

12

13                              **a.      The Labor Code Claims**

14   Lusk bases the meal period, rest period, unpaid wages, separation wages, wage statement,

15   and expenditure reimbursement claims on violations of the California Labor Code and the

16   applicable California Industrial Welfare Commission Wage Order.  Lusk asserts that each of these

17   claims is based on Defendants' unlawful policies and practices that uniformly applied to the entire

18   class.

19   In his motion, Lusk identifies specific risks associated with these separate claims as

20   follows:  For the meal period, rest period, unpaid wages, and expenditure reimbursement claims,

21   Lusk states that Defendants have maintained facially compliant written policies on the underlying

22   matters and that further prosecution of these claims will involve the weighty task of proving that,

23   notwithstanding these written policies, Defendants were violating the law by enforcing unwritten

24   policies and practices.  Also against these claims, Lusk notes that Defendants produced numerous

25   declarations, wherein putative class members asserted that alleged meal and rest period violations,

26   off-the-clock work, and unreimbursed expenses have not occurred.

27   Specific to the expenditure reimbursement claim, Lusk notes that under California law

28   employees seeking reimbursement under Labor Code § 2802 have a duty to maintain and submit

1   reimbursement requests.  See Gattuso v. Harte-Hanks Shoppers, Inc., 42 Cal. 4th 554, 568–69

2   (2007).  He contends that this obligation—which Defendants invoked in their defense during

3   mediation—presents even more risk to that claim.

4          As to risks against the wage statement and separation wages claims, Lusk points to the

5   well-established case law split regarding whether plaintiffs are able to recover under California

6   Labor Code §§ 203 and 226 on the basis of meal and rest period violations.  See Bates v. Leprino

7   Foods Co., No. 2:20-cv-0700-AWI-BAM, 2020 WL 6392562, at *3–6 (E.D. Cal. Nov. 2, 2020).

8   He also cites Defendants' possible defense against these claims based on their lack of wrongful

9   intent under the respective statutes.  See § 203(a) (violation where "an employer willfully fails to

10  pay" separation wages); § 226(e)(1) (violation with "[a]n employee suffering injury as a result of a

11  knowing and intentional failure by an employer" to provide wage statements).  While unstated in

12  his motion, Lusk can seemingly attribute additional risk to the wage statement and separation

13  wages claims in so far as they are derivative of the risks associated with the meal period, rest

14  period, and unpaid wages claims (as addressed above).

15         The Court credits Lusk's accounting of these specific risks in his latest motion.

16

17                          **b.      The PAGA Claim**

18         As pleaded, the PAGA claim is derivative of all the Labor Code claims.  Under PAGA,

19  aggrieved employees are able to bring private actions on behalf of themselves and other

20  employees to recover civil penalties for Labor Code violations that were previously recoverable

21  only by the California Labor and Workforce Development Agency ("LWDA").  Cal. Labor Code

22  § 2698 et seq.; Iskanian v. CLS Transp. L.A., LLC, 59 Cal. 4th 348, 379–80 (2014) (citing Arias

23  v. Superior Court, 46 Cal. 4th 969 (2009)).  Where civil penalties are recovered under PAGA, 75

24  percent of the recovery goes to the LWDA, and the remaining 25 percent goes to the aggrieved

25  employees.  Cal. Labor Code § 2699(i).  Civil penalties under PAGA are separate and distinct

26  from statutory penalties provided under other sections of the Labor Code, meaning an employee

27  may recover both PAGA penalties and statutory penalties for Labor Code violations.  Iskanian, 59

28  Cal. 4th at 381.

8

The proposed settlement allocates $100,000 of the gross settlement amount to PAGA recovery:  $75,000 goes to the LWDA and $25,000 is allocated to the net settlement amount for class recovery.[4]  These figures stand in stark contrast to the maximum potential PAGA recovery that Lusk estimates in his motion:  that is, $6,501,500.  The Court questions this figure itself, as well as the substantial difference between the estimate and the $100,000 figure that the proposal actually includes.

Turning first to the estimate, Lusk indicates that he calculated a maximum potential recovery of $6,501,500 by adding the potential recovery of $2,600,600 in civil penalties under Labor Code § 2699(f)(2) for both meal period and rest period violations and $1,300,300 in civil penalties under Labor Code § 558(a) for unpaid wages violations.  Motion 19.  The underlying math is less than crystal clear, but Lusk seems to suggest that these separate figures are each based on 510 first violations and 13,258 subsequent violations.  The unpaid wages figure is half of the meal and rest period figures because civil penalties under § 558(a) are punished through $50 and $100 payments for initial and subsequent violations whereas the default civil penalty scheme under § 2699(f)(2) imposes $100 and $200 punishments.  Granting these figures, Lusk's estimate does not incorporate other civil penalties that he sought through the PAGA claim in his first-amended complaint.  This includes civil penalties based on violations of Labor Code §§ 201, 202, and 203 (payment of separation wages); § 204 (payment for all hours worked); § 212 (compliance requirements for issuing wages); § 223 (payment of wages based on a designated wage scale); § 226 (provision of wage statements); §§ 1194 and 1197 (payment of minimum wages); § 1198 (maximum hours of work); and § 2802 (expenditure reimbursement).  FAC, ¶ 192.  Not only have all these allegations been made, they are also set to be released according to the terms of the proposed settlement (in addition to any other claims under these provisions that could have been

---

[4] While the LWDA is not a party to this action, the Labor Code directs that a "proposed settlement shall be submitted to the [LWDA] at the same time that it is submitted to the court." Cal. Labor Code § 2699(*l*)(2).  Lusk represents that the proposed settlement was submitted to the LWDA on May 15, 2020.  Setareh Decl., ¶ 35, Ex. 2.  He does not confirm whether LWDA has responded in any fashion.  See Haralson v. U.S. Aviation Servs. Corp., 383 F. Supp. 3d 959, 971 (N.D. Cal. 2019) (suggesting that the notice provision exists to allow for comment from the LWDA).  The Court also notices that the submission to the LWDA seems to have been completed before the proposed settlement was revised, although the parties' joint revisions do not appear to have directly implicated the PAGA claim.  But see Maciel v. Bar 20 Dairy, LLC, No. 1:17-cv-00902-DAD-SKO, 2020 WL 5095885, at *21 (E.D. Cal. Aug. 28, 2020) (ordering the parties to submit a revised settlement to LWDA for comment).

raised based on the allegations of this action). Proposed Settlement, ¶ 18. The Court suspects that the unaddressed allegations have some value and should have been included in Lusk's risk assessment. And if that is not the case and these allegations have no value whatsoever, Lusk must explain to the Court why these specifically pleaded allegations are entirely valueless and why it is fair and reasonable for the class members to release all claims of this kind for nothing in return.

The Court's concerns with Lusk's PAGA analysis do not end there. Even assuming that $6,501,500 represents the maximum potential recovery on the PAGA claim, Lusk has not sufficiently shown how this number was reduced to a mere fraction of that amount ($100,000 or 1.5% of the estimate) based on the facts and circumstances of this case. Lusk seems convinced that the PAGA claim "is not likely to bear fruit in this case" because trial courts have discretion to decrease unjust and oppressive PAGA awards under Labor Code § 2699(e)(2). For support, he points the Court to the decision in Cotter v. Lyft, Inc., 176 F. Supp. 3d 930 (N.D. Cal. 2016). Cotter, to put it simply, does not offer him help. In fact, in Cotter, the Northern District denied preliminary approval in part because the plaintiffs' PAGA analysis was full of arbitrary assumptions and calculations, including an unexplained shrinking of a maximum PAGA estimate of $5,430,000 million to $122,250 in the proposed settlement. Id. at 939–41. While the court acknowledged its discretionary authority under § 2699(e)(2), it rejected the plaintiffs' theory that this statute compelled a certain reduction of PAGA penalties on the basis of an unrelated state court decision and instead emphasized that any application of that discretion would necessarily depend on the facts and circumstances of the specific case at hand. Id.; see also Haralson v. U.S. Aviation Servs. Corp., 383 F. Supp. 3d 959, 971–74 (N.D. Cal. 2019) (examining ways in which courts have evaluated whether fractional recovery on a PAGA claim is reasonable).

Like in Cotter, and as noted above, this Court has concerns about Lusk's calculation of the PAGA claim's potential value. The Court also has concerns regarding how only a tiny fraction of that potentially undervalued estimate (1.5%) and the gross settlement amount (8.33%) ended up in the proposed settlement. The Court has discretionary authority to reduce PAGA awards under § 2699(e)(2). If that authority is going to be so dramatically relied upon, however, Lusk must make at least a preliminary showing that such a reduction would be warranted in light of the facts

1  and circumstances of this particular case.  With nothing more than generic references to

2  Defendants' line of business being one of low margins, Lusk has not done that here.

3

4                          **c.      The Credit Reporting Claims**

5          Lusk has raised four credit reporting claims under federal and California law.  Broadly,

6  these claims are based on allegations that Defendants obtained credit reports as part of employee

7  background checks and then failed to disclose to employees that the credit reports were obtained.

8          In denying Lusk's first motion, the Court explained that Lusk had failed to address these

9  claims within his risk assessment, despite the fact that Lusk was asking the Court to certify the

10  claims and that the proposed settlement, if it was finally approved, would release Defendants from

11  further liability on the claims.  Doc. No. 43 at 13.  In his latest motion, Lusk states that Defendants

12  provided verified discovery responses indicating that they did not perform background checks on

13  any applicants or employees, which in turn threatens to negate the entire theory of liability for

14  these claims as class members would not be able to prove the alleged injury.  While he describes

15  this particular risk, Lusk once again entirely omits these claims from his risk assessment.  Lusk

16  does not clearly explain their absence.  One interpretation is that this is a mistake, in which case

17  the Court's previous concerns regarding Lusk's full examination and explanation of these claims

18  remains.  Another interpretation is that Lusk believes these claims are worthless and that their

19  absence from the assessment is intentional.  The Court finds problems with this reading as well.

20          Under the proposed settlement, class members will release any claims based on the federal

21  Fair Credit Reporting Act, the California Investigative Consumer Reporting Agencies Act, and the

22  California Consumer Credit Reporting Agencies Act that could have been raised under the

23  allegations of this action.  Proposed Settlement, ¶ 18.[5]  In other words, if the credit reporting

24  claims are indeed unequivocally meritless such that their non-inclusion in the potential recovery

25  estimate is appropriate and class members' settlement shares are not considered in any way

26  _____

27  [5] The proposed Settlement Notice and Claim Form do not reference the Fair Credit Reporting Act, Investigative
Consumer Reporting Agencies Act, or Consumer Credit Reporting Agencies Act amongst the extended list of released

28  claims.  See Doc. No. 62-1 at 49 and 55.  These provisions should be expressly cited in these documents, just as they
are in the proposed settlement's release paragraph.  See Proposed Settlement, ¶ 18.

attributable to these claims, the proposed settlement creates a one-sided bargain.  That is, for nothing of value in return, the class members are asked to grant a release that stretches far beyond the four credit reporting claims that have actually been raised in this action.  Without any explanation from Lusk, this outcome seems unfair, unreasonable, and inadequate.

### d.       The UCL Claim

As with the credit reporting claims, the Court explained in denying Lusk's first motion that Lusk had not addressed the exposure and recovery risks related to the UCL claim.  Doc. No. 43 at 13.  Lusk does not cure this deficiency in his latest motion.  He has not provided an estimate for the maximum potential recovery on this claim, nor has he provided an explanation regarding the possible risks that run against that claim.  As things stand, Lusk's risk assessment treats the UCL claim as having no value.  That may be the case.  But if it is, Lusk needs to inform the Court as to why this claim is entirely without merit.  And once again, the proposed settlement states that all claims that could have been raised under the UCL based on the allegations of this action will be released.  Proposed Settlement, ¶ 18.  Lusk must explain how such a broad release for nothing in return warrants the Court's approval.

### e.       The Meal and Rest Period Claims

As discussed above, Lusk provides both potential recovery estimates and possible risks regarding the meal and rest period claims.  While crediting these efforts, the Court still finds deficiencies with how Lusk has accounted for these claims in his latest motion compared to how the claims were pleaded in his first-amended complaint.

As to the meal period claim, in his motion, Lusk calculates a potential recovery ($896,979.96) by multiplying the number of shifts greater than six hours (81,028) by the average hourly rate ($11.07).  Motion at 19.  In line with this calculation, Lusk has sought recovery for meal period violations based on Defendants' failure to provide meal periods for each five-hour work period, as required under Labor Code § 512(a) and Wage Order 5, § 11(A).  FAC, ¶¶ 102–103.  Yet, in his first-amended complaint, Lusk also alleges that Defendants are liable for failing

12

to provide class members who worked shifts of ten or more hours with a second meal period (or compensation in lieu thereof), as required under the same laws.  FAC, ¶¶ 105–106.  These allegations are not clearly addressed (if they are addressed at all) in Lusk's potential recovery estimate and risk assessment.

Lusk's treatment of the rest period claim contains a similar problem.  In his motion, Lusk calculates a potential recovery for this claim ($1,961,913.96) by multiplying the number of shifts greater than three-and-a-half hours (177,228) by the average hourly rate ($11.07).  Motion at 19.  In his first-amended complaint, however, Lusk alleges that Defendants failed to provide class members with rest periods for each work period of four hours or major fraction thereof, as required under Wage Order 5, § 12(A).  FAC, ¶ 116.  It is unclear from Lusk's description of the potential recovery estimate whether shifts where employees were entitled to more than one rest period—i.e., shifts longer than six hours—were counted as multiple violations, such that the estimate is consistent with the allegations underlying this claim.

Given that these theories of liability have been raised, they are covered by a proposed settlement that seeks to resolve all of Lusk's outstanding claims.  Proposed Settlement, ¶ 18.  This in turn means that these claims should have been addressed in Lusk's motion.  The Court is unable to determine whether the proposed settlement is fair, reasonable, and adequate without information on the value of the theories and their associated risks.

### f.    The Unpaid Wages Claim

Lusk's assessment of the unpaid wages claim suffers from the same deficiency as his assessment of the meal and rest period claims.  As set forth in the first-amended complaint, the unpaid wages claim is based in part on Defendants' alleged failure to pay class members overtime wages under Labor Code § 510(a) and Wage Order 5, § 3(A).  See FAC, ¶¶ 132–133, 135–137.  These statutory provisions require employers to pay overtime wages at a rate of one and one-half times an employee's regular rate of pay.  See Cal. Labor Code § 510(a); Cal. Code Regs. tit. 8, § 11050(3)(A).  Lusk acknowledges this theory of liability in his motion.  He refers to his unpaid wages claim as based on "alleged unpaid straight time and overtime wages," and asserts that

13

1  "whether Defendants failed to pay all overtime wages due and payable to former employees within

2  the times specified under the California Labor Code" is amongst the common issues that

3  predominate over individual issues in this action.  Motion at 20, 30.  Moreover, the proposed

4  settlement mentions overtime wages in significant ways:  it states that Defendants' failure to pay

5  overtime wages at the correct overtime rates is both a claim in this action and a claim that will be

6  released if the settlement is granted final approval by the Court.  Proposed Settlement, ¶¶ A, 18.

7  The proposed class notice and claim form similarly state that "all claims for unpaid wages,

8  including without limitation overtime wages" held by class members will be fully and completely

9  released upon entry of a final approval order.  Doc. 61-2 at 49, 55.  Despite all of these references,

10  Lusk does not address the potential recovery or risks attendant to an overtime wages claim in his

11  motion.  Rather, he calculates a potential recovery on the unpaid wages claim ($1,478,619.90) by

12  multiplying the total number of unpaid wages violations (267,140) by the time spent working off

13  the clock (.5 hours) by the average hourly rate ($11.07).  Motion at 18.

14      Like with the other insufficiently addressed claims and theories of liability discussed

15  above, Lusk's failure to assess the value of the overtime wages allegations leaves the Court to

16  assume that those allegations are without value.  If that is indeed the case, Lusk needs to inform

17  the Court why that is so.  He also needs to explain how class members' gratuitous release of any

18  and all overtime wages claims that have arisen during the class period constitutes a fair,

19  reasonable, and adequate deal.

20

21          **g.      The Class Period**

22      In addition to the claim-specific problems addressed above, the Court is concerned that an

23  unaddressed issue with the applicable class period affects Lusk's entire claims valuation and risk

24  assessment analysis.  The proposed settlement defines the class period as "the period of time from

25  August 22, 2013 through the date of Preliminary Approval of the Settlement."  Proposed

26  Settlement, ¶ 4.  In other words, the class period has remained open since the parties reached their

27  agreement on October 12, 2018.  Since that date, Lusk has moved for preliminary approval on

28  three occasions.  In his latest motion, Lusk provides potential recovery estimates that are very

14

close, if not identical, to the estimates he provided in his first motion, which was filed on April 1, 2019.  Compare Motion at 18–19 with Doc. No. 36 at 20.  For example, in his first motion, Lusk estimated that the potential recovery on the meal period claim was $872,470.21; in his third motion, Lusk estimates that this claim is worth $896,979.96.  Both motions estimate the potential recovery on the wage statement claim is $1,213,000.

Lusk has not explained whether the most recent estimates account for the nearly two years that have elapsed since estimates were first provided.  Comparing the two motions suggests otherwise, which portends a significant undervaluing of the class claims.  For instance, if the wage statement estimate is calculated by multiplying the total number of pay periods during the entire class period by $50 and $100 for first and subsequent violations, as Lusk purports in his latest motion, it seems obvious that the value of that claim should have greatly increased between April 2019 and March 2021 as pay periods continued to occur.  The same can be said for the rest of the estimates that Lusk has (or should have) provided.  See Cotter, 176 F. Supp. 3d at 940 (explaining that counsel had drastically undervalued a claim because outdated information with an open class period was used).

Beyond simply undervaluing the claims, the open class period also subjects to release all claims that could have been raised based on the underlying allegations that have accrued since April 1, 2019.  Problems exist if these claims are not given any value.  As an example, pretend a putative class member had wage statement claims accrue in February and March 2021.  If the class member does not opt out and recovers under the proposed settlement, she will be unable to pursue those wage statement claims, as they presumably constitute claims that "have been, or that could have been, asserted against [Defendants], whether or not presented, based on the primary rights or the facts alleged at any point in time in this Action."  Proposed Settlement, ¶ 18.  Yet, according to Lusk's motions, no part of the class member's recovery under the proposed settlement will be attributable to those specific wage statement claims as the value of wage statement class claim has not changed since April 1, 2019.  Like with the faults discussed above, the Court remains unconvinced that the proposed settlement offers a fair and reasonable result to the extent it both fails to compensate for certain recovery and releases claims that could have been raised to secure

1   that recovery.

2

3                           **h.     Class Relief Conclusion**

4          As noted above, in his motion, Lusk asserts that the gross settlement amount represents an

5   "excellent result" because it equals approximately 13% of the maximum potential recovery.  In

6   light of the foregoing issues, the Court currently finds this assertion incorrect, if not wholly

7   misleading.  The claim of 13% is based on the gross settlement amount ($1,200,000) and a sub-

8   total potential recovery ($9,222,923.74) that excludes potential recovery on the PAGA, credit

9   reporting, and UCL claims, as well as the meal period, rest period, and unpaid wages theories of

10  liability that were pleaded but not addressed in Lusk's motion.  It also does not incorporate the

11  fact that the class period has remained open since the parties reached an agreement in October

12  2018, which seemingly should increase potential recovery figures across the board.  But even if all

13  these omissions are excused, adding only Lusk's (potentially undervalued) PAGA estimate to the

14  sub-total potential recovery ($15,724,423.74), drops the recovery percentage to 7.6%.  This

15  percentage drops even further to 4.8% if the amount actually expected to be distributed to the class

16  ($760,000) is used instead of the gross settlement amount.  Again, this figure does not include any

17  of the claims that Lusk has not addressed.  Although a return of this kind is not per se

18  unreasonable, the exclusions, oversights, and rather arbitrary calculations that populate Lusk's risk

19  assessment pose a significant problem for securing preliminary approval at this time.

20

21                        **2.     Equitable Treatment of Class Members**

22         Rule 23(e) requires examination of whether a proposed settlement "treats class members

23  equitably relative to each other."  Fed. R. Civ. P. 23(e)(2)(D).  To consider this factor, the court

24  assesses whether the proposed settlement "improperly grant[s] preferential treatment to class

25  representatives or segments of the class."  Taafua v. Quantum Glob. Techs., LLC, No. 18-cv-

26  06602-VKD, 2021 WL 579862, at *7 (N.D. Cal. Feb. 16, 2021) (quoted source omitted).  "Matters

27  of concern could include whether the apportionment of relief among class members takes

28  appropriate account of differences among their claims, and whether the scope of the release may

affect class members in different ways that bear on the apportionment of relief."  Fed. R. Civ. P. 23(e)(2)(D) advisory committee's note to 2018 amendment.

Under the proposed settlement, class members' actual recovery will be based on the number of weeks they worked for Defendants during the class period.  A given class member's settlement share is calculated by dividing this number by the total of all class members' work weeks, and then multiplying that quotient by the net settlement amount.  Proposed Settlement, ¶ 15(b).  Thus, the proposed distribution scheme treats class members equally in one primary sense.  What may be equal might not be equitable, however, as the scheme seemingly does not account for apparent distinctions amongst the class members based on the class claims.

Take, for instance, the separation wages claim that Lusk estimates is worth $3,376,792.80, an amount greater than any other addressed claim aside from the (potentially underestimated and severely discounted) PAGA claim.  According to his motion, Lusk bases this estimate on a "termination count" of 1,271.  In other words, more than 40% of the approximately 2,206 putative class members did not have a termination event during the class period that would entitle them to recovery under Labor Code § 203.  Lusk recognized as much in his first-amended complaint, wherein he alleged that a subclass would be needed for class members who are entitled to separation wages.  FAC, ¶¶ 20, 159, 167.  Similar questions can be raised regarding the meal period, rest period, and expenditure reimbursement claims, for which class members who worked longer shifts or used their personal vehicles for work-related activities could have disproportionately endured the statutory violations for which the settlement purportedly compensates.  Again, Lusk recognized these claims (among others) were deserving of subclasses in the first-amended complaint.  FAC, ¶¶ 20, 95, 108, 111, 119, 140, 143.

Acknowledging all of these class member distinctions would obviously require a distribution scheme more complicated than the one included in the proposed settlement.  This drawback notwithstanding, such complication may be necessary to ensure class members are treated equitably.  If that is not the case, then Lusk must at least explain to the Court how it is that equitable treatment will still be provided despite the clear distinctions.

1

      **3.**      **Adequate Representation**

2

      **a.**      **Class Counsel**

3       In denying Lusk's first motion, the Court was not persuaded by Lusk's efforts to

4 demonstrate that a proposed attorney's fee award of $400,000, or 33.3% of the gross settlement

5 amount, was warranted.  Doc. No. 43 at 14–17.  This, the Court explained, was a significant

6 upward adjustment from the 25% benchmark that the Ninth Circuit has established for cases where

7 attorney's fees are to be determined based on a percentage of a large fund created by a settlement

8 or award for class distribution.  See In re Online DVD-Rental Antitrust Litig., 779 F.3d 934, 949

9 (9th Cir. 2015); Hanlon v. Chrysler Corp., 105 F.3d 1011, 1029 (9th Cir. 1998).  Factors courts

10 may consider when assessing a requested percentage include:

11

12

13

14

> the extent to which class counsel achieved exceptional results for the class, whether the case was risky for class counsel, whether counsel's performance generated benefits beyond the cash settlement fund, the market rate for the particular field of law (in some circumstances), the burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work), and whether the case was handled on a contingency basis.

15 Online DVD-Rental Antitrust Litig., 779 F.3d at 954–55 (internal quotation marks omitted).

16 When considering preliminary approval of a proposed settlement, the court should assess the

17 reasonableness of the attorney's fee award because "an inordinate fee may be the sign that counsel

18 sold out the class's claims at a low value in return for the high fee."  Newberg on Class Actions

19 § 13:54.  "A defendant's willingness to pay high fees may also indicate that the relief in the

20 settlement undervalues the class's claims, because otherwise it would not be in the defendant's

21 interest to pay that much."  Id.

22       Lusk explains that the parties have since revised the proposed settlement such that counsel

23 is set to receive an award of $300,000, which represents 25% of the gross settlement amount.

24 Motion at 8.  As this matches the benchmark that the Ninth Circuit recognizes, the Court's

25 previously raised concern has been alleviated.  Even so, the Court takes note that an amount of

26 attorney's fees may still be adjusted upwards or downwards from the 25% benchmark if the record

27 shows "'special circumstances' justifying a departure."  Bluetooth Headset Prods. Liab. Litig., 654

28 F.3d at 942 (quoted source omitted); see also Powers v. Eichen, 229 F.3d 1249, 1256–57 (9th Cir.

1   2000) (stating that an explanation in the record is necessary for departure from the benchmark).

2

3                               **b.      Class Representative**

4          Discretionary incentive awards to class representatives are fairly typical in class actions.

5   Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 958 (9th Cir. 2009).  These awards are meant to

6   "compensate class representatives for work done on behalf of the class, to make up for financial or

7   reputational risk undertaking in bringing the action, and, sometimes, to recognize their willingness

8   to act as a private attorney general."  Id. at 958–59.  To justify any proposed incentive award, the

9   class representative shall present evidence demonstrating the quality of his or her representation

10  and be prepared to rationalize any discrepancy between an incentive award and the settlement

11  shares of the unnamed class members.  Alberto v. GMRI, Inc., 252 F.R.D. 652, 669 (E.D. Cal.

12  2008).  The court, in turn, must assess whether an incentive payment is excessive by balancing the

13  size of any award compared to the settlement amount and the size of each payment; the court may

14  also consider "the actions the plaintiff has taken to protect the interests of the class, the degree to

15  which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff

16  expended in pursuing the litigation . . . and reasonable fear[s of] workplace retaliation."  Staton v.

17  Boeing Co., 327 F.3d 938, 977 (9th Cir. 2003).  While they may be commonly granted, district

18  courts must vigilantly scrutinize all incentive awards, as unreasonable incentive awards undermine

19  a "critical check on the fairness of the settlement for the class as a whole" because class

20  representatives could become "more concerned with maximizing those incentives than with

21  judging the adequacy of the settlement as it applies to class members at large."  Id.; see also

22  Radcliffe v. Experian Info. Sols., Inc., 715 F.3d 1157, 1165 (9th Cir. 2013).

23         The proposed settlement provides for a maximum class representative payment of $15,000.

24  Proposed Settlement, ¶ 14(c).  The payment represents 1.25% of the gross settlement amount and

25  almost 2% of the net settlement amount.  Through counsel's declaration, Lusk emphasizes his

26  willingness to serve as a class representative as shown by his participation in this lawsuit.  Setareh

27  Decl., ¶ 32.  He also has sat for a deposition.  Id., ¶ 7.

28         The Court finds this incentive award suffices for preliminary approval purposes.  While it

                                                    19

cannot fully evaluate whether the claimed amount is excessive as it does not yet know exactly how much work Lusk has had to do, the Court will always be able to review the evidence Lusk presents before granting final approval.  The Court impresses upon Lusk that if this matter should reach that stage, presentation of that evidence remains his burden.

### B.      Conditional Certification

Rule 23 of the Federal Rules of Civil Procedure imposes a two-step test for deciding whether a class may be certified.  Under the first step, the court determines whether the moving party has established four perquisites:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)–(4).  If the prerequisites of Rule 23(a) are met, the court considers whether the proposed class action meets at least one of the three provisions of Rule 23(b).  Fed. R. Civ. P. 23(b).  Lusk seeks certification under Rule 23(b)(3), which states that a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

While the same standards under Rule 23(a) and (b) are used for both litigation and settlement classes, courts apply the certification criteria slightly differently in each situation.  In re Hyundai & Kia Fuel Econ. Litig., 926 F.3d 539, 556 (9th Cir. 2019).  Certification of a litigation class requires consideration of trial manageability, a concern that is not present for certification of a settlement class.  Id.  Meanwhile, settlement classes demand "heightened attention to the definition of the class or subclasses," as "a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold."  Id. at 557 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997)).  "[T]he aspects of Rule 23(a) and (b) that are important to certifying a settlement class are 'those

1   designed to protect absentees by blocking unwarranted or overbroad class definitions.  The focus

2   is on whether a proposed class has sufficient unity so that absent members can fairly be bound by

3   decisions of class representatives.'"  Id. at 558 (quoting Amchem Prods., 521 U.S. at 621).

4          According to the proposed settlement, Defendants stipulate that the certification

5   requirements have been met for the purpose of settling this case.  Proposed Settlement, ¶ 21.  The

6   proposed settlement also provides that Defendants reserve the right to contest certification if the

7   Court does not approve the proposal for any reason.  Id.  The conditionally certified class is to be

8   defined as follows:

9          All persons who have been employed in California by Defendants as hourly-paid or
       "nonexempt" employees, whether directly or through an employment agency or a
10       professional services organization, at any time during the period from August 22,
       2013 through the date that the Court grants Preliminary Approval of the Settlement.
11

12   Id.

13          Based on the collective representations in Lusk's motion, the Court finds that conditional

14   certification will likely be appropriate assuming a proposed settlement can secure preliminary

15   approval.  As discussed above, the Court remains concerned with the lack of subclass treatment

16   for certain class claims.  This concern applies in the certification context as well.  But otherwise,

17   Lusk has generally made a prima facie case that the class should be certified for settlement

18   purposes.  Despite this, a question remains regarding the Court's ability to actually certify the

19   class following a final fairness hearing based on the record.

20          In denying Lusk's first motion, the Court explained that Lusk had not shown whether a

21   sufficient amount of discovery had been conducted before an agreement was reached.  Doc. No.

22   43 at 13–14.  The Court wondered whether a lack of discovery translated to Lusk's insufficient

23   evaluation of each claim, noting as well that his failure to even address certain claims could imply

24   that those claims were not subject to any discovery.  Id. at 14.  In his latest motion, Lusk attempts

25   to ease this concern with the following description of the discovery efforts:

26          The Parties conducted significant and extensive investigation of the facts and law
       during the prosecution of this action.  This included formal written discovery by
27       both Parties and the production of the class list and almost 1,000 pages of
       documents (which included Defendants' meal period and rest break policies, along
28       with the relevant employee handbook, time punch records and wage statements), as

1   well as Plaintiff's videotaped deposition.

2   Motion at 10–11, 17; Serateh Decl., ¶ 7.  The Court finds this explanatory effort little better than

3   the last go-around, and its previous apprehension that insufficient discovery on the class claims

4   has led to insufficient evaluation of those claims lingers.

5          Moreover, aside from the representation above, Lusk only discusses discovery in his

6   motion for purposes of describing risks attendant to the class claims.  For instance, Lusk states that

7   during discovery Defendants produced sixty-nine declarations, wherein putative class members

8   averred that their time and pay records were accurate, meal and rest period violations did not

9   occur, and expenditure reimbursements were either provided or not required because personal

10  vehicles were not used for work-related activities.  Motion at 21–23.  Against these declarations,

11  Lusk offers no evidence in favor of the class claims.  Aside from his own deposition, which he

12  does not cite to, Lusk does not indicate whether any other depositions have been taken or any

13  supporting declarations have been procured.[6]  Instead, whenever evidence is needed for purposes

14  of arguing that certification is warranted, Lusk relies solely on Defendants' stipulation that the

15  requirements of Rule 23(a) and (b) are met or bald statements in counsel's declaration that assert

16  the same to be true.  But this alone does not provide a basis in the record for the Court to adopt

17  such a conclusion for itself.

18         Up to this point, Lusk has made a case that all of the class claims are based on Defendants'

19  unlawful policies and practices that uniformly applied to the entire class.  Yet, according to his

20  motion, the only evidence regarding those policies and practices (namely, Defendants'

21  declarations) appears to unanimously indicate that they do not in fact exist.  While Lusk is not

22  required to conclusively prove his case to obtain certification, he must offer some proof that the

23  allegedly unlawful policies and practices upon which he bases the class claims do in fact exist.

24  See Perez v. Leprino Foods Co., No. 1:17-cv-00686-AWI-BAM, 2021 WL 53068, at *8 (E.D. Cal.

25  Jan. 6, 2021).  And although even less is required at this early stage, Lusk must make at least some

26  showing that certification will be possible.  See Fed. R. Civ. P. 23(e)(1) advisory committee's note

27  _____

28  [6] Lusk also has not explained how the payroll and timekeeping records that he appears to have used for his potential recovery calculations provide an adequate evidentiary foundation for the class claims.

to 2018 amendment ("[T]he court cannot make the decision regarding the prospects for certification without a suitable basis in the record.").  This bar, as low as it may be, is in place for a reason.  If this matter proceeds to a final approval hearing at which time Lusk cannot show that his claims are typical of the class claims and common questions predominate over individualized inquiries, the Court will have no basis on which to certify the class.  This in turn would collapse the settlement proceedings and require all involved to return to their current position, leaving everyone with nothing more than a massive waste of time, expenses, and judicial resources.  While Lusk has provided a foundation for conditional certification through argument, Defendants' stipulation, counsel's representations, and the presence of a neutral mediator during the negotiation of the proposed settlement, he must establish that foundation has a suitable basis in the record to assure the Court the matter should proceed.

### C.   Conclusion

The Court does not take lightly the fact that in once again denying a motion for preliminary approval and condition certification, it is further forestalling potential recovery for the putative class.  Nonetheless, the Court is obligated under Rule 23 to review and scrutinize the information the parties provide before it may grant its judicial stamp of approval.  Where that stamp proves difficult to obtain because the information that must be reviewed is not sufficient, it is not the Court's prerogative to ignore this obligation or otherwise ease the burden of those bearing responsibility under the rule.

Though the Court will deny Lusk's third motion, it will do so without prejudice and grant him an opportunity to file a new motion.  This too is a measure not taken lightly, as the Court recognizes that some of its concerns in denying Lusk's first motion have remained through its resolution of Lusk's second and third motions.  If Lusk chooses to file a new motion, he shall appropriately account for each and every one of the concerns raised in this order.

///

///

///

## **ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1.     Lusk's third motion for preliminary approval and conditional certification (Doc. No. 61) is DENIED without prejudice;

2.     This case is referred back to the magistrate judge for further scheduling and management.

IT IS SO ORDERED.

Dated:   May 31, 2021                                        _____

SENIOR  DISTRICT  JUDGE