1  Shaun Setareh (SBN 204514)
     shaun@setarehlaw.com
2  William M. Pao (SBN 219846)
     william@setarehlaw.com
3  SETAREH LAW GROUP
   9665 Wilshire Boulevard, Suite 430
4  Beverly Hills, California 90212
   Telephone (310) 888-7771
5  Facsimile (310) 888-0109

6  Attorneys for Plaintiffs
   JEREMY P. LUSK
7

8                    UNITED STATES DISTRICT COURT

9                  EASTERN DISTRICT OF CALIFORNIA

10                         FRESNO DIVISION

11

12  JEREMY R. LUSK, on behalf of himself, all      Case No. 1:17-cv-00762-AWI-EPG
    others similarly situated, and the general public,
13                                                  Assigned For All Purposes to the Honorable
                  *Plaintiff*,                      Anthony W. Ishii, Courtroom 2
14
         vs.                                        **PLAINTIFF'S UNOPPOSED FOURTH**
15                                                  **AMENDED NOTICE OF MOTION AND**
                                                    **MOTION FOR PRELIMINARY APPROVAL**
16  FIVE GUYS ENTERPRISES, LLC, a Delaware          **OF CLASS ACTION SETTLEMENT AND**
    limited liability company; ENCORE FGBF,         **CERTIFICATION OF SETTLEMENT**
17  LLC, a Delaware limited liability company; and  **CLASS; MEMORANDUM OF POINTS AND**
    DOES 1 through 100, inclusive,                  **AUTHORITIES**
18
                  *Defendants*.
19                                                  Date:          August 29, 2022
                                                    Time:          1:30 p.m.
20                                                  Place:         Courtroom 2
21                                                  Action Filed:      May 2, 2017
                                                    Action Removed:    June 2, 2017
22

23

24

25

26

27

28

1  TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2      PLEASE TAKE NOTICE that on August 29, 2022 at 1:30 p.m., or as soon thereafter as the

3  matter may be heard in Courtroom 2 of the United States District Court for the Eastern District of

4  California, located at 2500 Tulare Street, Eighth Floor, Fresno, California 93721, Plaintiff JEREMY R.

5  LUSK ("Plaintiff") will and hereby does move the Court to: (1) conditionally certify a settlement class;

6  (2) preliminarily approve the parties' proposed class action settlement (the "Settlement"); (3) appoint

7  Plaintiff as the Class Representative, his counsel as the Class Counsel, and Phoenix Settlement

8  Administrators as the Settlement Administrator; (4) approve the forms of Class Notice and proposed

9  timeline for administration; and (5) schedule a hearing on the final approval of the Settlement for March

10  28, 2022 or as soon thereafter as the Court is available.

11      This Motion is made on grounds that the Settlement is fair, adequate and reasonable and within

12  the range of possible final approval.

13      This Motion is based upon this Third Amended Notice of Motion and Motion for Preliminary

14  Approval of Class Action Settlement and Certification of Settlement Class; the accompanying

15  Declaration of Shaun Setareh, all accompanying exhibits, as well as all other pleadings and papers on file

16  with this Court and such further evidence and arguments as may be presented at the hearing.

17

18  DATED: July 25, 2022                    SETAREH LAW GROUP

19

20                          By:  */s/ Shaun Setareh*
                                SHAUN SETAREH
21                              WILLIAM M. PAO
                                Attorneys for Plaintiff
22                              JEREMY R. LUSK

23

24

25

26

27

28

Case No.: 1:17-cv-00762-AWI-EPG                          *Lusk v. Five Guys Enterprises, LLC*

PLAINTIFF'S UNOPPOSED FOURTH AMENDED NOTICE OF MOTION AND MOTION FOR PRELIMINARY
APPROVAL OF CLASS ACTION SETTLEMENT

4858-9929-3738.1 / 095390-1002

TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 1

    A.    PRIOR HISTORY OF MOTIONS FOR PRELIMINARY APPROVAL ...................... 1

    B.    THE REASONS FOR DENIAL OF THE THIRD AMENDED MOTION FOR
        PRELIMINARY APPROVAL ARE ADDRESSED IN THIS FOURTH
        AMENDED MOTION ................................................................................ 1

    C.    CASE AND SETTLEMENT SUMMARY ................................................... 5

II.   BACKGROUND .................................................................................................. 6

III.  THE SETTLEMENT .............................................................................................. 8

    A.    THE SETTLEMENT CLASS ............................................................... 8

        1.    Additional Subclasses for Claims Under Labor Code Section 203 and 226 ........... 8

        2.    The Class Period Has Been Modified to End on May 24, 2019 .............................. 9

    B.    GROSS SETTLEMENT AMOUNT AND DISTRIBUTIONS ...................................... 9

    C.    SCOPE OF THE CLASS MEMBER RELEASES ...................................... 12

    D.    NOTICE PROCEDURES ............................................................... 12

    E.    PAYMENT OF SETTLEMENT AMOUNTS................................................ 14

IV.   THE SETTLEMENT MERITS PRELIMINARY APPROVAL ........................................... 14

    A.    THE SETTLEMENT WAS THE PRODUCT OF INFORMED, NON-COLLUSIVE
        NEGOTIATIONS ................................................................................ 16

    B.    THE SETTLEMENT HAS NO "OBVIOUS DEFICIENCIES" ................................... 16

    C.    THE SETTLEMENT FALLS WITHIN THE RANGE OF POSSIBLE APPROVAL.. 17

        1.    Plaintiff's Estimated Maximum Potential Recovery............................................. 17

        2.    Liability Is Contested, and the Settlement Provides Class Members with
            Substantial Monetary and Injunctive Relief ......................................................... 21

            (i)    Unpaid Wages Claims.................................................................... 21

            (ii)   Meal and Rest Period Claims........................................................ 24

            (iii)  Unreimbursed Business Expense Claims....................................... 26

(iv)  Credit Reporting Act Claims.................................................... 27

(v)   Wage Statement and Waiting Time Penalty Claims .................. 30

(vi)  Other Risks and PAGA ........................................................... 31

(vii) UCL Claim ............................................................................. 34

3.  The Class Release Is Appropriate Given Plaintiff's Claims .................... 35

4.  Class Counsel's Fees Requested Are Consistent with Prevailing Market Rates .... 36

5.  The Settlement Provides for Equitable Treatment of Class Members .............. 37

D.  CERTIFICATION OF A CLASS FOR SETTLEMENT PURPOSES ONLY IS
    APPROPRIATE ............................................................................................. 38

    1.  The Numerosity Requirement Is Met ......................................... 38

    2.  Commonality and Predominance ................................................ 38

    3.  Typicality .................................................................................... 40

    4.  Adequacy of Representation ....................................................... 41

    5.  Class Certification Is Proper Under Rule 23(b)(3) ..................... 41

E.  THE NOTICE PACKET IS FAIR AND ADEQUATE ............................... 43

F.  APPOINTMENT OF THE SETTLEMENT ADMINISTRATOR ............ 44

G.  RESIDUAL ................................................................................................. 44

H.  PROPOSED SCHEDULE ........................................................................... 45

V.  REQUEST FOR ORAL ARGUMENT ................................................................ 46

VI. CONCLUSION ..................................................................................................... 46

TABLE OF AUTHORITIES

**FEDERAL CASES**

*Achal v. Gate Gourmet, Inc.*, 114 F.Supp.3d 781 (N.D. Cal. 2015) ........................................ 36

*Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.*, 917 F.2d 1171 (9th cir. 1990) ......................... 44

*Churchill Village, LLC v. General Electric*, 361 F.3d 566 (9th Cir. 2004) ................................ 47

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) ...................................... 14, 16

*Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030 (N.D. Cal. 2016) ........................................ 34

*Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152 (9th Cir. 2001) ............... 43, 46

*Diaz v. Trust Territory of Pac. Islands,* 876 F. 2d 1401 (9th Cir. 1989) ................................ 15

*Elkins v. Equitable Life Ins. Of Iowa*, 1998 WL 133747 (M.D. Fla. 1998) ............................. 46

*Fry v. Hayt, Hayt & Landau*, 198 F.R.D. 461 (E.D. Pa. 2000) ........................................ 41, 45

*Gay v. Waiters' & Dairy Lunchmen's Union Loc. No. 30*, 489 F. Supp. 282 (N.D. Cal. 1980) ............. 41

*Gilberg v. Cal. Check Cashing Stores*, Slip op. (9th Cir. January 29, 2019) ............................. 30

*Gutilla v. Aerotek, Inc.*, 2017 WL 2729864 (E.D. Cal. Mar. 22, 2017) ................................. 34

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ................................................ 16, 42

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992) ............................................ 44

*In re Computer Memories Sec. Litig.*, 111 F.R.D. 675 (N.D. Cal. 1986) ................................. 41

*In re Corrugated Container Antitrust Litigation*, 643 F.2d 195 (5th Cir. 1981) ........................ 38

*In re General American Life Ins. Company Sales Prac. Lit.*, 357 F. 3d 800 (8th Cir. 2004) ............... 39

*In re Prudential Ins. Co. of America*, 261 F.3d 355 (3d Cir.2001) ..................................... 39

*In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078 (N.D. Cal. 2007) ............................... 17, 18

*In re Toys R Us-Del., Inc.-Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438 (C.D. Cal. 2014) ........................................................................................... 22

*Lewis v. Gross*, 663 F.Supp. 1164 (E.D.N.Y. 1986) ...................................................... 41

*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234 (9th Cir. 1998) ......................................... 22

*Luo v. Zynga Inc.*, 2014 WL 457742 (N.D. Cal. Jan. 31, 2014) .......................................... 16

*Lyons v. Bank of Am., NA*, No. C 11-1232, 2012 WL 5940846 (N.D. Cal. Nov. 27, 2012) ................. 15

1   *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268 (9th Cir. 1989)....................................39

2   *Riordan v. Smith Barney*, 113 F.R.D. 60 (N.D. Ill. 1986) ..........................................................41

3   *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990)..................39

4   *Stovall-Gusman v. W.W. Granger, Inc.*, 2015 U.S. Dist. LEXIS 78671 (N.D. Cal. 2015)......................21

5   *Strube v. American Equity Inv. Life Ins. Co.*, 226 F.R.D. 688 (M.D. Fla. 2005)......................45

6   *Tombline v. Wells Fargo, NA,* No., 2014 WL 5140048 (N.C. Cal. Oct. 10, 2014)................................16

7   *Valentino v. Carter-Wallace*, 97 F.3d 1227 (9th Cir. 1996)........................................................46

8   *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943 (9th Cir. 1976)..................................................14

9   *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002)......................................................39

10  *Wang v. Chinese Daily News*, 231 F.R.D. 602 (C.D. Cal. 2005).......................................41, 43

11  *Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir. 1982) ................................................................38

12  *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1188 (9th Cir. 2001) ................................43

13

14  STATE CASES

15  *Arias v. Superior Court,* 46 Cal.4th 969 (2009) ..........................................................................33

16  *Armenta v. Osmose, Inc.*, 135 Cal.App.4th 314 (2005)..............................................................24

17  *Betancourt v. OS Restaurant Services, LLC*, 49 Cal.App.5th 240 (2020)................................30

18  *Choate v. Celite Corp.* (2013) 215 Cal. App.4th 1460 ..............................................................30

19  *Duran v. US Bank Nat'l Ass'n*, 59 Cal. 4th 1 (2014)................................................................21

20  *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal.4th 554 (2007) ..............................................27

21  In *Brinker Restaurant Corp. v. Superior Court*, 53 Cal. 4th 1004 (2012)..........................24, 25

22  *Iskanian v. CLS Transp. Los Angeles, LLC*, 59 Cal. 4th 348 (2014)........................................33

23  *Jong v. Kaiser Foundation Health Plan, Inc.,* 226 Cal.App.4th 391 (2014)..............................23

24  *Murphy v. Kenneth Cole Productions, Inc.*, 40 Cal.4th 1094 (2007) ........................................34

25  *North County Contractor's Assn., Inc. v. Touchstone Ins. Svcs.*, 27 Cal. App.4th 1085 (1994) ............16

26  *United Parcel Service Wage and Hour Cases*, 196 Cal.App.4th 57 (2011) ..............................24

27  *Villacres v. ABM Industries Inc.*, 189 Cal.App.4th 562 (2010) ................................................36

28

STATUTES

15 U.S.C. § 1681b ...........................................................................................................28

15 U.S.C. § 1681d ...........................................................................................................28

1681g ..............................................................................................................................28

202 ..................................................................................................................................31

203 ..................................................................................................................................31

8 Cal. Code Regs. § 13520 .............................................................................................30

Cal. Civ. Code §§ 1785.20.5 ..........................................................................................28

Cal. Civ. Code § 1786.16 ...............................................................................................28

Cal. Civ. Code § 1786.50 .........................................................................................29, 30

Cal. Gov't Code § 12652 ................................................................................................32

Cal. Lab. Code § 1197.1 .................................................................................................32

Cal. Lab. Code § 2699 ....................................................................................................32

Cal. Lab. Code § 558 ......................................................................................................32

Code Civ. Proc. § 1500 *et seq* .......................................................................................14

Fed. R. Civ. P. 23 .....................................................................................................38, 43

Labor Code § 226 ...........................................................................................................40

Labor Code §§ 201 .........................................................................................................31

Labor Code section 2699 ................................................................................................31


OTHER AUTHORITIES

*Manual for Complex Litigation, Third* (Fed. Judicial Center 1995) § 30.41 ...................14, 15

*Newberg on Class Actions* 4th (2002) ("*Newberg*"), § 11.41 .................................................14

*Newberg on Class Actions* 4th (2002) § 12:15 .................................................................35

*Newberg on Class Actions* 4th (2002), § 11.22 *et seq* ....................................................15

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

This amended motion seeks preliminary approval of the class action settlement of this wage-and-hour action between Plaintiff JEREMY R. LUSK ("Plaintiff"), on behalf of himself and the Class Members described below, and Defendants FIVE GUYS ENTERPRISES, LLC and ENCORE FGBF, LLC ("Defendants") (Plaintiff and Defendants, collectively, the "Parties.")

### A.    PRIOR HISTORY OF MOTIONS FOR PRELIMINARY APPROVAL

On April 2, 2019, Plaintiff filed his initial Motion for Preliminary Approval of the class action settlement. (ECF 36-37, 41.)  On December 23, 2019, this Court denied Plaintiff's motion and identified several issues that the Parties needed to address prior to submitting an amended motion.  (ECF 43.)

On May 19, 2020, Plaintiff filed his First Amended Motion for Preliminary Approval addressing the Court's concerns. (ECF 52.)  On October 19, 2020, the Court denied Plaintiff's First Amended Motion because the "description in the motion briefing of the settlement agreement's terms and the class notice's terms is at odds with the terms in the actual proposed settlement agreement and the actual proposed class notice." (ECF 55.)

On February 26, 2021, Plaintiff filed his Supplemental/Second Amended Motion for Preliminary Approval (the "Second Amended Motion") addressing the Court's concerns. (ECF 61-62, 64.)   On June 1, 2021, the Court denied Plaintiff's Second Amended Motion because Plaintiff had not provided sufficient information regarding assessment of the background check claims and the PAGA claims or addressed the effects of having an open class period.  (ECF 66.)

On September 25, 2021, Plaintiff filed his Third Amended Motion for Preliminary Approval (the "Third Amended Motion") addressing the Court's concerns. (ECF 75-77.)   On October 8, 2021, Defendants filed a Statement of Non-Opposition and Supplemental Brief Re: Plaintiff's Third Amended Motion.  (ECF 78.)  On January 24, 2022, the Court denied Plaintiff's Third Amended Motion.  (ECF 81.)

### B.    THE REASONS FOR DENIAL OF THE THIRD AMENDED MOTION FOR PRELIMINARY APPROVAL ARE ADDRESSED IN THIS FOURTH AMENDED MOTION

In its Order on Plaintiff's Third Amended Motion (the "TAM Order"), the Court recognized that Plaintiff had addressed many of the Court's concerns in its preceding order denying preliminary approval.

(ECF 81 at 5.)  However, a number of issues still remain to be addressed:

- The Unfair Competition Law ("UCL") claim, while having been supported further in the Third Amended Motion, still lacked sufficient information to determine its estimated value, leaving the Court to surmise that the claim has no value.

- The end date of the Class Period, as modified by the Parties in the Second Amended Joint Stipulation of Class Action Settlement and Release of Claims ("Second Amended Settlement") (ECF 80-1), while addressing the problems with an open-ended Class Period, does not seem to go far enough since it is still more than two years after mediation with the same settlement amount distributed among a significantly larger class.

- The allocation of the Net Settlement Amount ("NSA"), while partially addressed by the modified allocation in the Second Amended Settlement with respect to the Class Members with claims for statutory penalties under Labor Code section 203, is still problematic since the distribution will be more equitable for such persons but will still not fairly compensate other subgroups within the Class, such as those with wage statement claims under Labor Code section 226, for whom the relevant time period is three years shorter than for those with unpaid wage and/or reimbursement claims.

- There is an apparent lack sufficient support for conditional certification under Federal Rule of Civil Procedure ("FRCP") 23 in light of the information provided by Defendants in their Non-Opposition to the Third Amended Motion.

The Parties have revised the Second Amended Settlement, Amended Class Notice, and Amended Claim Form to conform with each other and with this Fourth Amended Motion for Preliminary Approval (the "Fourth Amended Motion").  The Parties made the following specific changes:

**Third Amended Joint Stipulation of Class Action Settlement and Release of Claims**: The Parties executed the Third Amended Joint Stipulation of Class Action Settlement and Release of Claims ("Stipulation" or the "Agreement") on July 25, 2022.  (Declaration of Shaun Setareh in Support of Plaintiff's Fourth Amended Motion ("Setareh Declaration" or "Setareh Decl."), ¶ 6.)  A true and correct copy of the Agreement is attached as **Exhibit A** to the Setareh Declaration.  (Setareh Decl., ¶ 6, Ex. A (hereinafter cited as "Stipulation").)

First, in the Agreement, the verbiage of the class definition has been revised to: "All persons who have been employed in California by Defendants as hourly-paid or "non-exempt" employees, whether directly or through an employment agency or a professional services organization, at any time during the period from August 22, 2013 through May 24, 2019." (Stipulation, ¶¶ 4, 5, 21.)  This places a hard cap on the Class Period as of the date of the hearing on Plaintiff's original Motion for Preliminary Approval, which is when the Parties had anticipated preliminary approval to be granted.  (Setareh Decl., ¶ 6.)  Thus, the scope of the release and the estimated recovery per Class Member now fall within the appropriate range when compared to the risk-adjusted estimated potential recovery for the class claims.  (*Id.*)

Second, the Agreement also now defines two Subclasses within the Settlement Class: the "Waiting Time Penalty Subclass" comprised of all Class Members during the "Waiting Time Penalty Subclass Period" from August 22, 2014 through May 24, 2019; and the "Wage Statement/PAGA Penalty Subclass" comprised of all Class Members during the "Wage Statement/PAGA Penalty Subclass Period" from August 22, 2016 through May 24, 2019.  (Stipulation, ¶ 5.)

Third, in addition to the provision that 25% of the NSA will go to the Waiting Time Penalty Subclass Members *pro rata* based upon each of their individual number of Work Weeks during the Waiting Time Penalty Subclass Period, the Agreement now provides 15% of the NSA will go to the Wage Statement/PAGA Penalty Subclass Members *pro rata* based upon each of their individual number of Work Weeks during the Wage Statement/PAGA Penalty Subclass Period, and 60% of the NSA will go to the Class Members *pro rata* based upon each of their individual number of Work Weeks during the Class Period.  (*Id.*, ¶ 15.)  This will distinguish Class Members within the two smaller Subclasses who have such claims from each other and from other Class Members who do not have any of the Subclass claims. (Setareh Decl., ¶ 6.) The proportions of the NSA allocations for the Class and each Subclass were matched to those of the risk-adjusted estimated potential recovery for the class claims, ensuring that all Settlement amounts payable to each Class Member are reasonably proportional to what they could expect to receive after a successful litigation. (*Id.*)

Finally, Defendants have been able to provide updated class data for the new, reduced Class Period. (*Id.*) There were 2,078 Class Members, 28,405 pay periods, and approximately 56,810 workweeks during the Class Period as currently defined.  (Stipulation, ¶ 24.)

1

**Second Amended Class Notice and Claims Form**: Attached to the Agreement as **Exhibits 1**

2

**and 2** are the second amended Class Notice and Claims Form reflecting the changes to the Agreement.

3

     **This Motion also reflects these changes**.  Plaintiff enumerates the issues raised by the Court in

4

its last order (ECF 81) and indicates where they have been addressed in this Fourth Amended Motion

5

(cited as "4AM") and supporting documents in the following table:

6

| Issue to Address Per Order on Plaintiff's Third Amended Motion for Preliminary Approval | Where Item Addressed |
|---|---|
| 1.    "The Court credits [Plaintiff's] explanation [of the risks attendant to the UCL claim], but still finds no information within Lusk's greater potential recovery analysis regarding the estimated value of the UCL claim. Motion at 24–26. Without this information, the Court is left to surmise that the claim is worthless…. [I]f this claim is in fact entirely without merit, he needs to explain why that is the case[,]… why the Court should approve of the proposed settlement's broad release of UCL claims for nothing in return[,] … [and] why the UCL claim is considered worthless when it is based entirely on the same Labor Code allegations…(ECF 81 at 6.) | 4AM, §§ IV.C.1, IV.C.2.vii. |
| 2.    "The parties have responded to [the Court's] concern [regarding an open-ended Class Period] by newly defining the applicable class period as "the period of time from August 22, 2013 through October 19, 2020." …This revision cures the problem with an open-ended class period. But the Court is unconvinced that the parties have used the correct end date. Lusk justifies that choice by noting that the Court denied his second motion for preliminary approval on October 19, 2020…. Yet, his successive motions suggest that the value of the class claims has remained largely unchanged since the parties reached their settlement agreement on October 12, 2018. In other words, the Court's October 19, 2020 order seemingly has nothing to do with Lusk's valuation of the claims. Like before, the Court suspects that the failure to account for this two-year span represents an undervaluation of the claims."  (ECF 81 at 6-7.) | 4AM, § III.A.2; Stipulation, ¶¶ 4, 5. |
| 3.    "Lusk indicates in his motion that if October 19, 2020, is used as the end date of the class period, the putative class expands from 2,206 to approximately 3,629 class member…. Despite acknowledging this relatively massive expansion of the putative class, Lusk continues to calculate the estimated value of the class claims using the lower figure…. This itself leads to the claims being undervalued and the return for class members being overstated in the instant motion."  (ECF 81 at 7.) | 4AM, §§ III.A.2, IV.C.1; Stipulation, ¶ 24. |
| 4.    "The proposed settlement was not equitably treating class members because settlement shares failed to reflect apparent distinctions amongst the class members based on the class claims….  The parties responded to this problem by revising the proposed settlement [to provide] that 25% of the net settlement amount will be allocated for equal distribution amongst those class members who experienced a termination event during the class period, while the remaining 75% will be allocated for equal distribution amongst all class members…. Their solution fixes part of the problem but leaves unaddressed the Court's stated concern that the same problem existed with other class claims that appear to disparately affect class members. For instance, in the greater potential recovery analysis, Lusk indicates that the value of the wage statement claim is premised, in part, on 996 first violations of Labor Code § 226. This number (996)—which matches the number of aggrieved employees for purposes of the PAGA claim—is substantially less than | 4AM, §§ III.A.1, III.B, IV.C.1, IV.C.5; Stipulation, ¶ 15. |

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| the number of putative class members (2,206). Once again, this math concerns the Court in so far as it projects that some class members will receive a windfall at the expense of other class members…. The parties' revision of the proposed settlement accounts for one of these claims, but their neglect of the others is left unexplained with clear red flags present." (ECF 81 at 7-8.) | |
| 5.      "As noted in the last order and above, the Court remains concerned with the lack of subclass treatment for certain class claims and this concern applies in the certification context as well. Doc. No. 66 at 21. Lusk does not address this problem in his latest motion." (ECF 81 at 7.) | 4AM, § III.A.1, IV.C.5; Stipulation, ¶¶ 4, 5, 15. |
| 6.      "The Court has expressed concern with its ability to actually certify this class based on the evidentiary record.... Across multiple motions, Lusk has offered next to nothing to show that the prospects for certification are adequately supported by the record, and Defendants have now made his task even harder by presenting evidence that directly undermines his certification position. Notwithstanding, the Court could provide conditional certification on the ground that the class claims follow a familiar format to claims that frequently garner certification…. [However,] Lusk must [provide] a suitable basis in the record for certification." (ECF 81 at 9-11.) | 4AM, §§ IV.C.2, IV.D; Setareh Decl., ¶¶ 10, 17, 36. |

## C.     CASE AND SETTLEMENT SUMMARY

This is a putative wage and hour class action on behalf of non-exempt employees employed by Defendants in California from August 22, 2013 through May 24, 2019 (the "Class Period"). The core issues in the case were based on allegations by Plaintiff that Defendants violated the Fair Credit Reporting Act and related California state law claims, did not provide legally compliant meal periods and rest breaks, did not compensate employees for all time worked, and, as a result, wage statements provided to employees were rendered inaccurate, final wages were not timely paid, and the conduct violated the California Private Attorneys General Act of 2004 ("PAGA") and the California Unfair Competition Law ("UCL"). Plaintiff also alleges that Defendants failed to reimburse him and the putative class for all necessary business expenses. Defendants dispute these claims.

After conducting extensive discovery, including both Parties' written discovery, the Class List from which Class Counsel were able to reach out to dozens of putative Class Members and conduct multiple interviews, Defendants producing almost 1,000 pages of documents (which included Defendants' meal period and rest break policies, along with the relevant employee handbook, time punch records and wage statements), as well as Plaintiff's videotaped deposition, the Parties agreed to participate in a full-day mediation.

As the result of arm's-length negotiations under the supervision of an experienced, highly regarded mediator with expertise in mediating complex wage and hour class actions, the Parties have

PLAINTIFF'S UNOPPOSED FOURTH AMENDED NOTICE OF MOTION AND MOTION FOR PRELIMINARY
APPROVAL OF CLASS ACTION SETTLEMENT

reached a fair and reasonable class action settlement of Plaintiff's claims. Pursuant to the Agreement, Plaintiff now requests that the Court enter an order preliminarily approving the Agreement; certifying a class for purposes of the settlement only; appointing Plaintiff as the Class Representative, Shaun Setareh and William M. Pao of the Setareh Law Group as Class Counsel, and Phoenix Settlement Administrators as the Settlement Administrator; approving and directing the mailing of the Class Notice and related materials; and scheduling a final approval hearing on February 13, 2023 or such later date that is available to the Court.

The Agreement provides for a total aggregate settlement fund of **$1,200,000.00** (the "Gross Settlement Amount" or "GSA"). (Stipulation, ¶ 13.) This amount is "all-in" and is non-reversionary. No class member will have to submit a claim in order to recover. Instead, checks will be mailed directly to the class members. Any uncashed checks will be transmitted to the State of California pursuant to California's Unclaimed Property Law to be held for the class member. In no circumstance will any of the **$1,200,000.00** revert to Defendants. (Stipulation, ¶ 44.)

After all Court-approved deductions from the GSA, it is estimated that the Net Settlement Amount ("NSA") of **$760,000.00** will be available to pay the Class Members' Settlement Payment. Based on an estimated 2,078 Class Members, the approximate average recovery for each Class Member is **$365.74**.

Both Parties believe the Settlement to be fair and reasonable, to adequately reflect the potential liability, and to be the result of thorough factual and legal analyses and arms-length negotiations. Through this motion, Plaintiff requests certification of a Settlement Class pursuant to Rule 23 of the Federal Rules of Civil Procedure and preliminary approval of the proposed class action settlement.

## II.  **BACKGROUND**

This class action was filed by Plaintiff on May 2, 2017 in Kings County Superior Court. (Setareh Decl., ¶ 7.) The complaint alleges the following causes of action: (1) violation of 15 U.S.C. section 1681b(b)(2)(A); (2) violation of 15 U.S.C. section 1681d(a)(1) and 1681g(c); (3) violation of California Civil Code section 1786 *et seq.*; (4) violation of California Civil Code section 1785 *et seq.*; (5) failure to provide meal periods; (6) failure to provide rest periods; (7) failure to pay hourly wages; (8) failure to indemnify; (9) failure to provide accurate wage statements; (10) failure to timely pay all final wages; and (11) unfair competition. (ECF 1-1.) On June 3, 2017, Defendants removed this action to the United

States District Court for the Eastern District of California. (*Id*., ¶ 8.)  On August 22, 2017, Plaintiff filed a First Amended Complaint ("FAC"). (*Id*., ¶ 9.)  The FAC alleges an additional cause of action for civil penalties under the Labor Code Private Attorneys General Act of 2004 (Lab. Code §§ 2698 *et seq*.) ("PAGA"). (ECF 10-1.)

The Parties conducted significant and extensive investigation of the facts and law during the prosecution of this action. (Setareh Decl., ¶ 10.)  This included formal written discovery by both Parties and the production of the class list from which Class Counsel were able to reach out to dozens of putative Class Members and conduct multiple interviews, and Defendants' production of almost 1,000 pages of documents (which included Defendants' meal period and rest break policies, along with the relevant employee handbook, time punch records and wage statements), as well as Plaintiff's videotaped deposition. (*Id*.)  These revealed policies and practices that would support class certification. (*Id*.)  For instance, the 2014 and 2015 employee handbooks stated only that "[t]eam members will receive one, ten-minute paid break for every four hours worked.  This time must be approved by your General Manager each day."  (*Id*.) There was no mention of the "major fraction thereof" with respect to the four hours worked, making this noncompliant with California law regarding rest periods on its face. (*Id*.) Furthermore, Class Counsel's expert analyzed the time and payroll data provided and found that 75.1% of all shifts where a meal period was required suffered some type of meal period violation and 35.8% of all shifts where a rest period was required suffered some type of rest period violation.[1]  (*Id*.)  Defendants also provided a Class List with addresses and phone numbers for putative Class Members from which Class Counsel were able to conduct multiple interviews with former employees and corroborate that each of the alleged wage and hour violations either were suffered directly or were observed happening to others.  (*Id*.)

In preparation for mediation, Class Counsel prepared substantive mediation brief summarizing

---

[1] Plaintiff's expert analyzed the timekeeping data for the putative Class Members produced by Defendants. (Setareh Decl., ¶ 36.) He found 81,028 shifts during the Class Period that were greater than 6 hours in length, thus requiring a meal period to be provided under California law. (*Id*.) Of these, there were 60,871 shifts, or 75.1%, that had some type of meal period violation (i.e., were missed completely, were taken later than the 5th hour, or were less than 30 minutes long). (*Id*.) The data also showed 194,847 shifts during the Class Period that were greater than 3.5 hours in length, thus requiring a rest period be provided under California law. (*Id*.) Of these, there were 63,514 shifts, or 35.8%, that had a missed rest period. (*Id*.) The rest period data was available because Defendants had a practice of keeping records of the rest breaks taken for each shift.  (*Id*.)

Plaintiff's claims, the relevant discovery obtained that supports those claims and the weaknesses of Defendants' defenses. (*Id.*, ¶ 11.)   The Parties mediated this matter before professional mediator, Deborah Crandall Saxe, Esq., on October 10, 2018 in Los Angeles, California. (*Id.*)  Although the Parties did not reach an agreement at the conclusion of mediation, the mediator sent the Parties a Mediator's Proposal to resolve the matter. (*Id.*)  On October 12, 2018, the Parties accepted the Mediator's Term Sheet. (*Id.*)

The Stipulation is intended to result in the creation of a settlement class comprised of all persons who have been employed in California by Defendants as non-exempt employees, whether directly or through an employment agency or a professional services organization, at any time during the period from August 22, 2013 through May 24, 2019.  (*Id.*, ¶ 9.) There are estimated to be 2,078 Settlement Class Members.  (*Id.*, ¶¶ 9, 28.)

Solely for the purpose of settling this case, the Parties stipulate that the requirements for establishing class action certification with respect to this class have been met and are met.  (*Id.*, ¶ 10.)  If the Court does not approve this Settlement for any reason, Defendants reserve their rights to contest class certification. (*Id.*)  If approved by the Court, the Agreement will result in the termination with prejudice of this action through the entry of the Judgment, and the release of all Released Claims for all Class Members. (*Id.*)  The Class Representative will also execute a general release of all possible claims. (*Id.*)

## III.   THE SETTLEMENT

The following is a summary of the material elements of the Settlement:

### A.    THE SETTLEMENT CLASS

The Class to be conditionally certified is defined as:

All persons who have been employed in California by Defendants as hourly-paid or "non-exempt" employees, whether directly or through an employment agency or a professional services organization, at any time during the period from August 22, 2013 through May 24, 2019.

(Stipulation, ¶¶ 4, 5, 21.)

### 1.    Additional Subclasses for Claims Under Labor Code Section 203 and 226

There are also two Subclasses that include Class Members who have claims under Labor Code sections 203 and 226: (1) a "Waiting Time Penalty Subclass" of all persons who have been employed in California by Defendants as hourly-paid or "non-exempt" employees, whether directly or through an

employment agency or a professional services organization, at any time during the Waiting Time Penalty

Subclass Period (i.e., August 22, 2014 through May 24, 2019) and whose employment with Defendants

was terminated at any time during that period; and (2) a "Wage Statement/PAGA Penalty Subclass" of all

persons who have been employed in California by Defendants as hourly-paid or "non-exempt"

employees, whether directly or through an employment agency or a professional services organization, at

any time during the Wage Statement/PAGA Penalty Subclass Period (i.e., August 22, 2016 through May

24, 2019). (*Id.*, ¶¶ 4, 5.) These Subclasses were added because they each have different limitation periods

from each other, shorter limitation periods than the other Class claims, and the Waiting Time Penalty

Subclass only further includes only employees separated from employment with Defendants during the

Waiting Time Penalty Subclass Period, meaning that, by definition, each of these Subclasses will include

only some members of the Class and of each other. Accordingly, they must be treated separately from the

Class as a whole to ensure that their members' payments under the Agreement reasonably reflect the

proportions of the estimated values of all class claims.

### 2.     The Class Period Has Been Modified to End on May 24, 2019

The Class Period was modified by the Parties in the Stipulation to end on a date certain, May 24,

2019, as this was the date set for the hearing on Plaintiff's original Motion for Preliminary Approval, the

date which the Parties originally expected preliminary approval to be granted. (Setareh Decl., ¶ 35; ECF

36.) Now, regardless of when the Court grants preliminary approval, the class size and scope of the

release will remain fixed as of that date, preventing both the dilution of the Settlement payments and the

expansion of the release to Defendants to more than originally contemplated. (Setareh Decl., ¶ 35.)

The revised end date for the Class Period also addresses the Court's concerns regarding

"successive motions" and "the Court's October 19, 2020 order seemingly [having] nothing to do with

Lusk's valuation of the claims." The October 19, 2020 date was the date which the Parties originally

expected preliminary approval to be granted and therefore does not represent an undervaluation of the

claims because the Class Period is consistent with the Parties' expectations at the time the original

settlement agreement was reached.

### B.     GROSS SETTLEMENT AMOUNT AND DISTRIBUTIONS

Defendants shall pay a maximum aggregate GSA of **$1,200,000.00**. (Stipulation, ¶ 13.) The GSA

covers: (1) the Class Representative payment of **$15,000.00** to Plaintiff in compensation for having prosecuted the action and undertaken the risk of payment of costs in the event this matter had not been successfully concluded (*Id.,* ¶ 14(c)); (2) Settlement Payments paid to Class Members for their class claims, including all Subclass members for their claims under Labor Code sections 203 and/or 226 (*Id.*, ¶ 15.); (3) PAGA Payment in the amount of **$100,000.00** to be allocated to claims for civil penalties under PAGA, which includes **$75,000.00** awarded to the State of California, subject to Court approval, and **$25,000.00** awarded to Qualified Claimants (*Id.*, ¶ 14(e)); (4) the Class Members' respective shares of any applicable payroll taxes (including Defendants' respective shares of any applicable employer payroll taxes) attributable to any payments under the Settlement (*Id.*, ¶ 17); (5) the Class Counsel Award, consisting of attorneys' fees not to exceed **$300,000.00** (25% of the GSA), plus costs not to exceed **$20,000.00**, to compensate Class Counsel for all work performed thus far and all work remaining to be performed in connection with the Settlement, including without limitation documenting and administering the Settlement and securing Court approval (*Id.*, ¶¶ 14(a)-(b)); and (6) the fees and expenses of the Settlement Administrator, not to exceed **$30,000.00** (*Id.*, ¶ 14(d)).

After all Court-approved deductions from the GSA of **$1,200,000.00**, the estimated NSA constitutes at least **$760,000.00** of the GSA for Class Members, including related tax payments (including Defendants' tax portion of tax payments).  To fairly allocate settlement funds based on the Qualified Claimant's dates of employment as a Class Member, 60% of the NSA will be allocated to all Class Members, 25% of the NSA will be allocated to Class Members with a claim under Labor Code section 203 (i.e., the Waiting Time Penalty Subclass), and 15% of the NSA will be allocated to Class Members with a claim under Labor Code sections 226 (failure to provide accurate itemized wage statements) and 2698 *et seq.* (PAGA) (i.e., the Wage Statement/PAGA Penalty Subclass). (*Id.*, ¶ 15(a)). The distributed payments will be calculated as follows:

- **Base Settlement Ratio Calculation.** The Claims Administrator shall assign to each Class Member a "Base Settlement Ratio," which shall be a fractional number comprised of (i) that Class Member's Individual Work Weeks as the numerator, and (ii) the aggregate total of all Class Members' Individual Work Weeks as the denominator. (*Id*., ¶ 15(b).) The Claims Administrator shall assign to each Class Member the "Base Settlement Share," which shall be

calculated by multiplying that Class Member's Settlement Ratio by 60% of the NSA. (*Id.*)

- **Waiting Time Penalty Subclass Ratio Calculation.** The Claims Administrator shall assign to each Waiting Time Penalty Subclass Member a "Waiting Time Penalty Subclass Settlement Ratio," which shall be a fractional number comprised of (i) that Waiting Time Penalty Subclass Member's Individual Work Weeks during the Waiting Time Penalty Subclass Period as the numerator, and (ii) the aggregate total of all Individual Work Weeks during the Waiting Time Penalty Subclass Period for Waiting Time Penalty Subclass Members as the denominator. (*Id.*, ¶ 15(c).) The Claims Administrator shall assign to each such Waiting Time Penalty Subclass Members an additional amount, the "Waiting Time Penalty Subclass Settlement Share," equal to his or her Waiting Time Penalty Subclass Settlement Ratio multiplied by 25% of the NSA. (*Id.*)

- **Wage Statement/PAGA Penalty Subclass Ratio Calculation.** The Claims Administrator shall assign to each Wage Statement/PAGA Penalty Subclass Member a "Wage Statement/PAGA Penalty Subclass Settlement Ratio," which shall be a fractional number comprised of (i) that Wage Statement/PAGA Penalty Subclass Member's Individual Work Weeks during the Wage Statement/PAGA Penalty Subclass Period as the numerator, and (ii) the aggregate total of all Individual Work Weeks during the Wage Statement/PAGA Penalty Subclass Period as the denominator. (*Id.*, ¶ 15(d).) The Claims Administrator shall assign to each such Wage Statement/PAGA Penalty Subclass Member an additional amount, the "Wage Statement/PAGA Penalty Subclass Settlement Share," equal to his or her Wage Statement/PAGA Penalty Subclass Settlement Ratio multiplied by 15% of the NSA.

The sum total of a Class Member's Base Settlement Share plus the Waiting Time Penalty Subclass Settlement Share, if any, plus the Wage Statement/PAGA Penalty Subclass Settlement Share, if any, is referred to as the "Settlement Share" for that Class Member. In the event that more than **$760,000.00** remains in the Net Settlement Amount after payment of the Class Counsel Award, Class Counsel Litigation Costs, Class Representative Enhancement, the PAGA Payment (both Class Member and LWDA shares), and Settlement Administration Costs, then the class Settlement Payment allocated to Qualified Claimants, will be increased on a *pro-rata* basis, in proportion to the amounts estimated above. (Stipulation, ¶¶ 41, 44.)

**C.    SCOPE OF THE CLASS MEMBER RELEASES**

The Parties agree that it is their intent that the Class Representative (and not the Class Members) shall be deemed to have fully, finally, and forever released the Released Parties from all Released Claims, as defined in paragraph 18. Such release includes a California Civil Code Section 1542 ("Section 1542") waiver, which releases all claims, known or unknown, within the definition of Released Claims, irrespective of the factual or legal basis for such claims. (Stipulation, ¶ 19.)

It is also the Parties' intent that the terms set forth in the Stipulation will release any further attempt, by lawsuit, administrative claim or action, arbitration, demand, or other action of any kind by each and all of the Class Members who did not timely and properly opt out, to obtain a recovery based on each and all of the allegations in the First Amended Complaint in this matter, including participating in any class or collective action, for harms arising during the Class Period. (Stipulation, ¶ 18.)

The Class Notice explains that it does not have the effect of waiving any and all claims a Class Member may have against Defendants. It only waives claims encompassed within the allegations of the First Amended Complaint, which shall be deemed to have been fully, finally, and forever released against the Release Parties, including the Class Representative.

**D.    NOTICE PROCEDURES**

If appointed by the Court, Phoenix Settlement Administrators, serving as Claims Administrator, will mail to all Class Members a Class Notice Packet containing a Class Notice (completed to reflect the order granting preliminary approval of the Settlement) based upon their last-known address provided by Defendants. (Stipulation, ¶ 26.). The proposed Class Notice is attached as **Exhibit A** to the Stipulation. Included in the Notice Packet will be a Claim Form, in the form attached to the Stipulation as **Exhibit B**.

The Class Notice will provide Class Members information regarding the Action and a summary of the Settlement's principal terms, including allocation of the Gross Settlement Amount. (Stipulation, ¶ 26.) Each Class Notice also will inform the Class Members of their rights and the manner and deadline to (1) dispute the data in the Claim Form (*e.g.*, Workweeks worked or separation during the Class Period) (*Id.*, ¶ 26(c), 30), (2) object to the Settlement (*Id.*, ¶ 28), and (3) elect not to participate in the Settlement. (*Id.*, ¶ 27.) The Class Notice will also inform Class Members of the claims to be released. (*Id.*) The Class Notice and all relevant documents pertinent to Plaintiff's Motion for Preliminary Approval, including the

Settlement Agreement, shall also be made available by Class Counsel online at a website created and maintained by the appointed Settlement Administrator at least five (5) weeks prior to the hearing on the Final Settlement Approval Motion.

No later than 30 calendar days after preliminary approval of the Settlement is granted by the Court, Defendants will provide the Settlement Administrator each Class Member's name, last known mailing address, last known telephone number, Social Security Number, the dates the Class Member was employed as a Class Member of Defendants in California during the Class Period, the number of Workweeks attributable to the Class Member, and whether the Class Member's employment with Defendants ended, in a form requested by the Settlement Administrator. (Stipulation, ¶ 25.)

No later than fifteen (15) calendar days after receipt of such address information, the Settlement Administrator will perform a national change of address ("NCOA") search, update the addresses per the results of the NCOA search, and then mail the Notice of Settlement and Claim Form, substantially in the forms attached as **Exhibits A and B** to the Agreement, respectively to each Class Member by first-class mail, postage prepaid. (Stipulation, ¶ 26.)

Class Members will have 45 calendar days after the Class Notice Packets are mailed (the "Response Deadline") to dispute the information in the Class Notice, elect not to participate in the Settlement (*i.e.*, exclude himself or herself), or submit a written objection. (Stipulation, ¶¶ 26(c), 27, 28.) Any Class Member who does not timely return a properly completed exclusion election will remain in the Class and be bound by the Settlement (and be paid their applicable Settlement Payment and other settlement payments as applicable. (Stipulation, ¶ 27.)

Any Notice Packets returned to the Settlement Administrator as non-deliverable on or before the Response Deadline will be sent promptly via regular First-Class U.S. Mail to the forwarding address affixed thereto. (Stipulation, ¶ 26(b).)  If no forwarding address is provided, the Settlement Administrator will promptly attempt to determine the correct address by lawful use of a skip-trace, or other search using the name, address and/or Social Security number of the Class Member involved, and shall then perform a single re-mailing, if another mailing address is identified by the Settlement Administrator. (*Id.*) Settlement Class Members who received a re-mailed Notice Packet shall have their Response Deadline extended fourteen (14) calendar days from the original Response Deadline. (*Id.*)

1  If five percent (5%) or more of the Class Members timely opt out of (*i.e.*, exclude themselves

2  from) the Settlement, then Defendants will have the right in their sole discretion to revoke the Settlement

3  by written notice to Class Counsel not later than seven (7) days before the Final Approval Hearing.

4  (Stipulation, ¶ 33.)

5  **E.    PAYMENT OF SETTLEMENT AMOUNTS**

6  The Settlement Administrator shall mail the Settlement Payment by regular First-Class U.S. Mail

7  to Settlement Class Members' last known mailing address no later than thirty (30) calendar days of the

8  Final Approval Date. (Stipulation, ¶ 41.)  Any settlement check(s) shall thereafter automatically be void if

9  not cashed within 180 calendar days after issuance. (Stipulation, ¶ 44.)

10  Settlement checks remaining un-cashed after expiration of the foregoing deadline shall be

11  immediately cancelled by the Settlement Administrator. (*Id*.)  Funds represented by cancelled checks will

12  be tendered by the Settlement Administrator to the State of California pursuant to California's Unclaimed

13  Property Law (*see* Code Civ. Proc. § 1500 *et seq*.) (*Id*.)  Any Class Member who does not timely cash his

14  or her settlement check(s) shall still be bound by all of the Settlement's terms, including those pertaining

15  to the Released Claims, as well as any Judgment that may be entered by the Court if it grants final

16  approval to the Settlement. (Stipulation, ¶ 18.)

17  **IV.    THE SETTLEMENT MERITS PRELIMINARY APPROVAL**

18  The law favors settlement, particularly in class actions and other complex cases where substantial

19  resources can be conserved by avoiding the time, cost, and rigors of formal litigation.  *See Newberg on*

20  *Class Actions* 4th (2002) ("*Newberg*"), § 11.41 (and cases cited therein); *Class Plaintiffs v. City of Seattle*,

21  955 F.2d 1268, 1276 (9th Cir. 1992); *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976).

22  A class action, however, may not be dismissed, compromised, or settled without the approval of the court.

23  Fed. R. Civ. P. 23(e).

24  Judicial proceedings under Rule 23, Federal Rules of Civil Procedure, have led to defined

25  procedures and specific criteria for settlement approval in class action settlements, described in the

26  *Manual for Complex Litigation, Third* (Fed. Judicial Center 1995) ("*Manual*") § 30.41. The *Manual*'s

27  settlement approval procedure describes three distinct steps: (1) Preliminary approval of the proposed

28  settlement at an informal hearing; (2) Dissemination of mailed and/or published notice of the settlement to

all affected class members; and (3) A "formal fairness hearing," or final settlement approval hearing, at which class members may be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement may be presented. *Id.*, § 30.41. The procedure, commonly used by federal courts and endorsed by the leading class action commentator, Professor Herbert Newberg, safeguards class members' procedural due process rights and enables the court to fulfill its role as the guardian of class interests. *See Newberg*, § 11.22 *et seq.* Federal Rule of Civil Procedure Rule 23(e) requires the Court to review and approve a proposed voluntary dismissal, settlement, or other compromise of a certified class's claims. The Ninth Circuit has held that Rule 23(e) also applies to settlements before certification, but in a much lighter form that does not entail "the kind of substantive oversight required when reviewing a settlement binding upon the class." *Diaz v. Trust Territory of Pac. Islands,* 876 F. 2d 1401, 1408 (9th Cir. 1989). Although there has been "some uncertainty" about whether this holding applies in the wake of the 2003 amendments to Rule 23(e), *see, e.g., Lyons v. Bank of Am., NA,* No. C 11-1232, 2012 WL 5940846, at *1 & n.1 (N.D. Cal. Nov. 27, 2012), courts in this district continue to follow *Diaz* to evaluate the proposed settlement and dismissal of putative class claims, *see, e.g., Tombline v. Wells Fargo, NA,* No., 2014 WL 5140048, at *2 (N.C. Cal. Oct. 10, 2014). *See also Luo v. Zynga Inc.*, 2014 WL 457742, at **3-4 (N.D. Cal. Jan. 31, 2014) (applying *Diaz* to proposed settlement of putative class claims under FLSA and state law).

The decision to approve or reject a proposed settlement is committed to the trial court's sound discretion; a court's decision to approve a class action settlement may be reversed only upon a strong showing of "clear abuse of discretion." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) (citation omitted); *City of Seattle*, 955 F.2d at 1276 (in context of class action settlement, appellate court cannot "substitute [its] notions of fairness for those of the [trial] judge and the parties to the agreement," and will reverse only upon strong showing of abuse of discretion) (citation omitted).

The purpose of the preliminary evaluation of class action settlements is to determine only whether the proposed settlement is within the range of possible approval, and thus whether notice to the class of the settlement terms and conditions and the scheduling of a formal fairness hearing is worthwhile. To grant preliminary approval of this class action settlement, the court need only find that the settlement falls within the range of possible final approval, also described as "the range of reasonableness." *See, e.g.,*

*North County Contractor's Assn., Inc. v. Touchstone Ins. Svcs.*, 27 Cal. App.4th 1085, 1089-90 (1994); *In re Traffic Exec. Ass'n-Eastern Railroads,*, 627 F.2d 631, 633-34 (2d Cir. 1980); *see also* 4 *Newberg*, § 11.25. In sum, preliminary approval of a settlement and notice to the proposed class (or collective) is appropriate: "[i]f [1] the proposed settlement appears to be the product of serious, informed, noncollusive negotiations, [2] has no obvious deficiencies, [3] does not improperly grant preferential treatment to class representatives or segments of the class, and [4] falls with the range of possible approval…" *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007).

## A.    THE SETTLEMENT WAS THE PRODUCT OF INFORMED, NON-COLLUSIVE NEGOTIATIONS

The Settlement was reached after informed, arm's-length negotiations between the Parties with the help of Deborah Crandall Saxe, Esq., an accomplished mediator with significant experience mediating employment wage and hour class and collective actions. (Setareh Decl., ¶ 11.) The Parties conducted significant and extensive investigation of the facts and law during the prosecution of this action. (*Id.*, ¶ 10.) Such investigation included formal written discovery by both Parties, the production of the class list (from which Class Counsel was able to reach out to dozens of putative class members and conduct multiple interviews), and almost 1,000 pages of documents (which included Defendants' meal period and rest break policies, along with the relevant employee handbook, time punch records and wage statements), as well as Plaintiff's videotaped deposition. (*Id.*) In preparation for mediation, Class Counsel prepared a substantive mediation brief summarizing Plaintiff's claims, the relevant discovery obtained that supports those claims and the weaknesses of Defendants' defenses. (*Id.*, ¶ 11.) Plaintiff's counsel also retained an expert who reviewed and analyzed payroll and timekeeping data prior to mediation and settlement negotiations and found strong indications of widespread liability on the meal and rest break claims. (*Id.*, ¶¶ 10, 36.) Although the Parties did not reach an agreement at the conclusion of mediation, the mediator sent the Parties a Mediator's Proposal to resolve the matter. (*Id.*, ¶ 11.) On October 12, 2018, the Parties accepted the proposal. (*Id.*) Accordingly, the Settlement is the product of non-collusive negotiations.

## B.    THE SETTLEMENT HAS NO "OBVIOUS DEFICIENCIES"

The Settlement is substantial and non-reversionary and provides for a payment of **$1,200,000.00** by Defendants which is, by any account, a significant amount given the value of the claims made by

Plaintiff. (Setareh Decl., ¶ 12.)  The Settlement Payment for each Class Member asserting wage and hour claims will be based on the individual Workweek count for each Class Member divided by the total number of Workweeks for all Class Members, with 25% of the NSA going to Waiting Time Penalty Subclass Members, 15% of the NSA going to Wage Statement/PAGA Penalty Subclass Members, and 60% of the NSA going to all Class Members, which is a fair way to calculate what each such Class Member should receive, since these proportions approximate the proportions of the estimated potential value of the class claims. (Stipulation, ¶ 15; Setareh Decl., ¶ 16.)  If all other amounts sought are awarded, it is estimated that the average Class Member will receive approximately $365.74.

Defendants do not oppose the requested Class Representative Service Award (**$15,000.00**) or the Class Counsel Award (up to **$300,000.00** in fees plus up to **$20,000.00** in costs), and regardless they are subject to Court approval at the Final Approval hearing. (Stipulation, ¶¶ 14(a)-(b).)  The Parties agree that the LWDA will receive **$75,000.00** (75%) as its share of the **$100,000.00** PAGA Payment that is allocated to PAGA penalties, and that this amount is reasonable. (*Id*., ¶ 14(e).)

## C.    THE SETTLEMENT FALLS WITHIN THE RANGE OF POSSIBLE APPROVAL

The Settlement falls well within the range of possible approval.  To evaluate this criterion, which focuses on "substantive fairness and adequacy," "courts primarily consider plaintiffs' expected recovery balanced against the value of the settlement offer."  *In re Tableware Antitrust Litig*., 484 F. Supp. 2d at 1080.  Following review of the payroll and timekeeping data provided by Defendants and applicable law, Plaintiff's counsel determined that the value of their claims before considering civil penalties to be approximately **$2,935,317.85**. (Setareh Decl., ¶ 16.)

### 1.    Plaintiff's Estimated Maximum Potential Recovery

The following chart provides the estimated potential recovery[2] on a class basis that Plaintiff believes he could reasonably achieve *if he were to prevail on all his causes of action*:

///

---

[2] The analyses provided in previous motions were based upon estimates that were extrapolated from the sampling of data provided for mediation projecting class size and workweek growth linearly with respect to time, which was necessary because the date of preliminary approval was open-ended. (Setareh Decl., ¶ 37.) Having fixed the end of the Class Period to May 24, 2019, Defendants were able to provide the exact number of putative Class Members and Pay Periods during the Class Period.  Using these in conjunction with the data and analysis provided in mediation, a much more accurate estimate of the potential recovery for each of the claims is provided here.

PLAINTIFF'S UNOPPOSED FOURTH AMENDED NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

| | | | |
|---|---|---|---|
| 1 | | | |

**PLAINTIFF'S ESTIMATED MAXIMUM POTENTIAL RECOVERY**

Class Period (4-year SOL): 8/22/2013 – 5/24/2019
      Wage and Hour Putative Class Members ("PCMs"): 2,078     Number of Pay Periods: 28,405
      Number of Work Weeks: 56,810     Number of Shifts: 207,357

Unpaid Wages & 2802; Waiting Time Penalty Subclass Period (3-year SOL): 8/22/2014 – 5/24/2019
      PCMs: 2,077     Number of Pay Periods: 28,157     Number of Work Weeks: 56,314
      Number of Shifts: 205,546     Number of Shifts > 6 hours during 3-year SOL: 85,477
      Number of Shifts > 3.5 hours during 3-year SOL: 186,960

UCL Period (4-year SOL less 3-year SOL): 8/22/2013 – 8/21/2014
      PCMs: 10     Number of Pay Periods: 248     Number of Work Weeks: 496
      Number of Shifts: 1,810     Number of Shifts > 6 hours during UCL Period: 753
      Number of Shifts > 3.5 hours during UCL Period: 1,647

Wage Statement/PAGA Penalty Subclass Period (1-year SOL): 8/22/2016 – 5/24/2019
      PCMs: 1,879     Number of Pay Periods: 21,351     Number of Work Weeks: 42,702
      Number of Shifts: 155,862     Number of Terminated PCMs: 790

Assumptions based upon data provided by Defendants
      Average Hourly Pay: $11.07     Average Off-the-Clock Work Per Shift: 30 mins
      Portion of Pay Periods Where Secret-Shopper Bonus Earned (Reg. Rate Claim): 7.4%
      Average Underpayment Per Pay Period (Regular Rate Claim): $3.77
      Meal Period Violation Rate: 75.1%    Rest Period Violation Rate: 35.8%
      Average Number of Shifts Where Mileage Accrued per Pay Period: 2
      Average Miles Driven Per Shift Where Mileage Accrued: 10
      Number of Terminated Employees during 3-year SOL: 1,364

Risk adjustments for Statutory Penalties (Labor Code sections 203 and 226)
      Probability of success at showing of willfulness or "knowing and intentional" at trial: 1/2
      Probability of success at appeal or defense against appeal of this issue: 2/3

| Cause of Action | Estimated Potential Recovery | Calculations for Estimated Potential Recovery |
|---|---|---|
| **Unpaid Wages (Off-the-Clock)** (*during Class Period*) | **$1,147,718.23** | **Sum of Unpaid Wages during 3-year SOL and during UCL Period** |
| (*during 3-year SOL*) | *$1,137,697.66* | 205,546 shifts during 3-year SOL x $11.07 average hourly rate x 0.5 hours spent working off-the-clock |
| (*during UCL Period*) | *$10,020.56* (excluding interest) | 1,810 shifts during UCL Period x $11.07 average hourly rate x 0.5 hours spent working off-the-clock |
| **Regular Rate Claim (Unpaid OT premium)** (*during Class Period*) | **$7,924.43** | **Sum of Unpaid Wages during 3-year SOL and during UCL Period** |
| (*during 3-year SOL*) | *$7,855.24* | 28,157 pay periods x 7.4% pay periods with OT and bonus earned x $3.77 average unpaid premium OT based on regular rate per pay period |
| (*during UCL Period*) | *$69.19* (excluding interest) | 248 pay periods x 7.4% pay periods with OT and bonus earned x $3.77 average unpaid premium OT based on regular rate per pay period |

| | | |
|---|---|---|
| **Meal Period Premiums** (*during Class Period*) | **$717,102.64** | **Sum of Meal Period Premiums during 3-year SOL and during UCL Period** |
| (*during 3-year SOL*) | *$710,840.57* | 85,477 meal periods required (shifts greater than 6 hours) during 3-year SOL x 75.1% meal period violation rate x $11.07 average hourly rate |
| (*during UCL Period*) | *$6,262.07* (excluding interest) | 753 meal periods required (shifts greater than 6 hours) during the UCL Period x 75.1% meal period violation rate x $11.07 average hourly rate |
| **Rest Period Premiums** (*during Class Period*) | **$748,242.82** | **Sum of Rest Period Premiums during 3-year SOL and during UCL Period** |
| (*during 3-year SOL*) | *$741,708.83* | 186,960 rest periods required (shifts greater than 3.5 hours) during 3-year SOL x 35.8% rest period violation rate x $11.07 average hourly rate |
| (*during UCL Period*) | *$6,533.99* (excluding interest) | 1,647 rest periods required (shifts greater than 3.5 hours) during UCL Period x 35.8% rest period violation rate x $11.07 average hourly rate |
| **Reimbursement for Personal Vehicle Use** (*during Class Period*) | **$314,329.73** | **Sum of Rest Period Premiums during 3-year SOL and during UCL Period** |
| (*during 3-year SOL*) | *$311,585.36* | 28,157 pay periods during 3-year SOL x 2 Shifts Where Mileage Accrued per Pay Period x 10 miles driven x $0.5533 avg mileage reimbursement rate |
| (*during UCL Period*) | *$2,744.37* (excluding interest) | 248 pay periods during 3-year SOL x 2 Shifts Where Mileage Accrued per Pay Period x 10 miles driven x $0.5533 avg mileage reimbursement rate |
| **Sub-Total Potential Recovery (Unpaid Wages/Reimbursement Claims)** (*during Class Period*) | **$2,935,317.85** | ***Value of all claims in which Class Members have an ownership interest in the amounts recovered, i.e., unpaid wages and reimbursable expenses, during the 3-year SOL and UCL Period, combined.*** |
| (*during 3-year SOL*) | *$2,909,687.67* | |
| (*during UCL Period*) | **$25,630.18** | ***Value of the UCL Claim*** |
| **Waiting Time Penalties (Labor Code § 203)** | **$1,207,958.40** | 1,364 employees terminated during 3-year SOL x $11.07 average hourly rate x 8 hours x 30 days x 1/2 prob. of success of additional showing of willfulness at trial x 2/3 prob. of success at appeal re: willfulness |
| **Wage Statement Penalties (Labor Code § 226)** | **$680,383.33** | [(1,879 pay periods x $50 (for first violation during 1-yr SOL)) + (19,472 subsequent pay periods during the entire class period x $100 (for subsequent violations)] x 1/2 prob. of success of additional showing of "knowing and intentional" violation at trial x 2/3 prob. of success at appeal re: "knowing and intentional" violation |

| TOTAL POTENTIAL RECOVERY ON ALL CLASS CLAIMS (Unpaid Wages, Reimbursement, and Statutory Penalties) | **$4,823,659.58** | **SUM OF THE ABOVE AMOUNTS** |
|---|---|---|
| *PAGA Penalties* | *$8,367,500.00* | *Sum of the amounts calculated below* |
| LC § 558, for Unpaid OT under LC § 510 ($50 per viol.): | | |
| • Reg. Rate, (LC § 223) | $158,000.00 | 7.4% of pay periods with OT and bonus earned x 21,351 pay periods during PAGA Period x $50 |
| • Off-the-Clock Work | $1,067,550.00 | 21,351 pay periods during PAGA Period x $50 |
| LC § 1197.1, for Min. Wage claims under LC §§ 1194, 1194.2, 1197, and 1199 ($100 per viol.) | $2,135,100.00 | 21,351 pay periods during PAGA Period x $100 |
| LC § 2699, for LC violations w/o provided penalties ($100 per viol.): | | |
| • Meal Periods (LC §§ 204, 512, 226.7) | $2,135,100.00 | 21,351 pay periods during PAGA Period x $100 |
| • Rest Periods (LC §§ 204, 226.7, 223) | $2,135,100.00 | 21,351 pay periods during PAGA Period x $100 |
| • Mileage (LC § 2802) | $187,900.00 | 1,879 aggrieved employees x $100 per 1st (and only) violation |
| • Waiting Time Penalties (civil) (LC §§ 201, 202, 203) | $79,000.00 | 790 terminated aggrieved employees during 1-yr SOL x $100 per violation |
| LC § 226.3, for Wage Statement claim under LC § 226 | $469,750.00 | 1,879 aggrieved employees x $250 for initial citation |
| *Total Maximum Potential Recovery* | *$13,191,159.58* | *Sum of Class Claims and PAGA Penalties, if maximum PAGA Penalties Awarded* |

Therefore, the GSA is just under **25%** (and the NSA nearly 16%) of the class-wide damages, including statutory penalties, and nearly **41%** (and the NSA nearly 26%) of the unpaid wages and reimbursement claims. This is an excellent result, well above the amount of many settlements granted final approval by courts within the Ninth Circuit. *See e.g., Stovall-Gusman v. W.W. Granger, Inc.*, 2015 U.S. Dist. LEXIS 78671, *12-13 (N.D. Cal. 2015) (7.3% of the "estimated trial award"); *In re Toys R Us-*

*Del., Inc.-Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 453-54 (C.D. Cal. 2014) [(3%); *In re LDK Solar Secs. Litig.*, 2010 U.S. Dist. LEXIS 87168, *6 (N.D. Cal. 2010) (5% of "plaintiff's expert estimated damages").  Of course, it should not be surprising that a settlement yields less than what the class could theoretically have recovered at trial. *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes").

The Settlement should be approved because it confers a substantial benefit on Class Members, while proceeding with litigation would impose significant risk with no guarantee of increased benefits.

## 2. Liability Is Contested, and the Settlement Provides Class Members with Substantial Monetary and Injunctive Relief

Plaintiff's counsel conducted a thorough and exhaustive investigation into the facts of this class action and diligently pursued an investigation of Class Members' claims against Defendants. (Setareh Decl., ¶¶ 17(a)-(f).)  Plaintiff's counsel propounded written discovery, reviewed Defendant's written policies, including employee manuals and had an expert thoroughly review timekeeping and payroll data produced by Defendants to create a reliable damage model detailing the number of possible violations at issue. (*Id.*, ¶ 10.)  For its part, Defendants contest liability in the action, is represented by zealous counsel, and is prepared to vigorously defend against these claims if the Action is not settled.

To be sure, if the litigation proceeds, Defendants could face significant liability.  However, while Plaintiff is reasonably confident of a favorable outcome, there is substantial risk that the evidence and/or legal developments could seriously diminish the value of his and the Class Members' claims.

With respect to the claims asserted on behalf of the settlement Class in this case, there are significant risks that support the reduced compromise amount. These risks include, but are not limited to the following:

### (i) Unpaid Wages Claims

There is risk that Plaintiff would be unable to establish liability for the alleged unpaid straight time and overtime wages, *see Duran v. US Bank Nat'l Ass'n*, 59 Cal. 4th 1, 39 & fn. 33 (2014) ("*Duran*"), *citing Dilts v. Penske Logistics, LLC*  2014 WL 205039 (S.D. Cal. 2014) (dismissing certified off-the-clock claims based on proof at trial).

First, Plaintiff alleges that employees performed work off-the-clock. (Setareh Decl., ¶ 14(a).) Plaintiff asserts that he and potential class members were required to work off-the-clock after they had clocked out at the end of their shifts in order to count out their registers. (*Id.*) Even though the time spent counting out their registers should have been considered hours worked (as they were still under the direction and control of Defendants), they were nevertheless directed by their managers to clock out before counting out, which can take anywhere from 15 to 20 minutes. (*Id.*) As a result, Plaintiff and potential class members were not paid for all hours worked. (*Id.*) Moreover, Defendants' managers regularly directed their "redshirt[3]" employees to pick up food supplies from other stores in the local area and failed to ensure that these employees were paid for the time spent carrying out their assigned duties. (*Id.*) In addition to time spent counting out registers, which was uncompensated time under Defendants' control, Plaintiff and potential class members were occasionally required to make bank deposits. (*Id.*) These deposits occurred after employees clocked out for the day, and this time, was time spent under Defendants' control without compensation. (*Id.*)

This is supported by the fact that the handbooks produced in discovery and which were in effect during the Class Period provided that each manager is responsible for reviewing and approving the time records on all personnel under his supervision. (*Id.*) Plaintiff testified at deposition that his own experience with his managers was that they would make him clock out at the end of a shift, then count his drawer and, on at least four occasions, sent him on runs to the bank to make cash deposits for which none of that time was accounted in his paycheck. (*Id.*) Significantly, several other putative class members who were listed on the Class List provided by Defendants and whom Class Counsel were able to speak with by phone also recounted being similarly instructed by their managers at the ends of their shifts. (*Id.*) These former employees, no longer pressured to support Defendants' version of events, would provide a more accurate version of their experiences working for Defendants, without bias.

Defendants dispute that allegation and argue that none of the policy documents suggested that employees should perform any work off-the-clock, and none of the policy documents endorsed the practice of counting out cash registers while clocked out, picking up supplies from other stores while

---

[3] A term used by Defendants to denote non-managerial, hourly non-exempt employees.

1   clocked out, or making bank deposits while clocked out. (ECF 78 at 7-9.) However, the policies as

2   written are not what Plaintiff nor the putative class members allege. (Setareh Decl., ¶ 14(a).) Rather, they

3   allege that the common practice of managers was to instruct employees to perform these duties while off-

4   the-clock. (*Id.*) Therefore, Defendants cannot simply hide behind the fact that their written policies do not

5   explicitly instruct such work to be done off-the-clock. (*Id.*)

6          Defendants further contend that their policies required employees to maintain an accurate record

7   of time work and prohibited employees from working off-the-clock, therefore any actual instances of off-

8   the-clock work would be a violation of Defendants' policies and would be non-compensable time under

9   *Jong v. Kaiser Foundation Health Plan, Inc.*, 226 Cal.App.4th 391, 395 (2014) because Defendants were

10  prevented from acquiring knowledge of the uncompensated hours. (ECF 78 at 7.) In support of this,

11  Defendants produced 69 declarations from current employees. (ECF 78-1.) The sworn declarations

12  included blanket, general statements from employees stating that they believed that their time and pay

13  records were accurate, and that they did not count drawers, get supplies, or make bank deposits off the

14  clock. (*Id.*) Of course, this is disingenuous given the reality of the relationship between putative Class

15  Members and Defendants as their employers and the stark imbalance of power between them. Entry-level

16  non-exempt employees have hardly any incentive to make waves and accuse their *current* employer—

17  and, for many, their only source of income—of wage theft. (Setareh Decl., ¶ 14(a).) Accordingly,

18  Defendants' proffered declarations must be taken with a giant grain of salt, as they were all from

19  employees who were employed with Defendants at the time of their execution, who had more than

20  enough reason to sign declarations stating facts favorable to their then-current employers.(*Id.*) Moreover,

21  Defendants also have the luxury of cherry-picking and may simply choose not to provide a declaration

22  from any employee that might support or confirm any of the class allegations. (*Id.*)

23         Based on the foregoing facts and evidence, while the claims for unpaid wages are certifiable, there

24  is risk that Plaintiff would not be able to establish liability at trial. (*Id.*) However, since some managers did

25  make closing employees count drawers off the clock and make bank deposits, we can reasonably estimate

26  that 1/3 of the shifts are closing shifts and that these violations occurred on 25% of such shifts. (*Id.*)

27  Multiplying this to the maximum estimated potential recovery of $95,643.19 and PAGA penalties of

28  $1,067,550.00, we get a more realistic recovery for prevailing on this claim of $123,218.33 in damages

and $88,962.50 in PAGA penalties. (*Id*.) To the extent that such off-the-clock work could constitute a failure to pay the minimum wage, as was held in *Armenta v. Osmose, Inc.*, 135 Cal.App.4th 314, 324 (2005), the likely recoverable PAGA penalty would be $177,925.00.  (*Id*.)

Second, Plaintiff alleges that overtime wages were not paid in full due to failure to pay overtime based upon the regular rate of pay. (*Id*.) Specifically, Defendants ran a "secret shopper" program in which secret shoppers would be sent to Defendants' locations, and based upon the reports of these secret shoppers, discretionary bonuses could be earned by employees at that location. (*Id*.) These bonuses must be included when calculating the "regular rate of pay" for the employee who earned them in in pay period in which they were earned, and that regular rate must be the rate from which the overtime rate for that pay period, if overtime was worked therein, must be calculated.  (*Id*.)

Upon analysis of the timekeeping and payroll data produced for the putative Class by Defendants, it appears that 7.4% of all pay periods during the Class Period had both a bonus earned and overtime worked and paid. (*Id*.) Plaintiff's expert found that, on average, $3.77 of overtime was underpaid for each of these pay periods due to not calculating the regular rate for the pay period and basing the overtime rates used on the straight pay rate instead. (*Id*.)  This means that there is an estimated potential value of $7,924.43 on the regular rate portion of the unpaid wages claim, and the likely recoverable PAGA penalty would be $158,000.00. (*Id*.)

### (ii)    Meal and Rest Period Claims

As an initial matter, Plaintiff calculated the maximum liability for meal and rest periods at only one of each per shift, regardless of whether multiple meal violations or rest violations occurred per day, because only one meal break premium and one rest break premium can be recovered per day under Labor Code section 226.7.  *United Parcel Service Wage and Hour Cases*, 196 Cal.App.4th 57, 70 (2011).

While there exists sufficient evidence in the time and payroll data to certify a class on the meal and rest period claims alleged by Plaintiff, there is risk that Plaintiff would not be able to prove liability for the alleged failure to provide compliant meal periods and rest breaks.  In *Brinker Restaurant Corp. v. Superior Court*, 53 Cal. 4th 1004, 1040 (2012), the California Supreme Court held that an employer's duty with respect to meal breaks it to provide the opportunity to take meal and rest breaks to employees, but employers have no duty to policy meal breaks to ensure they are taken. *Id*.  "[W]ork by a relieved

1    employee during a meal break does not thereby place the employer in violation of its obligations and

2    create liability for premium pay….” *Id.*, at 1041.

3          Plaintiff asserts that Defendants did not enforce its written meal period and rest break policies,

4    defaulting to operational practices instead, and that this resulted in Class Members not receiving legally

5    compliant meal and rest periods.  (Setareh Decl., ¶ 14(b).)  For example, Plaintiff testified at deposition

6    that the normal situation during an 8-hour shift was that he would get a first rest break, but then the

7    restaurant would get so busy that he and others would have to take a late lunch since some employees

8    would have to cover for other employees while they took their meal breaks, and this led to meals being so

9    late that no second rest break could be taken. (*Id.*)  Plaintiff further asserted that Defendants’ written meal

10   period and rest break policies were habitually overridden by coercing employees into mis-recording their

11   meal periods and altering their timekeeping records to reflect that they were taken when in fact, they were

12   not taken, despite the fact that the employee handbook produced by Defendant included meal break

13   policies that appear to be facially compliant with California’s requirements. (*Id.*)

14         Upon review, the evidence clearly supports Plaintiff’s allegations of non-compliant common

15   practices. (*Id.*) First, the time and payroll records produced by Defendants revealed a staggering 75.1%

16   meal period violation rate across all shifts of greater than six hours (thus, requiring a meal period), and

17   Defendants’ rest period policies are, on their face, deficient under *Brinker* in that they do not include

18   reference to a “major fraction” of each four-hour period during which a rest break must be provided. (*Id.*)

19   Second, analysis of Defendants’ records, which include the times that rest breaks, if any, are taken, also

20   revealed a 35.8% violation rate among all shifts of 3.5 hours or longer (thus, requiring a rest period). (*Id.*)

21   Finally, several former employees, who were contacted by Class Counsel from the Class List produced by

22   Defendants, confirmed that during the Class Period at their work locations, it would frequently get so busy

23   that a timely rest period or meal period was simply not possible to take.  (*Id.*)

24         Against this, Defendants would cite their allegedly facially compliant written meal and rest break

25   policies as evidence that employees were provided with the opportunity to take meal and rest periods. (*Id.*)

26   This would be hard-pressed to justify over 60,000 meal period violations and over 63,000 rest period

27   violations found in the data that Defendants produced.  (*Id.*)  Accordingly, Defendants also contest the

28   factual predicate for Plaintiff’s meal and rest period claims. (*Id.*) They assert that the timekeeping records

they produced in discovery show shifts with clock outs for compliant meal periods. (*Id.*)  Defendants also would point to the declarations they obtained from then-current employees, which also included statements from employees that stated that they received the opportunity to take all their meal and rest periods and either stated that they took all their meal and rest breaks when provided with the opportunity or that they sometimes voluntarily skipped meal and rest breaks despite being given the opportunity to take them. (ECF 78-1.)  Defendants would even cite to Plaintiff's deposition, where he testified that his preference on shifts shorter than six hours long was to skip the meal period because he would rather just finish his shift and go home than take a meal period and stay at work for an extra 30-minute unpaid period of time.  (ECF 78 at 9.)

However, this again must be weighed against the fact that the declarations proffered by Defendants were all taken from *current* employees, who are incentivized by the very nature of their dependence upon Defendants for income and the means of survival, to comply with signing statements in Defendants' favor. (Setareh Decl., ¶ 14(b).)  Furthermore, Plaintiff's expert analyzed the data regarding meal periods for shifts of 6 hours or longer, where a meal period *must* be provided in the absence of an on-duty meal period waiver.  (*Id.*)  Thus, the preference of Plaintiff or any putative Class Member with respect to shifts of 5 to 6 hours in length has nothing to do with the 75.1% of 6-hour-plus shifts where a meal period violation occurred.  (*Id.*)

The foregoing facts and evidence, while sufficient to support certification, carry a risk that Plaintiff would not be able to establish liability at trial.  Accordingly, realistically assuming that 50% of meal break violations as shown in the records were due to non-exempt employees being prevented from taking meal breaks, the likely recoverable meal break premiums would be 50% x $717,102.64 = $358,551.32, and the likely recoverable PAGA penalties would be 50% x $2,135,100.00 = $1,067,550.00. (*Id.*)  Making the same assumption for rest breaks, the likely recoverable rest break premiums would be $748,242.82 x 50% = $374,121.41, and the likely recoverable PAGA penalties would be $2,135,100.00 x 50% = $1,067,550.00.  (*Id.*)

**(iii)    Unreimbursed Business Expense Claims**

There is risk that Plaintiff would not be able to prove liability for the alleged failure to reimburse business expenses.  Plaintiff's unreimbursed business expense claims allege that employees were required

to use their personal vehicle for work purposes without being reimbursed, such as to drive to other Five Guys locations to pick up food and supplies. (Setareh Decl., ¶ 14(c).)  Putative Class Members contacted by Class Counsel confirmed that during some of their shifts, like Plaintiff, they had been instructed by managers to go make deposits to the bank using their personal vehicles and that they were never reimbursed their mileage in doing so.  (*Id*.)  Policy documents produced by Defendants included an Expense Reimbursement Policy that stated that employees can submit expense reports for reimbursement through a CONCUR website. (*Id*.)  Thus, there is no dispute as to whether Defendants paid for employees' expenses or that employees were subject to a common reimbursement policy.  (*Id*.)

Defendant would argue that, to the extent that there exist any other instances of unreimbursed business expenses incurred by employees, no liability exists under *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal.4th 554, 568 (2007), because *Gattuso* held that California's law pertaining to business expense reimbursement imposes a duty upon employees to maintain and submit records evidencing necessary expenses; thus, failure by the employee to submit reimbursement information does not create liability on the part of the employer for the failure to reimburse those unreported expenses. (*Id*.)  Defendants would cite their proffered employee declarations, which also included statements from employees that either stated that they did use their personal car for work but got reimbursed for those instances, or that they did not ever use their personal car for work, and that they did not incur any other business expenses related to work, such as cell phone expenses or e-mail/Internet expenses. (ECF 78-1.)  However, this must once more be weighed against the fact that the declarations were all taken from current employees, who are necessarily biased in Defendants' favor. (Setareh Decl., ¶ 14(c).)

Based on the foregoing facts and evidence, while there is enough to certify a class on the reimbursement claim, there is risk that Plaintiff would not be able to establish liability at trial. Realistically assuming that there is a 20% chance finding records evidencing mileage incurred by non-exempt employees at the behest of their managers, the likely recoverable reimbursable expenses would be 20% x $314,329.73 = $62,865.95, and the likely recoverable PAGA penalties would be 20% x $187,900.00 = $37,580.00.  (*Id*.)

**(iv)  Credit Reporting Act Claims**

Plaintiff further risks being unable to prove liability for the alleged credit reporting act claims,

which allege that Defendants violated various state and federal credit reporting laws because applications

for employment authorized Defendants to conduct background checks on applicants, including criminal

background checks, driving history checks, and consumer report investigations.  Plaintiff alleged that the

disclosure and authorization forms violated various state and federal requirements with respect to such

disclosures and authorization forms appearing on stand-alone documents, rather than being embedded

with other, unrelated information on the job applications.  Plaintiff further alleged that Defendants failed

to disclose information such as the name of the agency conducting the consumer report investigation and

the basis for the use of consumer credit reports. (Setareh Decl., ¶ 14(d).)

Irrespective of the existence of any flaws in the authorization forms, verified discovery responses

from Defendants indicated that no background checks were actually performed on any applicants or

employees. (*Id.*)

If this matter were to proceed to trial, there is risk Plaintiff is unable to establish liability for the

credit reporting claims.  Defendants intend to argue at trial that a necessary factual predicate for any credit

reporting claim is that Defendants actually procured a credit report/background report/consumer report.

See, e.g., 15 U.S.C. § 1681b(b)(2)(A) ["Except as provided in subparagraph (B), a person may not

procure a consumer report, or cause a consumer report to be procured, for employment purposes with

respect to any consumer, unless…"]; see also 15 U.S.C. § 1681d(a)(1) & 1681g(c); Cal. Civ. Code §

1785.20.5(a); Cal. Civ. Code § 1786.16(a)(2).)

Under controlling Ninth Circuit authority, a prospective employer violates Section 1681b(b)(2)(A)

when it procures a job applicant's consumer report after providing a disclosure form that does not

"consist[s] 'solely' of the disclosure." *Gilberg v. Cal. Check Cashing Stores*, 913 F. 3d 1169 (2019).  If no

reports were actually procured, there is risk that no class member suffered any injury and no liability

exists. (*Id.*)  The value of the violation is nominal at best.  While there is evidence that Defendants used

deficient disclosures to obtain employment applicants' authorization to procure background check reports

on them, which induced Plaintiff to allege the credit reporting claims, Defendants admit that no

background checks actually had been requested or performed on class members to date. Of course, this

does not change the fact the Defendants still possess the authorizations to run background checks to

unwitting Class Members, and while this risk is minimal – perhaps 1% at most - it is still not zero.  As the

likely penalty for the FCRA violation is $100, the minimum under 15 U.S.C. section 1681n(a)(1)(A), since the violation was procedural and at the low-end of willfulness on Defendants' part, the value of this claim is at most 1% x $100 penalty x 2,078 Class Members = $2,078.00.

Plaintiff's third and fourth causes of action under the California Investigative Consumer Reporting Agencies Act ("ICRAA") and the California Consumer Reporting Agencies Act ("CCRAA") are encompassed in the settlement in this case and included in the release. These state law claims are closely related to, and cover the same subject matter as, Plaintiff's first and second causes of action under the FCRA regarding the background check forms. However, as discussed below, both claims were disputed and as a practical matter have limited value to the class.

Both the ICRAA and CCRAA allow for actual damages. Cal. Civ. Code §§ 1786.50(a)(1); 1785.31(a)(1). However, Plaintiff claim is based on an allegation that the disclosure forms used improperly included extraneous language, and as such, Plaintiff and settlement class members did not incur any actual damages. To assert actual damages, a plaintiff would presumably have to allege and later prove not only that s/he did not understand that a background check would be done, but also that if s/he had known that a background check would be done, s/he would not have authorized it. This is unlikely as a job applicant is not going to refuse a background check if such assent is necessary to get a job. Even then, there would be no economic damages. A job applicant who refused the background check would not get the job therefore, there could be no argument of economic injury even if the disclosure was legally inadequate. Furthermore, actual damages require proof of causation *as a result of the failure.* Cal. Civ. Code § 1786.50 (emphasis added).

Even if class members suffered actual damages, Defendants would dispute that such a class could be certified due to asserted individualized issues inherent in determining who was damaged, including proof of causation. Defendants would also asserted it would be extremely difficult, if not impossible, to estimate the aggregate number of actual damages suffered by class members, as such damages would require individual proof, including proof of causation. Plaintiff himself was hired, which created challenges in him representing any class members who may claim to have suffered actual damages. Class members who prefer to seek individual statutory or actual damages rather than the payout in the class settlement can opt out of the settlement.

1    In addition to actual damages, Plaintiff also seeks statutory damages under the ICRAA. However,

2    the plain language of the ICRAA makes clear that statutory damages are not available in a class action.

3    Cal. Civ. Code § 1786.50(a). Therefore, and potential recovery would be too low to warrant the expense

4    of litigation on a case-by-case basis. This, plus the crucial fact that the background checks were never run

5    and failed to cause actual damages, leave the background check claims with only nominal value.

6    However, the release period only runs until May 24, 2019, so should Defendants have run any

7    background checks after that date, such claims would not be released.

8                        **(v)    Wage Statement and Waiting Time Penalty Claims**

9    There is risk that Plaintiff would not be able to prove liability for the alleged wage statement and

10   waiting time penalty claims.

11   Multiple Courts of Appeal in California have held that a plaintiff is not entitled to recover

12   penalties under Labor Code section 203 [unpaid wages upon termination] or Labor Code section 226

13   [wage statement violations] for non-provision of meal breaks and rest breaks. *See Betancourt v. OS*

14   *Restaurant Services, LLC*, 49 Cal.App.5th 240, 247-48 (2020). Plaintiff also might not prove that

15   Defendants acted with the intent necessary for the alleged claims for penalties under Labor Code sections

16   203 and 226. Specifically, section 203 requires that a plaintiff show the employer committed a "willful"

17   violation of the law in withholding wages. "A good faith dispute that any wages are due will preclude

18   imposition of waiting time penalties under Section 203." 8 Cal. Code Regs. § 13520. Similarly, penalties

19   pursuant to section 226 require a "knowing and intentional" violation. Defendants contend that they

20   would present several good faith defenses that would preclude a finding of willfulness under section 203.

21   *See Choate v. Celite Corp.* (2013) 215 Cal. App.4th 1460 (reversing award of section 203 penalties based

22   on good faith defense where underlying wage claim presented issue of first impression). Any such good

23   faith dispute could preclude penalties. (Setareh Decl., ¶ 14(e).) Plaintiff's Section 203 claim is derivative

24   insofar as it assumes, as with the wage-statement claim, that employees were not paid all wages owed

25   based on the above, and the potential recovery is based upon the number of employees terminated during

26   the Class Period. (*Id.*) If any wages are owing on any of the unpaid wages, meal break, or rest break

27   claims discussed above, then if an employee was not provided those wages upon termination or within 72

28   hours of resignation, then waiting time penalties are owed pursuant to Labor Code section 203. Labor

Code §§ 201, 202, 203. (*Id.*) Because the waiting time penalties derive from the unpaid wages, meal break, or rest break claims, then the claim with the highest chance of proof will be the chance of a former employee having a claim for waiting time penalties, if penalties are certain. (*Id.*)

Regardless of which claim has the highest chance of proof, there exists a heightened risk with respect to proof of willfulness or knowing and intentional conduct. (*Id.*) This additional element reduces the likelihood of success at trial or on appeal thereafter by introducing additional obstacles. (*Id.*) Against the prospects of an unknown jury panel, the opaque nature of a willful waiting time penalty violation or a knowing and intentional wage statement violation that is derivative of predicate unpaid wage, meal and rest premium wage, and reimbursement claims, Class Counsel estimates the probability of proving this element at trial at roughly 1-in-2. (*Id.*) Class Counsel is of the opinion that, regardless of what is found at trial, it is more likely than not that Plaintiff would prevail on an appeal by either side on this issue and ascribes a 2-in-3 probability of doing so. (*Id.*) These additional risks factor into the estimated potential recovery in comparison with the compensatory claims for unpaid wages and reimbursement—which have no such additional risk factors—and have the effect of reducing the actual value of the waiting time and wage statement penalty claims. (*Id.*)

### (vi)    Other Risks and PAGA

In addition to the risks outlined above, there are also risks that class certification may be denied due to individualized inquiries, that civil penalties awarded under PAGA are reduced at the Court's discretion, and that lengthy appellate litigation ensues as to issues of liability and/or certification.

With respect to the PAGA penalties, although the PAGA penalties calculated by Plaintiff's expert amounts to an extravagant $8,367,500.00, that amount is not likely to bear fruit in this case. Most significantly, the ultimate decision as to the amount of penalties is always up to the discretion of the Court. Labor Code section 2699(e)(2) states: "In any action by an aggrieved employee seeking recovery of a civil penalty available under subdivision (a) or (f), a court may award a lesser amount than the maximum civil penalty amount specified by this part if, based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory." Subdivision (a) states, "Notwithstanding any other provision of law, any provision of this code that provides for a civil penalty to be assessed and collected by the Labor and Workforce

1  Development Agency or any of its departments, divisions, commissions, boards, agencies, or employees,

2  for a violation of this code, may, as an alternative, be recovered through a civil action brought by an

3  aggrieved employee on behalf of himself or herself and other current or former employees pursuant to the

4  procedures specified in Section 2699.3."  Subdivision (f) specifies the penalties in instances where the

5  underlying statute does not specify any civil penalty.  In other words, where the facts and circumstances

6  of the particular case demonstrate that an unreduced award would be "unjust, arbitrary and oppressive, or

7  confiscatory," the court (or arbitrator) may reduce the award so as to ameliorate any such finding. (Setareh

8  Decl., ¶ 14(f).)

9       The standard for evaluating a PAGA settlement is not the same as (or even remotely similar to)

10  that which governs "a class action lawsuit, [since] PAGA claims such as the one before the court here are

11  intended to serve a decidedly different purpose--namely to protect the public rather than for the benefit of

12  private parties." *Gutilla v. Aerotek, Inc.*, 2017 WL 2729864, at *2 (E.D. Cal. Mar. 22, 2017) (recognizing

13  the distinct issues presented by class actions and adopting "fundamentally fair, reasonable, and adequate

14  with reference to the public policies underlying the PAGA" standard of review with respect to PAGA-

15  only settlement).  For this reason, many courts have simply referred to the PAGA settlement standard as a

16  mere "reasonableness" standard. *See, e.g., Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1037 (N.D. Cal.

17  2016)  In *Cotter*, the Court approved a $27 million settlement which allocated only $1 million toward

18  PAGA, whereas this case allocates a much larger proportion of the settlement toward PAGA ($100,000

19  out of $1,200,000).

20       Furthermore, the amount individual aggrieved employees recover in a PAGA settlement is not a

21  consideration in evaluating whether the settlement is reasonable, because PAGA enforcement actions

22  brought by the State result in none of the penalties being paid to individual aggrieved employees.  *See,*

23  *e.g.*, Cal. Lab. Code § 1197.1 (allowing Labor Commissioner to assess and collect civil penalty); Cal.

24  Lab. Code § 558 (same).

25       Moreover, given that PAGA penalties are primarily distributed to the state and the Labor Code

26  provides a mechanism by which the LWDA receives notice of the settlement and may intervene at any

27  time and assume control over the action.  *See* Cal. Lab. Code § 2699(l)(2); Cal. Gov't Code §

28  12652(c)(4)-(8), (e)(2) (the absence of intervention or opposition by the State, the real party in interest,

1    should be given great weight in assessing the reasonableness of the PAGA settlement).

2          Beyond this, Defendants have committed themselves to effectuate injunctive measures as part of

3    the Settlement implemented with respect to members of the Settlement Class employed by Defendants

4    after the Effective Date:

5          •    Implementation of a procedure, whereby employees can report any missed, late, or short meal

6               breaks or rest breaks;

7          •    Implementation of a procedure whereby employees review and verify their timekeeping records

8               and report any off the clock work;

9          •    Discontinuance of any practice where any credit report, consumer report, or background check

10              (within the meaning of the Fair Credit Reporting Act and/or the Consumer Credit Reporting

11              Agencies Act) is requested by Defendants for all applicants as a matter of course without legally

12              required disclosures under the Fair Credit Reporting Act and/or the Consumer Credit Reporting

13              Agencies Act.  (Stipulation, ¶ 63.)

14   Defendants' agreement to these measures of injunctive relief fulfills the purpose of the PAGA, which is to

15   deter the future violations.  At its heart, the PAGA is an enforcement tool of the LWDA, a cabinet-level

16   agency that coordinates workforce programs.  (https://www.labor.ca.gov/about/).  The California

17   Legislature enacted the PAGA because existing mechanisms for Labor Code enforcement were not

18   "significant enough to deter violations." *Iskanian v. CLS Transp. Los Angeles, LLC*, 59 Cal. 4th 348, 379

19   (2014) (quoting legislative history; internal quotation marks omitted). The Legislature determined that the

20   best means of "achiev[ing] maximum compliance with state labor laws" was to "allow aggrieved

21   employees, acting as private attorneys general, to recover civil penalties for Labor Code violations." *Arias*

22   *v. Superior Court,* 46 Cal.4th 969, 980-81 (2009). "The purpose of PAGA is not to recover damages or

23   restitution, but to create a means of 'deputizing' citizens as private attorneys general to enforce the Labor

24   Code." *Achal v. Gate Gourmet, Inc.*, 114 F.Supp.3d 781, 807 (N.D. Cal. 2015).  The allocation of

25   $100,000.00 to PAGA penalties is justified because the ends of the PAGA have been achieved since

26   future Labor Code violations by Defendants have been deterred.

27          Finally, Courts typically approve PAGA settlement amounts in the range of between 0.27% to

28   1.7% of the total settlement. *See Davis v. Brown Shoe Co.*, 2015 U.S. Dist. LEXIS 149010 (E.D. Cal.

2015) (PAGA Payment of $5,000 in a $1.5 million class settlement); *Zamora v. Ryder Integrated Logistics, Inc.*, 2014 U.S. Dist. LEXIS 184096 (S.D. Cal. 2014) ($7,500 payment to LWDA for PAGA on a $1.5 million class settlement); *Lusby v. Gamestop Inc.*, 2015 U.S. Dist. LEXIS 42637 (N.D. Cal. 2015) (PAGA Payment of $5,000 in a $500,000 class settlement); *Cruz v. Sky Chefs, Inc.*, 2014 U.S. Dist Lexis 17693 (N.D. Cal. 2014) (approving payment of $10,000 to the LWDA for PAGA out of $1,750,000 class settlement); *Chu v. Wells Fargo Investments, LLC*, 2011 WL 672645, *1 (N.D. Cal. 2011) (approving PAGA payment of $7,500 to the LWDA out of $6.9 million common-fund settlement); *Franco v. Ruiz Food Products, Inc.*, 2012 WL 5941801, *13 (E.D. Cal. 2012) (approving PAGA payment of $7,500 to the LWDA out of $2.5 million common-fund settlement); *Hopson v. Hanesbrands Inc.*, 2009 WL 928133, *9 (N.D. Cal. 2009) (approving PAGA allocation that was .49% of $408,420.32 gross settlement); *Garcia v. Gordon Trucking, Inc.*, 10-cv-00324-AWI-SKO, Dkt. 149-3, 165 (E.D. Cal.) (approving a class settlement of $3,700,000, with $10,000 allocated to the PAGA claim); *McKenzie v. Federal Express Corp.*, CV 10-02420 GAF (PLAx), Dkt. 139 & 141 (C.D. Cal.) (court approved a settlement in an amount of $8.25 million, with $82,500 allotted to the PAGA claim); *DeStefan v Frito-Lay*, 8:10-cv-00112-DOC (C.D. Cal.) (court approved a class settlement of $2 million, with $10,000 allocated to PAGA); *Martino v. Ecolab Inc.*, No. 3:14CV04358 (N.D. Cal. 2017) ($100,000 allotted as PAGA penalties or 0.48% of $21,000,000 settlement amount). Here, the allocation of $100,000 to the PAGA claims is 8.3% of the Gross Settlement Amount, which exceeds the norm.

### (vii)    UCL Claim

Claims under the UCL are governed by the four-year statute of limitations set out in Business and Professions Code section 17208, which allows for the restitution of unpaid wages and anything else in which the plaintiff has an ownership interest. This also includes meal period and rest period premium payments pursuant to Labor Code section 226.7, which are considered wages for these purposes. *Murphy v. Kenneth Cole Productions, Inc.*, 40 Cal.4th 1094, 1120 (2007). Accordingly, the maximum potential recovery and risk factors have already been addressed in the above sections relating to the unpaid wages and meal and rest break premiums since liability under the UCL derives from the elements of these other causes of action, simply extending the period of liability to four years instead of three, as would normally be the case under Code of Civil Procedure section 338. (Setareh Decl., ¶ 14(g).)

However, the actual value of the UCL claim derives from its extension of the normal 3-year limitations period to four years. (*Id.*) As there is an adequate legal remedy during the 3-year limitations period, only the time from 4 years prior to the filing of the action to 3 years and a day before the filing of the action are properly covered by the UCL. (*Id.*) The Estimated Potential Recovery chart above has split each of the unpaid wage and reimbursement claims into its value during the 3-year SOL Period and during the UCL Period, to enumerate the values of the component UCL Claims and derive the aggregate UCL Claim of $25,630.18.[4] (*Id.*)

In these respects, Defendants strongly deny any liability and the propriety of class certification for any reason other than settlement. (*Id.*) In light of the uncertainties of protracted litigation, the Settlement amount reflects a fair and reasonable recovery for the settlement Class Members. The Settlement amount is, of course, a compromise figure. (*Id.*) By necessity, it took into account risks related to liability, damages, class and collective action certification, and all the defenses asserted by the Defendants as to all such matters. (*Id.*) Moreover, each settlement Class Member will be given the opportunity to opt out of the Settlement, allowing those who feel they have claims that are greater than the benefits they can receive under this Settlement to pursue their own claims. (*Id.*)

In light of these risks for both parties, the Settlement provides a sizeable recovery while mitigating all Parties' risk if the matter were to proceed. (*Id.*) As such, the Settlement is fair, reasonable, adequate, and is in the best interest of the Class in light of all known facts and circumstances, including the risk of the significant delay. (*Id.*) The Settlement is also in the best interest of judicial efficiency in this case, as it obviously eliminates a lengthy and contested pre-certification class action lawsuit from this Court's calendar. (*Id.*)

### 3.    The Class Release Is Appropriate Given Plaintiff's Claims

"A clause providing for the release of claims may refer to all claims raised in the pending action, or it may refer to all claims, both potential and actual, that may have been raised in the pending action with respect to the matter in controversy. " 4 *Newberg on Class Actions, supra*, § 12:15, at pp. 310-311.

---

[4] The value of the UCL Claim is substantially lower than the aggregate value of subsequent years because Defendant Encore did not start ramping up its operations as a Five Guys franchisee until well into 2014. (Setareh Decl., ¶ 38.)

1   "As a matter of settlement strategy, the defendants may negotiate a release of all claims up to the date of

2   settlement, though this date naturally falls after the date the complaint was filed." *Id.*, § 12:15, pp. 315-

3   316. "[There is no rigid rule against the addition of new claims shortly before submission of a proposed

4   settlement provided that proper notice and opportunity for opting out are afforded ... and that the

5   settlement fairly and adequately provides for the new claims. " *Weinberger v. Kendrick*, 698 F.2d 61, 77

6   (2d Cir. 1982) (citations omitted). "The weight of authority establishes that... a court may release not only

7   those claims alleged in the complaint and before the court, but also claims which 'could have been alleged

8   by reason of or in connection with any matter or fact set forth or referred to in' the complaint.... And it has

9   been held that even when the court does not have power to adjudicate a claim, it may still 'approve release

10   of that claim as a condition of settlement of [an] action [before it]. ' " *In re Corrugated Container Antitrust*

11   *Litigation*, 643 F.2d 195, 221 (5th Cir. 1981) (citations omitted, italics added). "[A] judgment pursuant to

12   a class settlement can bar [subsequent] claims based on the allegations underlying the claims in the settled

13   class action. This is true even though the precluded claim was not presented, and could not have been

14   presented, in the class action itself." *In re Prudential Ins. Co. of America*, 261 F.3d 355, 366 (3d

15   Cir.2001); *accord*. *In re General American Life Ins. Company Sales Prac. Lit*., 357 F. 3d 800, 804-805

16   (8th Cir. 2004); *Villacres v. ABM Industries Inc*., 189 Cal.App.4th 562, 586-587 (2010).

17      As described above, as part of the Settlement, Class Members will release all claims based on or

18   arising from the facts pled in the complaint. (Stipulation, ¶ 18.)  These released claims appropriately track

19   the breadth of Plaintiff's allegations in the Action. (*Id.*)

20      And, of course, Class Members have the right to opt out of the Settlement by submitting a Request

21   for Exclusion provided for in the Class Notice. (Stipulation, ¶¶ 26(c), 27.)  If they do so, they will not

22   release any claims but, of course, also will not share in the recovery in that event.

23          **4.   Class Counsel's Fees Requested Are Consistent with Prevailing Market Rates**

24      The compensation sought for Plaintiff's counsel is also fair and reasonable.  The Ninth Circuit has

25   directed that, to determine what constitutes a fair and reasonable percentage of the settlement for purposes

26   of calculating common fund attorneys' fees, the courts should begin with a "benchmark" percentage of

27   the total fund.  *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989); *Vizcaino v.*

28   *Microsoft Corp*., 290 F.3d 1043, 1047 (9th Cir. 2002); *Six Mexican Workers v. Arizona Citrus Growers*,

904 F.2d 1301, 1311 (9th Cir. 1990). The percentage can be adjusted upwards where the risks overcome, the benefits obtained and the work necessary to achieve those results supports such an adjustment of the benchmark.

Due to the Court's concern regarding Class Counsel's Fee Award, Class Counsel seeks no more than **$300,000.00** (this amount is equivalent to twenty-five percent or 25% of the Gross Settlement Amount.) (Setareh Decl., ¶ 9; Stipulation, ¶ 14(a).) Class Counsel also requests actual costs incurred and paid without reimbursement in the litigation of this Action, not to exceed **$20,000.00**. (*Id.*)

### 5.    The Settlement Provides for Equitable Treatment of Class Members

The settlement also satisfies Rule 23(e)'s requirement that the proposed settlement treat class members equitably relative to each other. The Court's prior order stated that the proposed "settlement shares failed to reflect apparent distinctions amongst the class members based on the class claims." The Court noted that the settlement contemplated "996 first violations of Labor Code § 226" which "is substantially less than the number of putative class members (2,206)." The revised settlement agreement now provides for equitable distribution of the settlement by calculating settlement shares based upon subclasses representing the categories of claims with differing statutes of limitations.

Sixty percent (60%) of the Net Settlement Amount shall be allocated to all Class Members, distributed on a *pro rata* basis according to each member's number of Work Weeks during the relevant limitations period, representing equitable distribution of the settlement among all Class Members for all claims with four-year statutes of limitation (i.e., for unpaid wages, meal and rest period premiums, and expense reimbursement under the Labor Code and as extended by the UCL).

Twenty-five percent (25%) of the Net Settlement Amount shall be allocated to the Waiting Time Penalty Subclass, distributed on a *pro rata* basis according to each member's number of Work Weeks during the relevant limitations period, representing equitable distribution of the settlement among all Class Members for claims with three-year statutes of limitations (i.e., under Labor Code § 203).

Fifteen percent (15%) of the Net Settlement Amount shall be allocated to the Wage Statement/PAGA Penalty Subclass, distributed on a *pro rata* basis according to each member's number of Work Weeks during the relevant limitations period, representing equitable distribution of the settlement among all Class Members for claims with one-year statutes of limitations (i.e., under Labor Code § 226

and Labor Code § 2698, *et seq.*)

These percentages nearly approximate the proportions of the potential recovery on the Class Claims.  (*See* Section IV.C.1, above.)

### D.    CERTIFICATION OF A CLASS FOR SETTLEMENT PURPOSES ONLY IS APPROPRIATE

Pursuant to Rule 23(c)(1), Federal Rules of Civil Procedure, the Court may "make a conditional determination of whether an action should be maintained as a class action, subject to final approval at a later date."  *Fry v. Hayt, Hayt & Landau*, 198 F.R.D. 461, 466 (E.D. Pa. 2000) (citing Fed. R. Civ. P. 23(c)(1)).  Conditional approval of the class is appropriate where the plaintiff demonstrates (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation; and one of the three requirements of Rule 23(b) also is met.  Conditional certification of the settlement class is appropriate here as all the factors Rule 23 requirements are met.  (Setareh Decl., ¶¶ 27-33.)

### 1.    The Numerosity Requirement Is Met

The numerosity requirement is met if the class is so large that joinder of all members would be impracticable.  *Gay v. Waiters' & Dairy Lunchmen's Union Loc. No. 30*, 489 F. Supp. 282 (N.D. Cal. 1980), *aff'd*, 694 F.2d 531 (9th Cir. 1982).  In determining whether joinder would be impracticable, a court may consider not only the sheer number of class members, *Riordan v. Smith Barney*, 113 F.R.D. 60, 62 (N.D. Ill. 1986) (numbers alone may be dispositive), but also "the nature of the action, the size of the individual claims, [and] the inconvenience of trying individual suits."  *Wang v. Chinese Daily News*, 231 F.R.D. 602, 606 (C.D. Cal. 2005).  "A class action may proceed upon estimates as to the size of the proposed class."  *Lewis v. Gross*, 663 F. Supp. 1164, 1169 (E.D.N.Y. 1986).  *See also, In re Computer Memories Sec. Litig.*, 111 F.R.D. 675, 679 (N.D. Cal. 1986) (class certified where plaintiffs did not establish exact size, but demonstrated that class would "obviously be sufficiently numerous").

Here, the estimated count of approximately 2,078 class members satisfies the numerosity requirement. (Setareh Decl., ¶ 28.)  It is sufficiently numerous that the individual joinder of all members is impracticable.

### 2.    Commonality and Predominance

Rule 23(a)(2) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).

The commonality requirement has been construed permissively; not all questions of law and fact need to be common. *Hanlon v. Chrysler Corp*., 150 F.3d at 1019. "The existence of shared legal issues with divergent factual predicates is sufficient." *Id.* Where a class is united by a common interest in determining whether a defendant's broad course of conduct is actionable, commonality is not defeated "by slight differences in class members' positions." *Blackie v. Barrack,* 524 F.2d 891, 901 n.17 (9th Cir. 1975).

Here, Plaintiff alleges that his claims involve common questions of both fact and law regarding Defendants' alleged failure to abide by state wage-and-hour laws, FCRA and related California background check laws – and Defendants will not object to Plaintiff's position on this issue solely for the purposes of the Settlement. In this litigation, all Class Members have shared a common interest in determining: whether Defendants procured a background check report on Plaintiff and putative class members with non-compliant disclosure forms, whether Defendants provided legally compliant meal periods and rest breaks to Class Members; whether Defendants paid employees for all time worked; whether Defendants properly reimbursed employees for business expenses incurred when they used their personal vehicles to perform errands for Defendants, whether Defendants violated the itemized wage statement provisions of Labor Code section 226 by not providing accurate information as to wages; and whether Defendant's policies and practices violated Labor Code section 203 and Business & Professions Code sections 17200 *et seq*., and PAGA. (*Id.*, ¶ 30.)

Given the permissive standard that courts in the Ninth Circuit employ when determining commonality, certification of the Class for settlement purposes is appropriate as Rule 23(a)(2) is satisfied.

Once it is established that common issues of law or fact exist, for Rule 23(b)(3) purposes, the Court next examines whether those common issues predominate. The predominance inquiry focuses on whether the class is "sufficiently cohesive to warrant adjudication by representation." *Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001). Central to predominance is "the notion that the adjudication of common issues will help achieve judicial economy." *Zinser v. Accufix Research Institute, Inc*., 253 F.3d 1188, 1189 (9th Cir. 2001). When common questions represent a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an

individual basis." *Hanlon*, 150 F.3d at 1022. It is well settled that the need for determining differing amounts of damages suffered by different class members does not preclude class certification. *See*, *Blackie*, 524 F.2d at 905; *Wang*, 231 F.R.D. at 613.

There are common issues that may predominate over individual issues in this litigation. (Setareh Decl., ¶ 31.) For example: (1) whether Defendants furnished a legally compliant disclosure form before obtaining a background check on Plaintiff and putative class members; (2) whether Defendants uniformly failed to provide Class Members with legally compliant meal periods and rest breaks; (3) whether Defendants required or permitted employees to work off the clock; (4) whether Defendants properly reimbursed employees for business expenses for the use of their personal vehicles during work hours; (5) whether Defendants provided putative Class Members with itemized wage statements that were inaccurate in violation of Labor Code § 226; (6) whether Defendants failed to pay all overtime wages due and payable to former employees within the times specified under the California Labor Code; (7) whether Defendants conduct violates Business & Professions Code sections 17200 *et seq.*, and PAGA. (*Id.*)

In addition, the time and payroll records indicate that 75.1% of shifts where meal periods were required and 35.8% of shifts where rest periods were required had some type of violation. (*Id.*, ¶ 14(b).)

### 3.  **Typicality**

Furthermore, "Rule 23(a)(3) requires that the claims of the named parties be typical of the claims of the members of the class." *Fry*, 198 F.R.D. at 468. This factor is also construed permissively. *See Hanlon*, 150 F.3d at 1019-20. "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent Class Members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. In other words, named plaintiffs need not be "identically situated" with all other class members. "It is enough if their situations share a common issue of law or fact and are sufficiently parallel to insure a vigorous and full presentation of all claims for relief." *Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.*, 917 F.2d 1171, 1175 (9th Cir. 1990).

Typicality refers to the "nature of the claim . . . of the class representative, and not to the specific facts from which it arose." *Hanlon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). The typicality requirement is satisfied where "the named Plaintiffs raise the same Labor Code violations as other putative class members." *Id*. Here, Plaintiff is raising the same claims as the putative class

1   members and has alleged no other individual claims in this matter. (*Id.*, ¶ 29.)  Plaintiff contends—and for

2   purposes of the Settlement only, Defendants will not object to Plaintiff's position—that Plaintiff's

3   respective claims are essentially identical to all other non-exempt employees employed in California by

4   Defendants, and Plaintiff's claims are typical of such workers with the same common issues. (*Id.*)

5   Plaintiff's claims have each been corroborated through interviews conducted by Class Counsel of several

6   putative Class Members whose contact information were included in the Class List produced to Plaintiff

7   by Defendants. (*Id.*)

8                    **4.    Adequacy of Representation**

9           Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the

10  interests of the class."  Adequate representation turns on whether the named plaintiff and his counsel

11  "have any conflicts of interest with other class members," and whether the named plaintiff and his counsel

12  will "prosecute the action vigorously on behalf of the class."  Adequacy may be established by the mere

13  fact that counsel are experienced practitioners.  *Hanlon*, 150 F.3d at 1020.

14          To meet the adequacy of representation requirement in Rule 23(a)(4), Plaintiff must show:

15  "(1) that the putative named plaintiff has the ability and the incentive to represent the claims of the class

16  vigorously, (2) that he or she has obtained adequate counsel, and (3) that there is no conflict between the

17  individual's claims and those asserted on behalf of the class."  *Fry*, 198 F.R.D. at 469.

18          There are no conflicts of interest between Plaintiff and Class Members, and Plaintiff has both

19  shown and expressed his willingness to represent Class Members.  (*Id.*, ¶ 32.)  The similarity of the claims

20  asserted and remedies sought by Class Members and Plaintiff do not suggest any divergent interests held

21  by Plaintiff.  (*Id.*)  Defendants did not assert unique defenses against Plaintiff that it could not assert

22  against any other Class Member.  (*Id.*)  Also, there are no conflicts with Plaintiff's counsel. (*Id.*)

23          For purposes of the Settlement only, Defendants will not challenge Plaintiff's claim that the

24  adequacy of representation requirement is met here because Plaintiff claims he has the same interests as

25  the remaining members of the Settlement Class, there is no conflict between the named Plaintiff's claims

26  and those of the other Class Members, and Plaintiff is represented by experienced and competent counsel

27  who have substantial experience in litigating wage-and-hour class actions. (*Id.*)

28                   **5.    Class Certification Is Proper Under Rule 23(b)(3)**

In deciding whether to certify a class for settlement purposes, a court considers the following factors to determine whether a class action is superior: (a) class members' interests in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; and (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum.[5] Some courts have found that the third Rule 23(b)(3) factor is "conceptually irrelevant in the context of a settlement." *See Strube v. American Equity Inv. Life Ins. Co.*, 226 F.R.D. 688, 697 (M.D. Fla. 2005). "With the settlement in hand, the desirability of concentrating the litigation in one forum is obvious." *Elkins v. Equitable Life Ins. Of Iowa*, 1998 WL 133747, at *19 (M.D. Fla. 1998).

To determine whether the superiority requirements of Rule 23(b)(3) are satisfied, a court compares a class action with alternative methods for adjudicating the parties' claims. Lack of a viable alternative to a class action necessarily means that it satisfies the superiority requirement. *See Valentino v. Carter-Wallace*, 97 F.3d 1227, 1235-36 (9th Cir. 1996) ("a class action is a superior method for managing litigation if no realistic alternative exists"). "[I]f a comparable evaluation of other procedures reveals no other realistic possibilities, [the] superiority portion of Rule 23(b)(3) has been satisfied." *Culinary/Bartender Trust Fund*, 244 F.3d at 1163. In *Culinary/ Bartender Trust Fund*, the Ninth Circuit held that the "case involve[d] multiple claims for relatively small sums" and that the class action clearly served as the only method that would "'permit the plaintiffs to pool claims which would be uneconomical to litigate individually.'" *Id.* at 1163.

The class action is superior here as it is on the only method that will allow Class Members "to pool [their individual] claims which would be uneconomical to litigate individually." (Setareh Decl., ¶ 33.)

The factors articulated in Rule 23(b)(3)(A), (B) and (C) also favor class certification. It is difficult to believe that any Class Members have an interest in individually controlling the prosecution of separate

---

[5] Rule 23(b)(3)(A)-(C). When a court reviews a class action settlement, it does *not* consider Rule 23(b)(3)(D), the fourth factor, regarding difficulties of managing a class action. *Amchem Products Inc. v. Woodward*, 521 U.S. 591, 620 (1997) (in deciding whether to certify a class for settlement purposes, a district court "need not inquire whether the case, if tried, would present intractable management problems").

1   actions, given the relatively small sums involved for any one Class Member.  Any Class Member who

2   wants to pursue a separate action can opt out of the Settlement.

3          Also, it is desirable to concentrate the issues in this forum.  The Settlement allows all individuals

4   to resolve similar claims against Defendants through a process that does not even require the submission

5   of a claim form.

6          Here, Defendants agree not to dispute for purposes of the Settlement only that certification of the

7   Class is appropriate under Rule 23(b)(3) based on Plaintiff's claim in the settlement context that

8   "questions of law or fact common to class members predominate over any questions affecting only

9   individual members, and…a class action is superior to other available methods for fairly and efficiently

10  adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  Although Defendants have expressed

11  concerns regarding trial manageability, these concerns are not implicated in a settlement.

12         **E.      THE NOTICE PACKET IS FAIR AND ADEQUATE**

13         "Adequate notice is critical to court approval of a class settlement under Rule 23(e)."  *Hanlon*,

14  150 F.3d at 1025.  A class action settlement notice "is satisfactory if it 'generally describes the terms of

15  the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward

16  and be heard.'"  *Churchill Village, LLC v. General Electric*, 361 F.3d 566, 575 (9th Cir. 2004) (quoting

17  *Mendoza v. Tucson Sch. Dist. No. 1.*, 623 F.2d 1338, 1352 (9th Cir. 1980).

18         Here, the Class Notice and Claim Form (**Exhibits A and B**, respectively, to the Agreement) and

19  the manner of notice are "the best notice practicable," as required under Rule 23(c)(2)(B).  All Class

20  Members can be identified, and the Class Notice Packet (including the Class Notice and Data Dispute

21  Form) will be mailed directly to each Class Member using First-Class U.S. Mail. (Stipulation, ¶ 26.)  The

22  Class Notice and all relevant documents pertinent to Plaintiff's First Amended Motion for Preliminary

23  Approval shall also be made available online at a website created and maintained by the Settlement

24  Administrator not less than 5 weeks prior to the final approval hearing. The Class Notice adequately

25  informs Class Members of the nature of the litigation, the essential terms of the Settlement, his or her

26  estimated Settlement Payment and other payments (if any), and how to object to or elect not to participate

27  in the Settlement or correct the information on which his or her Settlement Payment or other payment (as

28  applicable) is calculated. (*Id.*, ¶¶ 26-30; Stipulation, Exhs. A and B.)  Further, the Class Notice identifies

1   Class Counsel's contact information, specifies the amounts of the Class Representative Service Award,

2   the Class Counsel Award that Plaintiff will seek, and explains how to obtain additional information

3   regarding the Action and the Settlement. (*Id.*)

4          Specifically, Defendant shall provide the Settlement Administrator with the Class Data for

5   purposes of preparing and mailing Notice Packets to Settlement Class Members.  'Class Data' means

6   information regarding Settlement Class Members that Defendant will in good faith compile from their

7   records and provide to the Settlement Administrator formatted as a Microsoft Excel spreadsheet and shall

8   include each Settlement Class Member's identifying information. (Stipulation, ¶ 25.)

9          The Class Notice and other materials will be promptly mailed by the Settlement Administrator

10  after updating the addresses through a national change of address search.  The Settlement Administrator

11  will attempt to locate any Class Members whose Class Notices are returned as undeliverable. (Stipulation,

12  ¶ 26(b).)  In sum, these procedures provide the best possible notice to the Class Members.

13  **F.    APPOINTMENT OF THE SETTLEMENT ADMINISTRATOR**

14          Defendant obtained bids from two third-party settlement administrators experienced in

15  administering wage-and-hour class action settlements, Phoenix Settlement Administrators and Simpluris,

16  Inc., both of which Plaintiff's counsel had prior satisfactory dealings as a settlement administrator.

17  (Setareh Decl., ¶ 26.)  Ultimately, Phoenix Settlement Administrators was selected because they agreed to

18  cap their fees at no more than **$17,500.00**[6]. (*Id.*)  Phoenix Settlement Administrators is regularly

19  appointed as claims administrator by California courts to administer settlements.  The Parties thus selected

20  Phoenix Settlement Administrators, which Class Counsel believes is reasonable in light of Class

21  Counsel's experience in such settlement administration matters and given the work to be done by or

22  potentially required of the Settlement Administrator due to the various Settlement provisions. (*Id.*)

23  **G.    RESIDUAL**

---

[6] The Parties intend that the maximum amount payable to the Settlement Administrator from the GSA be $30,000, and this remains so in the Settlement. (Stipulation, ¶ 14(d).) This should provide sufficient funds should the fees and costs of administration increase beyond Phoenix's capped bid of $17,500 for administration of the Settlement to 2,206 Class Members. (Setareh Decl., ¶ 26.) In this Fourth Amended Motion, such an increase is not expected since the size of the Class has decreased to 2,078 with the reduction of the Class Period.  (*Id.*)

The entire Gross Settlement Amount will be paid out. (Stipulation, ¶ 44.) Settlement checks that remain uncashed after more than 180 calendar days following the checks' issuance will be paid to the State of California pursuant to California's Unclaimed Property law in the name of the Class Member. (*Id.*)

### H.   PROPOSED SCHEDULE

Plaintiff proposes the following schedule for approval of the Settlement, which assumes that preliminary approval of the Settlement is granted on August 29, 2022.

| Date | Event |
|---|---|
| 09/28/22 | Defendant will provide Settlement Administrator a database containing Class Member information necessary to calculate Settlement Payment (30 calendar days after Preliminary Approval). |
| 10/13/22 | Settlement Administrator to mail Class Notice Packets to all Class Members (15 calendar days after receiving Class Member information). |
| 11/27/22 | Last day for Class Members to submit Objections, Requests for Exclusion, and Data Dispute Forms to the Settlement Administrator (45 calendar days after Settlement Administrator mails Class Notice Packets to all Class Members), subject to extension provisions of Settlement Agreement. |
| 12/11/22 | Date by which Settlement Administrator will provide Parties with a list of all Class Members who submitted timely and valid Request for Exclusion Forms (14 calendar days after the deadline for submitting exclusions), subject to extension provisions of Settlement Agreement. |
| 01/09/23 | Date Plaintiff will submit his motion for final approval of Settlement. |
| 01/23/23 | Date by which Plaintiff and Settlement Administrator will file with the Court a summary of objections received and Plaintiff's responses thereto (21 calendar days before the final approval hearing). |
| 02/06/23 | Date by which Settlement Administrator will file declaration certifying that notice packets have been mailed under the provisions of the Settlement Agreement (7 calendar days before the final approval hearing). |
| 02/08/23 | Date by which the parties must file responsive documents to any objections (5 business days before the final approval hearing). This is also the deadline to submit objections. |
| 02/13/23 | Hearing on Plaintiff's motion for final approval of Settlement. |

1

## V.      REQUEST FOR ORAL ARGUMENT

2

Plaintiff respectfully requests that the Court hold a hearing on this motion for preliminary

3

approval in the event that the Court has any additional concerns pertaining the adequacy of class relief,

4

equitable treatment of class members, adequacy of representation, or any other concerns regarding the

5

terms of the settlement.  Oral argument will promote judicial efficiency in this matter, as Plaintiff can

6

address the Court's concerns in real time without any delays associated with refiling a motion for

7

preliminary approval.

8

## VI.     CONCLUSION

9

For the reasons set forth above, Plaintiff respectfully request that the Court grant his motion in its

10

entirety and enter an order:  (1) conditionally certifying the Settlement Class; (2) granting preliminary

11

approval of the Settlement; (3) appointing Plaintiff as the Class Representative; (4) appointing Shaun

12

Setareh and William M. Pao of the Setareh Law Group as Class Counsel; (5) approving and directing the

13

mailing of the Class Notices and related materials; (6) appointing Phoenix Settlement Administrators as

14

the Settlement Administrator; and (7) scheduling the final approval hearing for February 13, 2023 or as

15

soon thereafter as is available and convenient for the Court.

16

17

DATED: July 25, 2022                    SETAREH LAW GROUP

18

19                                      By: */s/ Shaun Setareh*_____
                                        SHAUN SETAREH
20                                      WILLIAM M. PAO
                                        Attorneys for Plaintiff

21

22

23

24

25

26

27

28

PLAINTIFF'S UNOPPOSED FOURTH AMENDED NOTICE OF MOTION AND MOTION FOR PRELIMINARY
APPROVAL OF CLASS ACTION SETTLEMENT