1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY R. LUSK,<br><br>   Plaintiff,<br><br>   v.<br><br>FIVE GUYS ENTERPRISES LLC; AND ENCORE FGBF, LLC,<br><br>   Defendants. | CASE NO. 1:17-cv-00762-AWI-EPG<br><br>ORDER ON PLAINTIFF'S FOURTH AMENDED MOTION FOR PRELIMINARY APPROVAL<br><br>(Doc. Nos. 86) |

In this class action lawsuit, Plaintiff Jeremy Lusk is suing Defendants Five Guys Enterprises LLC and Encore FGBF, LLC, on grounds that they violated federal and California credit/consumer reporting laws, California wage-and-hour laws, and California unfair competition law.  The parties reached a proposed class settlement, but the Court denied Lusk's first four motions for preliminary approval of the settlement and conditional certification of the putative class under Federal Rule of Civil Procedure 23(e).  Lusk now moves a fifth time for such relief.  Doc. No. 86.  For the reasons discussed below, the Court will grant this motion.

## BACKGROUND

### A. Claims and Allegations in Operative Pleading

From approximately August 2016 to November 2016, Lusk worked in California as a manager-in-training for Defendants.  Lusk filed his lawsuit in state court on May 2, 2017, and Defendants removed the action.  Thereafter, Lusk filed a first-amended complaint, wherein he pleaded the following twelve class claims: (1) failure to make a proper disclosure, in violation of

the federal Fair Credit Reporting Act, 15 U.S.C. § 1681b(b)(2)(A); (2) failure to provide a proper summary of rights, in violation of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681d(a)(1) and 1681g(c); (3) failure to make a proper disclosure, in violation of California's Investigative Consumer Reporting Agencies Act, Cal. Civ. Code § 1786.16(a)(2)(B); (4) failure to make a proper disclosure, in violation of California's Consumer Credit Reporting Agencies Act, Cal. Civ. Code § 1785.20.5(a); (5) failure to provide meal periods or compensation in lieu thereof, in violation of Cal. Labor Code §§ 226.7, 512, and 1198, and California Industrial Welfare Commission Wage Order 5-2001 ("Wage Order 5"); (6) failure to provide rest periods or compensation in lieu thereof, in violation of Cal. Labor Code §§ 226.7 and 1198, and Wage Order 5; (7) failure to pay earned wages, including overtime wages, in violation of Cal. Labor Code §§ 204, 223, 510, 1194, 1197, and 1198, and Wage Order 5; (8) failure to reimburse for necessary gas and mileage expenditures, in violation of Cal. Labor Code § 2802(a); (9) failure to provide accurate itemized wage statements, in violation of Cal. Labor Code § 226; (10) failure to pay separation wages, in violation of Cal. Labor Code §§ 201– 203; (11) violations of California's unfair competition law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq.; and (12) entitlement to civil penalties under California's Private Attorney General Act ("PAGA"), Cal. Lab. Code § 2698 et seq.  See Doc. No. 13 ("FAC").

**B. Procedural History**

After conducting some discovery, the parties participated in mediation and reached a proposed agreement for a class-wide settlement.  Doc. No. 29.  Lusk has since moved four times for preliminarily approval of that proposal and conditional certification of the putative class, with the Court denying each motion. See Doc. Nos. 36, 43, 52, 55, 61, 66, 75, 81.

The Court denied the first motion because its proposed settlement agreement failed to offer adequate relief to the class as required under Rule 23(e)(2)(C).  Specifically, the Court found that the parties improperly discounted the proposed settlement amount based on risk assessments that lacked factual and evidentiary foundation and that were not applied to all claims.  The Court also found that the record did not support Luck's proposed attorney's fee award of 33% of the gross settlement amount, nor show that the parties conducted sufficient discovery to evaluate the merits

of each claim.  Furthermore, the Court found that the motion failed to demonstrate that the expenditure indemnification claim and the multiple consumer reporting claims warrant class certification under Rule 23(a)-(b).

The Court denied the second motion because its description of the terms of its revised settlement agreement and class notice was at odds with the terms in the actual proposed settlement agreement and class notice.  Lusk's third motion addressed this concern and some of the concerns the Court found regarding the first motion,[1] but the Court ultimately denied the third motion for several reasons.  First, the third motion did not account for all potential exposure and recovery risks related to Lusk's credit reporting, UCL, overtime wage, and meal and rest break claims, nor demonstrate why the facts and circumstances of the case warranted a reduction of the PAGA award to only 8.33% of the gross settlement amount.  Second, given the proposed settlement agreement's opened ended class period—i.e., "the period of time from August 22, 2013 through the date of Preliminary Approval of the Settlement"—the third motion did not address whether the settlement's terms and estimates accounted for the nearly two years that elapsed from the time the first motion was filed.  Third, the third motion failed to adequately address how the settlement agreement's payment scheme equitably accounted for distinctions among class members, given that some but not all class members worked longer shifts, were terminated, or were not reimbursed for business expenses.  Finally, the third motion did not provide sufficient evidence in support of the proposed class for purposes of certification under Rule 23(a)–(b).

Lusk's fourth motion resolved many of these issues,[2] but was ultimately denied on the

---

[1] Lusk's third motion addressed the Court's earlier concern regarding the settlement agreement's proposed attorney's fee award by reducing it from 33% of the gross settlement amount to 25%, which matches the benchmark recognized by the Ninth Circuit.  The third motion's proposed inventive award to Plaintiff for serving as the putative class representative also sufficed for preliminary approval purposes.  Furthermore, the Court noted that the third motion generally made a prima facie case that the class should be certified for settlement purposes, despite some concerns with the lack of subclass treatment for certain class claims.

[2] The Court found that the fourth motion addressed both the risks attendant to the class claims based on credit reporting statutes and unpaid wages (and assigned nominal or zero value to these claims), and the calculated number of meal and rest period violations in light of permissible recovery under Labor Code § 226.7 for such claims.  Additionally, the fourth motion revised the Settlement Notice and Claim Form by including the credit reporting statutes amongst the extended list of released claims.  Furthermore, the fourth motion included sufficient evidence showing that the revised settlement was submitted to the California Labor and Workforce Development Agency for purposes of the PAGA claim and that the proposed PAGA award was sufficient.

following grounds: First, the fourth motion provided no analysis regarding the estimated value of the UCL claim. Second, the fourth motion's proposed class period end date of October 19, 2020 cured the open-ended class period problem but still represented an undervaluation Lusk's claims, given that the value of the class claims remained largely unchanged since the time the first motion was filed.  Third, while the fourth motion addressed some of the Court's concerns regarding equitable payment of settlement funds to class members, it still did not account for the distinctions among class members regarding their wage statement claims.  Finally, the fourth motion again did not provide sufficient evidence in support of the proposed class for purposes of certification under Rule 23(a)–(b).

Lusk now moves for the same relief for a fifth time without opposition by Defendants.  Doc. No. 86.  With his latest motion, Lusk submits a supporting declaration from counsel, which comes with attached copies of the proposed class settlement agreement, class notice, and class member claim form.  Doc. Nos. 87 & 87-1.

**C. <u>Proposed Settlement</u>**

The proposed settlement agreement indicates that Defendants will pay a "gross settlement amount" ("GSA") of $1,200,000 to a settlement class of approximately 2,078 persons who have been employed in California by Defendants as hourly-paid or "non-exempt" employees, whether directly or through an employment agency or a professional services organization, at any time during the period from August 22, 2013 through May 24, 2019.  Doc. No. 87-1 at 5, 7, 13; Doc. No. 87 at 8-9.  In return, Defendants will be fully released from liability for all claims in this lawsuit and any other claims that have been or could have been raised based on the allegations of this action (excluding those claims of class members who properly "opt out").  Doc. No. 87-1 at 11-12.  From the GSA, Lusk will receive a class representative award of up to $15,000 and his counsel will receive up to $300,000 for attorney fees and $20,000 for costs as compensation for their prosecution of this lawsuit.  <u>Id.</u> at 7-8.  The GSA will also provide the third-party claims administrator with up to $30,000 for fees and expenses, and cover a payment of $100,000 in civil penalties under PAGA, of which $75,000 will be awarded to the State of California with the remaining $25,000 reserved for the class.  <u>Id.</u> at 8.  With these amounts deducted, the putative

class will be entitled to the remainder of the GSA, also referred to as the "net settlement amount" ("NSA"). Id. at 9-11. As Lusk represents in his motion, simple math using the figures above allocates an estimated NSA of $760,000 for class member distribution or an average gross recovery of $365.74 per class member. Doc. No. 86 at 13. In an effort to fairly allocate the NSA based on each class member's dates of employment, the NSA will be distributed as follows:

- 60% of the NSA will be allocated to all class members. Each class member will be assigned a "base settlement ratio" that is determined by dividing each class member's individual work weeks by the aggregate total individual work weeks of all class members. Each class member's "base settlement ratio" will then be multiplied by 60% of the NSA to produce each class member's base settlement share. Doc. No. 87-1 at 9.

- 25% of the NSA will be allocated to class members with a claim under Labor Code section 203 (i.e., the Waiting Time Penalty Subclass).[3] Each member within this subclass will be assigned a "waiting time penalty subclass settlement ratio" that is determined by dividing each subclass member's individual work weeks during the Waiting Time Penalty Subclass Period by the aggregate total individual work weeks of all subclass members during the Waiting Time Penalty Subclass Period. Each subclass member's "waiting time penalty subclass settlement ratio" will then be multiplied by 25% of the NSA to produce each subclass member's waiting time penalty subclass share. Id. a 9-10.

- 15% of the NSA will be allocated to class members with a claim under Labor Code sections 226 (failure to provide accurate itemized wage statements) and 2698 et seq. (PAGA) (i.e., the Wage Statement/PAGA Penalty Subclass).[4] Each member within

---

[3] The settlement agreement defines the Waiting Time Penalty Subclass as "all persons who have been employed in California by Defendants as hourly-paid or 'non-exempt' employees, whether directly or through an employment agency or a professional services organization, at any time during the Waiting Time Penalty Subclass Period and whose employment with Defendants has been terminated at any time during the Waiting Time Penalty Subclass Period. Doc. No. 87-1 at 6. The Waiting Time Penalty Subclass Period is defined as "the period of time from August 22, 2014 through May 24, 2019." Id. at 5.

[4] The settlement agreement defines the Wage Statement/PAGA Penalty Subclass as "all persons who have been employed in California by Defendants as hourly-paid or 'non-exempt' employees, whether directly or through an employment agency or a professional services organization, at any time during the Wage Statement/PAGA Penalty

this subclass will be assigned a "wage statement/PAGA penalty subclass settlement ratio" that is determined by dividing each subclass member's individual work weeks during the Wage Statement/PAGA Penalty Subclass Period by the aggregate total individual work weeks of all subclass members during the Wage Statement/PAGA Penalty Subclass Period.  Each subclass member's "wage statement/PAGA penalty subclass settlement ratio" will then be multiplied by 15% of the NSA to produce each subclass member's wage statement/PAGA penalty subclass share.  Id. at 10.

As to an estimated value of the class claims,[5] Lusk posits in his motion that, based on a review of payroll and timekeeping data provided by Defendants and applicable law, the class would recover approximately $13,191,159.58 if he were to prevail on all of the claims.  Doc. No. 86 at 27.  Lusk separates this figure into the following claim-specific amounts:

- $717,102.64 (excluding interest) for the meal period claim during the 3-year statute of limitations and UCL period.

- $748,242.82 (excluding interest) for the rest period claim during the 3-year statute of limitations and UCL period.

- $1,147,718.23 (excluding interest) for the unpaid wages (off-the-clock) claim during the 3-year statute of limitations and UCL period.

- $7,924.43 (excluding interest) for the regular rate (unpaid OT premium) claim during the 3-year statute of limitations and UCL period.

- $314,329.73 (excluding interest) for the expenditure reimbursement claim during the 3-year statute of limitations and UCL period.

- $680,383.33 for the wage statement penalties claim for first violations during the 1-year statute of limitations and subsequent violations during the entire class period.

---

Subclass Period."  Doc. No. 87-1 at 6.  The Wage Statement/PAGA Penalty Subclass Period is defined as "the period of time from August 22, 2016 through May 24, 2019."  Id. at 5.

[5] Lusk notes that the estimated value of the class claims provided in his prior motions were based on estimates that were extrapolated from the sampling of data provided for mediation projecting class size and workweek growth linearly with respect to time, which was necessary because the class period was open ended until the date of preliminary approval.  Doc. No. 86 at 24 n.2.  Now that the Motion's proposed class period has a fixed end date of May 24, 2019, Lusk states the Motion now provides a more accurate estimate of the potential recovery for each of the claims.  Id.

1   • $1,207,958.40 for the separation wages penalties claim during the 3-year statute of

2   limitations.

3   • $8,367,500.00 in civil penalties for the PAGA claim.

4   Id. at 25-27.

5   The settlement agreement provides that following preliminary approval of the settlement

6   by the Court, each Class member will be mailed a class notice packet that includes a Claim Form

7   and a Class Notice providing information regarding the class action and a summary of the

8   settlement's principal terms and claims to be released.  The Class Notice will also inform the class

9   members of their rights and the manner and deadline to dispute the data in the Claim Form, object

10  to the settlement, and elect not to participate in the Settlement.  Settlement payments will be

11  mailed to participating class members as checks.

12  **LEGAL STANDARD**

13  Federal Rule of Civil Procedure 23(e) requires judicial review and approval of any class

14  settlement.  This process generally involves three stages.  In the first stage, the parties move for

15  "preliminary approval" of the proposed settlement and, if necessary, "conditional certification" of

16  the class.  4 William B. Rubenstein, Newberg on Class Actions § 13:16 (5th ed.).  If the court

17  grants this threshold relief, the second and third stages require (1) the provision of notice to the

18  class members, along with an opportunity for them to object to or opt out of the proposed

19  settlement, and (2) a "final approval" determination following a fairness hearing.  Id.

20  To secure preliminary approval and conditional certification, the parties must provide

21  sufficient information for the court to determine that it "will likely be able to" grant final approval

22  of the settlement under Rule 23(e)(2) and certify the class for a judgment on the settlement.  Fed.

23  R. Civ. P. 23(e)(1)(B).  As to the first determination, Rule 23(e)(2) states that a binding class

24  settlement may be approved only on finding that it is "fair, reasonable, and adequate."  Fed. R.

25  Civ. P. 23(e)(2).  Before making such a finding, courts must consider whether: (1) the class

26  representative and counsel have adequately represented the class; (2) the proposal was negotiated

27  at arm's length; (3) the relief provided for the class is adequate in light of the costs, risks, and

28  delay of trial and appeal; the effectiveness of any proposed method of distributing relief to the

7

class, including the method of processing class-member claims; the terms of any proposed award of attorney's fees, including timing of payment; and any agreement made in connection with the proposal; and (4) the proposal treats class members equitably relative to each other. Id.; see also In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 946 (9th Cir. 2011).  As to the second determination, a class may be certified if it meets the four prerequisites under Rule 23(a) and at least one of the three categories of class actions under Rule 23(b).  See Fed. R. Civ. P. 23(a)–(b).

The court's role in the class settlement process is an important one, as "the parties that are present and settling the case—class counsel, the class representatives, and the defendants—are proposing to compromise the rights of absent class members." Newberg on Class Actions § 13:40.  To ensure the interests of the absent class members are properly safeguarded, the "judge must adopt the role of a skeptical client and critically examine the class certification elements, the proposed settlement terms, and procedures for implementation." Id. (quoting Manual for Complex Litigation § 21.61 (4th ed.)).

## DISCUSSION

The Court will first address preliminary approval of the proposed settlement agreement and conditional class certification, and then turn to the Class Notice and Final Approval Hearing.

### A. Preliminary Approval

When determining whether a settlement should be approved, a court is to balance several factors, including: "[i] the strength of the plaintiffs' case; [ii] the risk, expense, complexity, and likely duration of further litigation [and] the risk of maintaining class action status throughout the trial; [iii] the amount offered in settlement; [iv] the extent of discovery completed and the stage of the proceedings; [and] [v] the experience and views of counsel . . . ." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998); see also Kim v. Allison, 8 F.4th 1170, 1178 (9th Cir. 2021) (citing Hanlon for factors courts consider when examining whether a proposed settlement comports with Rule 23(e)).  Some courts save the Hanlon factors set forth above for the final-approval stage, focusing at the preliminary stage simply on whether the settlement "falls within the range of possible approval." O'Connor v. Uber Techs., Inc., 201 F. Supp. 3d 1110, 1122 (N.D. Cal. 2016).  Other courts examine the Hanlon factors in addition to conducting a range-of-

1   reasonableness analysis at the preliminary stage, looking at factors such as whether the settlement
2   is the product of non-collusive negotiations, has no obvious deficiencies, does not improperly
3   grant preferential treatment to class representatives or segments of the class, and falls within the
4   range of possible approval.  Id.  These courts reason that it is better to closely scrutinize the
5   settlement terms at the earliest opportunity so that if a fatal flaw exists, it can be addressed before
6   the parties "waste a great deal of time and money in the notice and opt-out process."  Id.  The
7   Court agrees with the latter approach, and thus applies both the *Hanlon* factors and the range-of-
8   reasonableness analysis here.  See Kutzman v. Derrel's Mini Storage, Inc., 2020 U.S. Dist. LEXIS
9   13314, *26 (E.D. Cal. Jan. 24, 2020) (applying *Hanlon* factors and the range-of-reasonableness
10   test at the preliminary approval stage).

11          **1.  Strength of Plaintiff's Case**

12          The court should "evaluate objectively the strengths and weaknesses inherent in the
13   litigation and the impact of those considerations on the parties' decisions to reach these
14   agreements."  Adoma v. Univ. of Phoenix, Inc., 913 F.Supp.2d 964, 975 (E.D. Cal. 2012).  That in
15   mind, the court need "not reach 'any conclusions regarding the contested issues of fact and law
16   that underlie the merits of th[e] litigation.'"  Brewer v. Salyer, 2017 U.S. Dist. LEXIS 101374, *7
17   (E.D. Cal. June 29, 2017).

18          Here, Lusk asserts that Defendants denied class members meal and rest breaks without
19   compensation, failed to pay for off-the-clock work and overtime, violated credit reporting laws,
20   and correspondingly misrepresented wages in mandatory wage statements.  Defendants contest
21   liability in this action on numerous grounds.  First, Defendants argue that their policy documents
22   prohibit off-the-clock work and that any instance of failing to maintain accurate time records for
23   such work or reimbursable business expenses prevented Defendants from knowing of them
24   thereby making the work non-compensable under Jong v. Kaiser Foundation Health Plan, Inc.,
25   226 Cal.App.4th 391, 395 (2014) and Gattuso v. Harte-Hanks Shoppers, Inc., 42 Cal.4th 554, 568
26   (2007).  See Doc. No. 86 at 30, 34.  Second, Defendants claim that their written meal and rest
27   break policies were facially compliant and that, as supported by several declarations, their
28   employees were always provided opportunities to take compliant meal and rest breaks.  Id. at 32-

33. Third, Defendants allege they did not violate any credit reporting laws because they did not request or perform any background checks, credit reports, or consumer reports for any applicant or employee. Id. at 35. Finally, Defendants claim the class is not entitled to wage statement or waiting time penalties because Defendants did not commit a "knowing and intentional" or "willful" violation of the Labor Code. Id. at 37. In light of such considerations, Plaintiff's "willingness to settle this action at a discount to the maximum estimated recovery does not appear suspect [] or improvident." Kutzman, 2020 U.S. Dist. LEXIS 13314, at *28. Therefore, this factor weighs in favor of approval.

## 2. The Risk, Expense, Complexity and Likely Duration of Further Litigation and the Risk of Maintaining Class Action Status Throughout Trial

"Approval of settlement is 'preferable to lengthy and expensive litigation with uncertain results.'" Munoz v. Giumarra Vineyards Corp., 2017 U.S. Dist. LEXIS 95910, *26 (E.D. Cal. June 21, 2017); accord In re Syncor ERISA Litig., 516 F.3d 1095, 1101 (9th Cir. 2008) ("[T]here is a strong policy that favors settlements, particularly where complex class action litigation is concerned."). Moreover, "[e]mployment law class actions are, by their nature, time-consuming and expensive to litigate." Aguilar v. Wawona Frozen Foods, 2017 U.S. Dist. LEXIS 76751, *6 (E.D. Cal May 19, 2017).

This action involves a putative class with numerous subclasses and multiple claims under state and federal law that challenge several aspects of Defendants' operations, including Defendants' background check process for job applicants over a period of more than five years, and the payment of overtime, management of meal and rest breaks, reimbursement of expenses, and preparation of wage statements in California over a period of more than four years. Plaintiff would have to prove that Defendants had unlawful policies and practices in the foregoing areas and that Defendants' conduct was willful. This would require both parties to examine numerous witnesses through depositions and trial testimony. Some individualized proof would also likely be required to establish the extent to which a given employee missed breaks, performed off-the-clock work, or incurred work-related expenses. This would increase the complexity, expense, and duration of this litigation, and raise the risk of non-certification of the class. Furthermore, there is

1  a risk involved in seeking non-mandatory PAGA penalties, and it is unlikely that trial would

2  commence in the near future.  The case could be further delayed and the corresponding expenses

3  could be further increased by an appeal.  Given these risks of receiving no recovery or delayed

4  recovery, which in turn would be substantially reduced in value by extensive costs and protracted

5  litigation expenses, the Court finds that this *Hanlon* factor weighs in favor of preliminary approval

6  of the settlement.  See Kutzman, 2020 U.S. Dist. LEXIS 13314, at *28-29.

7  **3.  The Amount Offered in Settlement**

8  The amount offered in settlement is generally considered to be the most important

9  consideration of any class settlement.  See Bayat v. Bank of the W., 2015 U.S. Dist. LEXIS

10  50416, *12 (N.D. Cal. Apr. 15, 2015) (citing In re HP Inkjet Printer Litig., 716 F.3d 1173, 1178-

11  79 (9th Cir. 2013)).  To determine whether a settlement amount is reasonable, the Court must

12  consider the amount obtained in recovery against the estimated value of the class claims if

13  successfully litigated.  Litty v. Merrill Lynch & Co., 2015 U.S. Dist. LEXIS 74693, *25 (C.D. Cal.

14  Apr. 27, 2015) (quoting In re Mego Financial Corp. Sec. Litig., 213 F.3d 454, 459 (9th Cir.

15  2000)); see also Officers for Justice v. Civil Service Com'n of City and Cty. of S.F., 688 F.2d 615,

16  628 (9th Cir. 1982) ("[A] cash settlement amounting to only a fraction of the potential recovery

17  will not per se render the settlement inadequate or unfair.").  Courts regularly approve class

18  settlements where class members recover less than one quarter of the maximum potential recovery

19  amount.  See Bravo v. Gale Triangle, Inc., 2017 U.S. Dist. LEXIS 77714, 2017 WL 708766, *10

20  (C.D. Cal. Feb. 16, 2017) (approving a settlement where net recovery to class members was

21  approximately 7.5% of the projected maximum recovery amount); Bellinghausen v. Tractor

22  Supply Co., 306 F.R.D. 245, 256 (N.D. Cal. 2015) (approving a settlement where the gross

23  recovery to the class was approximately 8.5% of the maximum recovery amount).

24  In its prior order regarding Plaintiff's fourth motion for preliminary approval, the Court

25  found that Plaintiff adequately evaluated the value of some of his claims, but not the UCL claim.

26  The Court also found that the fourth motion's proposed class period end date of October 19, 2020

27  cured the open-ended class period problem but still represented an undervaluation of Plaintiff's

28  claims.  Additionally, the Court found that the proposed agreement did not fully resolve the

Court's concerns regarding equitable payment of settlement funds to class members. Here, the Court finds that the current motion's proposed settlement agreement addresses these concerns.[6] Therefore, the Court will now consider whether the settlement agreement's GSA is reasonable.

If Plaintiff prevails on all claims, the projected maximum recovery amount is $13,191,159.58. Doc. No. 86 at 27. $8,367,500.00 of that amount derives from estimated PAGA penalties, of which the LWDA would receive $6,275,625 (75%) with the remaining $2,091,875 (25%) going to the putative class members. See Cal. Labor Code § 2699(i). Thus, after deducting the LWDA's portion of the estimated PAGA penalty, the putative class members' projected recovery amount is $6,915,534.58. See Arredondo v. Sw. & Pac. Specialty Fin., Inc., 2022 U.S.

---

[6] With respect to the UCL claim, the current motion provides that UCL claims are governed by a four-year statute of limitations set out in Business and Professions Code section 17208, which allows for the restitution of unpaid wages and anything else in which the plaintiff has an ownership interest, including meal period and rest period premium payments pursuant to Labor Code section 226.7. Because liability under the UCL claim derives from the elements of Lusk's corresponding unpaid wage and meal and rest break premium claims, the motion addressed the maximum potential recovery and risk factors for the UCL claim through the analysis it performed for these other claims. Furthermore, given that the corresponding claims have a 3-year statute of limitations, the motion notes that the "actual value of the UCL claim derives from its extension of the normal 3-year limitations period to four years." Doc. No. 86 at 42. In other words, the value of the UCL claim derives from only the period of time between "4 years prior to the filing of the action" and "3 years and a day before the filing of the action" (i.e., the UCL period). Id. After splitting each of the unpaid wage and reimbursement claims into its value during the 3-year statute of limitations period and during the UCL period, the motion calculated an aggregate UCL claim value of $25,630.18. Id. at 25-26. In light of these considerations, the Court finds that the motion adequately addresses the value of the UCL claim.

With respect to the class period end date, the motion's proposed class period has a fixed end date of May 24, 2019, which was the date of the hearing on Lusk's first motion for preliminary approval and the date when the parties anticipated preliminary approval would be granted. The motion states that the class size and scope of the release will remain fixed as of this end date, preventing both the dilution of the settlement payments and the expansion of the release to cover more than what the parties originally contemplated. Doc. No. 86 at 16. The motion also states that its estimates for the potential recovery for each claim accurately reflect the class period's proposed time frame from August 22, 2013 through May 24, 2019. Id. at 24 n.2. The Court finds that the motion's proposed class period end date adequately addresses the Court's earlier concerns and, therefore, is approved.

With respect to equitable payment of settlement funds to class members, the motion's proposed settlement payment scheme purports to distribute settlement shares in an equitable manner by allocating the shares based on each class member's dates of employment. As previously mentioned, 60% of the NSA will be allocated to all class members on a pro rata basis according to each member's number of individual work weeks for all claims with 4-year statute of limitations (i.e., for unpaid wages, meal and rest period premiums, and expense reimbursement under the Labor Code and as extended by the UCL); 25% of the NSA will be allocated to class members with a claim under Labor Code section 203 (i.e., the Waiting Time Penalty Subclass) on a pro rata basis according to each member's number of individual work weeks during the Waiting Time Penalty Subclass Period; and 15% of the NSA will be allocated to class members with a claim under Labor Code sections 226 (failure to provide accurate itemized wage statements) and 2698 et seq. (PAGA) (i.e., the Wage Statement/PAGA Penalty Subclass) on a pro rata basis according to each member's number of individual work weeks during the Wage Statement/PAGA Penalty Subclass Period. Doc. No. 87-1 at 9. The Court finds that allocating the NSA on a pro rata basis in this manner is equitable and fair. Taafua v. Quantum Glob. Techs., LLC, 2021 U.S. Dist. LEXIS 28754, *23 (N.D. Cal. Feb. 16, 2021) (finding that pro rata distribution of net settlement fund was equitable and fair).

1  Dist. LEXIS 101568, *22-23 (E.D. Cal. June 6, 2022) (deducting LWDA's portion of the PAGA

2  penalty from projected maximum recovery amount before calculating the class members' rate of

3  recovery).  The gross settlement amount of $1,200,000 is 17.35% of $6,915,534.58, and the net

4  settlement amount of $760,000 is 10.99% of $6,915,534.58.  Given that recovery rates in this

5  range have been found to be reasonable in the Ninth Circuit, the Court likewise finds that the

6  settlement amount offered here is reasonable.  See Bellinghausen, 306 F.R.D. at 256; Bravo, 2017

7  U.S. Dist. LEXIS 77714, at *30-31.

8             **4.   The Extent of Discovery Completed**

9         "A settlement following sufficient discovery and genuine arms-length negotiation is

10  presumed fair."  Adoma v. Univ. of Phx., Inc., 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012) (citing

11  Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 528 (C.D. Cal. 2004)).  The

12  Court should lean in favor of a settlement where evidence is presented that a considerable amount

13  of discovery has been conducted "because it suggests that the parties arrived at a compromise

14  based on a full understanding of the legal and factual issues surrounding the case."  Kutzman,

15  2020 U.S. Dist. LEXIS 13314, at *32 (citing Adoma, 913 F. Supp. 2d at 977).

16         Here, the record indicates that the parties conducted formal written discovery and

17  exchanged approximately 1,000 pages of documents relating to Defendants' meal period and rest

18  break policies, employee handbook, time punch records, and wage statements. Doc. No. 86 at 23.

19  The parties also completed a videotaped deposition of Lusk and produced a class list which class

20  counsel used to contact and conduct multiple interviews of putative class members.  Id. at 23, 48.

21  Furthermore, the parties partook in mediation with an accomplished mediator with significant

22  experience mediating employment wage and hour class and collective actions.  Id. at 23.  In

23  preparation for mediation, class counsel prepared a substantive mediation brief and retained an

24  expert who reviewed and analyzed payroll and timekeeping data.  Id.  The Parties did not reach an

25  agreement directly at the conclusion of mediation, but they eventually reached a settlement after

26  informed, arm's-length negotiations and with the help of the mediator's proposal to resolve the

27  matter.  Id.  In light of the above, the Court finds that this factor weighs in favor of preliminary

28  approval.

### 5.   The Experience and Views of Counsel

The Court is to "accord great weight to the recommendation of counsel because they are aware of the facts of the litigation and in a better position than the court to produce a settlement that fairly reflects the parties' expected outcome in the litigation." Rodriguez v. Danell Custom Harvesting, LLC, 327 F.R.D. 375, 388-89 (E.D. Cal. 2018) (citing Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 528 (C.D. Cal. 2004)).

Here, class counsel has extensive experience in wage and hour class action litigation, Doc. No. 87 at 2-5, and they believe the Settlement to be "fair and reasonable, to adequately reflect the potential liability, and to be the result of thorough factual and legal analyses and arms-length negotiations." Doc. No. 86 at 13. Class counsel's recommendation that the settlement be approved is entitled to significant weight and supports approval of the Settlement Agreement. Rodriguez, 327 F.R.D. at 388-89.

### 6.   Range-of-Reasonableness: Collusion, Deficiencies, Preferential Treatment

In determining whether any collusion, deficiencies, or preferential treatment exists, the court's goal is to ensure that the class representatives and their counsel do not receive a disproportionate benefit "at the expense of the unnamed plaintiffs who class counsel had a duty to represent." Lane v. Facebook, Inc., 696 F.3d 811, 819 (9th Cir. 2012). To that end, the Ninth Circuit in *Bluetooth* identified three "subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations": "(1) when counsel receive a disproportionate distribution of the settlement; (2) when the parties negotiate a 'clear sailing' arrangement (i.e., an arrangement where defendant will not object to a certain fee request by class counsel); and (3) when the parties create a reverter that returns unclaimed fees to the defendant." Allen v. Bedolla, 787 F.3d 1218, 1224 (9th Cir. 2015) (quoting Jones v. GN Netcom, Inc. (In re Bluetooth Headset Prods. Liab. Litig.), 654 F.3d 935, 947 (9th Cir. 2011)).

Here, class counsel seeks attorney fees of up to $300,000, which amounts to 25% of the gross settlement amount of $1,200,000. Doc. No. 86 at 16-17. The parties have also agreed to a fee of up to $20,000 to compensate class counsel for litigation expenses, an administrative fee of up to $30,000 for the settlement administrator, and a class representative service award of up to

$15,000 to Lusk.  Id. at 17.  Although the settlement appears to have a "clear sailing" arrangement under which Defendants will not oppose the requested attorney fees award, Doc. No. 87 at 9, Doc. No. 86 at 24, the proposed maximum attorney fees amount is in line with the benchmark for this Circuit.  See Bluetooth, 654 F.3d at 947 (referencing a 25% benchmark); Six (6) Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990) (same); see also Gonzalez v. Nci Grp., Inc., 2022 U.S. Dist. LEXIS 140330, *12 (E.D. Cal. Aug. 8, 2022). Additionally, the proposed maximum fee for the settlement administrator does not strike the Court as excessive, particularly given the fact that this action involves over two thousand putative class members. See Vasquez v. Coast Valley Roofing, Inc., 266 F.R.D. 482, 483 (E.D. Cal. 2010) (approving $25,000 administrator fee awarded in wage and hour case involving only 177 potential class members).  The Court also notes that the Settlement Agreement does not contain a provision for the reversion of funds to Defendants.  Doc. No. 86 at 18; Doc. No. 87-1 at 20-21.  The fact that the parties engaged in mediation and that the Settlement is based on a mediator's proposal further supports a finding that the settlement agreement is not the product of collusion.  See Villegas v. J.P. Morgan Chase & Co., 2012 U.S. Dist. LEXIS 166704, *15 (N.D. Cal. Nov.21, 2012) (finding that reaching a settlement following participation in mediation with "with a private mediator experienced in wage and hour class actions... tends to support the conclusion that the settlement process was not collusive") (citing Satchell v. Fed. Express Corp., 2007 U.S. Dist. LEXIS 99066, *44 (N.D. Cal. Apr. 13, 2007)).  Furthermore, although the potential class representative service award of up to $15,000 is substantially higher than what many participating class members will receive, the Court gives weight to Plaintiff's declaration that the service award is reasonable given that he took the risk of suing his employers, was actively involved in this lawsuit including the settlement negotiations, and participated in discovery including being deposed by Defendants."[7] Doc. No. 87 at 30.  See Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 958-59 (9th Cir. 2009) (stating that incentive awards are "fairly typical in class action cases" and are "discretionary sums awarded by the court 'to compensate class representatives for work done on behalf of the class, to

---

[7] As stated in its prior order, Doc. No. 66 at 20, the Court does not yet know exactly how much work Lusk has had to do; therefore, it remains Lusk's burden to present that evidence before the final approval hearing.

make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general'"); see also Almanzar v. Home Depot U.S.A., Inc., 2022 U.S. Dist. LEXIS 127724, *21 (E.D. Cal. July 18, 2022) (finding that proposed incentive award of $15,000 was not so disproportionate that it created a conflict of interest between the class representative and the class); Dakota Med., Inc. v. RehabCare Grp., Inc., 2017 U.S. Dist. LEXIS 154458, *39 (E.D. Cal. Sep. 20, 2017) (approving incentive award of $15,000).  Thus, the Court finds no collusion, deficiencies, or preferential treatment that is severe enough to preclude preliminary approval of the settlement.

**B. Conditional Certification**

Before certifying a class, the Court must determine whether that class meets the requirements set forth in Rule 23(a) and Rule 23(b) of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 23(e)(2).  Courts must pay "undiluted, even heightened, attention" to class certification requirements in a settlement context.  Amchem Products, Inc. v. Windsor, 521 U.S. 591, 620 (1997); Partl v. Volkswagen, AG (In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig), 895 F.3d 597, 606 (9th Cir. 2018).  The parties cannot "agree to certify a class that clearly leaves any one requirement unfulfilled," and consequently a court cannot blindly rely on the fact that the parties have stipulated that a class exists for purposes of settlement.  Carlin v. DairyAmerica, Inc., 328 F.R.D. 393, 399 (E.D. Cal. 2018).

The Court will first determine whether subsection Rule 23(a) is satisfied and then turn to the certification requirements in Rule 23(b).

**1. Rule 23(a)**

Rule 23(a) provides that the following four criteria "must be met to certify a class action: (1) numerosity; (2) commonality of law or fact; (3) typicality of the representative plaintiff's claims; and (4) adequacy of representation."  Carlin, 328 F.R.D. at 399.  A class may only be certified if the court is "satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."  Id. (citing General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 161 (1982)).  The burden is on the party seeking class certification to show that these elements have been met.  Id. (citing Doninger v. Pac. N.W. Bell, Inc., 564 F.2d 1304, 1308 (9th Cir. 1977)).

1

### a) **Numerosity**

To satisfy the numerosity requirement in Rule 23(a), a class must be so numerous that joinder of all members individually is "impracticable." Fed. R. Civ. P. 23(a)(1).  This requirement "does not mean that joinder must be impossible, but rather means only that the court must find that the difficulty or inconvenience of joining all members of the class makes class litigation desirable."  Carlin, 328 F.R.D. at 399 (citing Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 913-914 (9th Cir. 1964)).  There is no specific numerical threshold; instead, the law "requires examination of the specific facts of each case and imposes no absolute limitations."  Id. (citing General Tel. Co. v. E.E.O.C., 446 U.S. 318, 330 (1980)).  Generally, forty or more members will satisfy the numerosity requirement.  Collins v. Cargill Mean Solutions Corp., 274 F.R.D. 294, 300 (E.D. Cal. 2011).

Here, Plaintiff estimates that there are 2,078 class members.  Doc. No. 86 at 10; Doc. No. 87-1 at 13.  Because joinder of all putative class members would be impracticable, the Court finds that numerosity is satisfied.

### b) **Commonality**

Questions of law or fact must be "common to the class."  Fed. R. Civ. P. 23(a)(2).  This does not mean all questions of fact and law need be common.  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).  Instead, a plaintiff need only demonstrate "the class members have suffered the same injury."  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349-350 (2011).  "Their claims must depend upon a common contention" that, when determined, would resolve an issue "central to the validity of each one of the claims in one stroke."  Id. at 350.  In an employment context, this inquiry is satisfied when the entire class was injured by the same system-wide policy or practice.  See Goodwin v. Winn Mgmt. Grp. LLC, 2017 U.S. Dist. LEXIS 117133, *12-13 (E.D. Cal. July 26, 2017) (citing Franco v. Ruiz Food Prods., 2012 U.S. Dist. LEXIS 169057, *15 (E.D. Cal. Nov. 27, 2012)).

Here, Plaintiff alleges common questions of law and fact regarding Defendants' alleged failure to abide by state wage-and-hour laws, FCRA, and related California background check laws.  Doc. No. 86 at 46.  Specifically, Plaintiff alleges that class members have a shared common

interest in determining (1) whether Defendants procured a background check report on Plaintiff and putative class members with non-compliant disclosure forms; (2) whether Defendants provided legally compliant meal periods and rest breaks to Class Members; (3) whether Defendants paid employees for all time worked; (4) whether Defendants properly reimbursed employees for business expenses incurred when they used their personal vehicles to perform errands for Defendants; (5) whether Defendants violated the itemized wage statement provisions of Labor Code section 226 by not providing accurate information as to wages; and (6) whether Defendants' policies and practices violated Labor Code section 203, Business & Professions Code sections 17200 et seq., and PAGA. Id. In light of the record and questions raised above, the Court finds that common questions of law and fact exist regarding Defendants' policies and practices.

### c)  <u>Typicality</u>

The requirement of typicality is met if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality requires that a class representative "possess the same interest and suffer the same injury" as the putative class. <u>Falcon</u>, 457 U.S. at 156. Representative claims need only be "reasonably co-extensive with those of absent class members; they need not be substantially identical." <u>Hanlon</u>, 150 F.3d at 1020. The typicality requirement ensures that "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." <u>Falcon</u>, 457 U.S. at 157 n.13.

Here, Plaintiff alleges that he is raising the same Labor Code violations as those of other putative class members. Doc. No. 86 at 47-48. Plaintiff also states that he has not alleged any individual claims. <u>Id.</u> Furthermore, Plaintiff submitted a signed declaration stating that Plaintiff's counsel interviewed several putative class members who corroborated that Plaintiff's claims are essentially identical to all other non-exempt employees employed in California by Defendants. Doc. No. 87 at 7-8; Doc. No. 86 at 48. For example, the interviews corroborated Plaintiff's allegations that class members directly suffered wage and hour violations or observed them happening to others. Doc. No. 87 at 8. The Court finds that Plaintiff's claims are "reasonably co-extensive" with those of absent putative class members and, therefore, the typicality requirement

1    is satisfied.

2        d)  **Adequacy of Representation**

3        The requirement of adequate representation asks whether the representative "will fairly and

4    adequately protect the interests of the class." See Fed. R. Civ. P. 23(a)(4).  Courts are to inquire

5    (1) whether the named plaintiff and counsel have any conflicts of interest with the rest of the

6    potential class members and (2) whether the named plaintiff and counsel will prosecute the action

7    vigorously for the class as a whole.  See Hanlon, 150 F.3d at 1020.

8        Here, Lusk does not appear to have any conflicts of interest with putative class members,

9    and has apparently participated actively in the preparation and prosecution of this case. Doc. No.

10   86 at 48.  Similarly, putative class counsel do not appear to have conflicts with the putative class

11   members, and they have been involved as class counsel in numerous wage and hour class action

12   matters in California.  Doc. No. 86 at 48; Doc. No. 87 at 2.  Thus, the Court finds that this factor is

13   satisfied.

14       2.  **Rule 23(b)**

15       Lusk seeks certification under Rule 23(b)(3), which requires a showing that: (1) questions

16   of law or fact common to class members predominate over any questions affecting only individual

17   members; and (2) a class action is superior to other available methods for fairly and efficiently

18   adjudicating the controversy.  See Amchem, 521 U.S. at 615.  The test of Rule 23(b)(3) is "far

19   more demanding" than that of Rule 23(a).  Wolin v. Jaguar Land Rover N. Am., LLC, 617 F.3d

20   1168, 1172 (9th Cir. 2010).

21       a)  **Predominance**

22       Common questions of law and fact predominate over individual questions when "the issues

23   in the class action subject to generalized proof, and thus applicable to the class as a whole . . .

24   predominate over those issues that are subject only to individualized proof."  Carlin, 328 F.R.D. at

25   400 (citing Ortega v. J.B. Hunt Transport, Inc., 258 F.R.D. 361, 366 (C.D. Cal. 2009)).  In

26   evaluating predominance, courts look to whether the focus of the proposed class action will be on

27   the words and conduct of the defendants rather than on the behavior of the individual class

28   members.  Id. at 401.  "[C]ourts' discomfort with individualized liability issues is assuaged in

large part where the plaintiff points to a specific company-wide policy or practice that allegedly gives rise to consistent liability." Kurihara v. Best Buy Co., 2007 U.S. Dist. LEXIS 64224, *27 (N.D. Cal. Aug. 30, 2007) (collecting cases). Where there exist "broad employer policies [which] can impact many workers at once . . . a need for class treatment" is often present. Sepulveda v. Wal-Mart Stores, Inc., 237 F.R.D. 229, 247 (C.D. Cal. 2006).

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." Stearns v. Ticketmaster Corp., 655 F.3d 1013, 1020 (9th Cir. 2011) (quoting Erica P. John Fund, Inc., v. Halliburton Co., 563 U.S. 804, 809 (2011)). The requirement is satisfied if a plaintiff establishes that a "common nucleus of facts and potential legal remedies dominates the litigation." Hanlon, 150 F.3d at 1022.

Here, as stated above, the common questions are (1) whether Defendants procured a background check report on Plaintiff and putative class members with non-compliant disclosure forms; (2) whether Defendants provided legally compliant meal periods and rest breaks to Class Members; (3) whether Defendants paid employees for all time worked; (4) whether Defendants properly reimbursed employees for business expenses incurred when they used their personal vehicles to perform errands for Defendants; (5) whether Defendants violated the itemized wage statement provisions of Labor Code section 226 by not providing accurate information as to wages; and (6) whether Defendants' policies and practices violated Labor Code section 203, Business & Professions Code sections 17200 et seq., and PAGA. Doc. No. 86 at 46. These common questions focus "on the words and conduct of the defendants" and will involve relatively minor individualized determinations as to the type and extent of each class member's harm. Carlin, 328 F.R.D. at 401. For example, with respect to Plaintiff's background check and non-compliant disclosure form claims, determining which employees executed such forms is fairly minor in comparison to determining whether Defendants had a common policy or practice of procuring background check reports with non-compliant disclosure forms. Kutzman, 2020 U.S. Dist. LEXIS 13314, at *20-*21. Additionally, with respect to Plaintiff's wage and hour law claims, individualized determinations may be required to determine overtime worked, breaks missed, and expenses incurred by each class member, but it appears that the findings as to the

nature and legality of Defendants' policies and practices covering these areas would have broad applicability to the class for purposes of determining liability.  Id. at *21.  Defendants' time and payroll records also provide common proof to determine the scope and frequency of the alleged wage and hour law violations.  Doc. No. 86 at 47.  Furthermore, class counsel's interviews with several putative class members corroborate Plaintiff's contention that they were subject to the same relevant policies and procedures and that their claims are essentially identical.  Doc. No. 87 at 7-8; Doc. No. 86 at 48.  This indicates that "broad employer policies" existed that "impact[ed] many workers at once."  Sepulveda, 237 F.R.D. at 247.  Accordingly, the Court finds that the predominance requirement is met as to the putative class.

**b)  Superiority**

In determining whether the superiority requirement of Rule 23(b) is met, courts are to consider "(a) the class members' interests in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3).  Where the parties have agreed to pre-certification settlement, some of these factors, namely (d) and perhaps (c), are irrelevant.  Murillo v. Pac. Gas & Elec. Co., 266 F.R.D. 468, 477 (E.D. Cal. 2010) (citing Amchem Prods. v. Windsor, 521 U.S. 591, 620 (1997)).

Here, Plaintiff claims that class members would likely not be interested in individually controlling the prosecution of separate claims because it would be uneconomical to litigate the claims individually.  Doc. No. 86 at 49.  The Court agrees that it is difficult to believe that class members would be interested in individual prosecutions because the potential recovery for many of the workers, especially those with fewer workweeks during the class period, is relatively low compared to the costs of individually litigating the claims and the risks of employer retaliation and uncertain outcomes.  Wolin v. Jaguar Land Rover N. Am., LLC, 617 F.3d 1168, 1175 (9th Cir. 2010) ("Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." (citation omitted)).

1   Additionally, the parties have not identified, and the Court is unaware of, any concurrent litigation

2   regarding the issues of the instant case.  Accordingly, the Court finds that the superiority

3   requirement is satisfied.

4       **C. <u>Class Notice</u>**

5           For any class certified under Rule 23(b)(3), "the court must direct to class members the

6   best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B), 23(e)(1).  The

7   absent class members must be provided with notice, an opportunity to be heard, and a right to opt-

8   out of the class.  <u>AT&T Mobility LLC v. Concepcion</u>, 563 U.S. 333, 349 (2011).  "The notice

9   must clearly and concisely state in plain, easily understood language" the following information:

10  (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or

11  defenses; (iv) that a class member may enter an appearance through an attorney if the member so

12  desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the

13  time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on

14  members under Rule 23(c)(3).  Fed. R. Civ. P. 23(c)(2)(B).  "Adequate notice is critical to court

15  approval of a class action settlement under Rule 23(c)(2)(B) . . . . [B]oth the content of the notice

16  and the form of the notice must be adequate and approved by the Court."  <u>Monterrubio v. Best</u>

17  <u>Buy Stores, L.P.</u>, 291 F.R.D. 443, 452 (E.D. Cal. 2013) (internal citation omitted).

18          Here, the proposed notice in this action appears to satisfy all of these criteria.  The notice

19  will be mailed directly to each class member using First-Class U.S. Mail, and the settlement

20  administrator will attempt to locate any class member whose class notice gets returned as

21  undeliverable by working with Defendants' counsel and class counsel to find a more current

22  address.  Doc. No. 87-1 at 14-15.  The notice also provides each member with options to either

23  remain a member of the class by submitting a claim form, object to the settlement, or exclude

24  oneself from the class.  Doc. No. 87-1 at 30-36.  Additionally, the notice summarizes the claims

25  and nature of the action, defines the class and subclasses, provides instructions on how to opt-in,

26  opt-out, or object to the settlement, and describes the terms and binding effect of the class

27  settlement's release and waiver.  The notice also includes individualized estimates of each class

28  member's prospective settlement share, the amounts of the class representative service award and

attorney fees, instructions on how to get additional information regarding the case, and the contact information of class counsel.  In light of the above, the Court finds that the proposed content and form of the notice is adequate.  See Kutzman, 2020 U.S. Dist. LEXIS 13314, at *39-41.

**D.  <u>Final Approval Hearing</u>**

As to schedule, the settlement agreement states that within thirty (30) days after the Court grants preliminary approval of the settlement, Defendant ENCORE FGBF, LLC, shall provide to the settlement claims administrator an electronic database of all class members, each member's last known mailing address, Social Security number, employee identification number, and the total number of work weeks during the Class Period, the period between August 22, 2014 and May 24, 2019, and the period between August 22, 2016 and May 24, 2019, in which that class member performed any work for Defendants as an hourly or nonexempt employee.  Within fifteen (15) days of receipt of this class data, the claims administrator will mail to each class member by first-class U.S. mail a notice packet containing the notice of pendency of class action settlement, the proposed settlement, and the hearing date for final court approval.  Class members will have forty-five (45) days from the initial mailing of the class notice to object, opt out, or otherwise respond to the class notice.  Within fourteen (14) days after the deadline for submitting exclusions subject to applicable extensions, the claims administrator will provide the parties with a list of all class members who submitted timely and valid requests for exclusions.  Plaintiff thereafter will file his motion for final approval of settlement.  Twenty-one days before the final approval hearing, Plaintiff and the claims administrator will file with the Court a summary of objections received and Plaintiff's responses thereto.  Not later than seven days (7) days prior to the final approval hearing, the claims administrator will provide the Parties for filing with the Court a declaration of due diligence setting forth its compliance with its obligations under this Agreement.

The Court approves this schedule and will set the Final Approval Hearing for March 27, 2023 at 1:30pm in Courtroom 2 (AWI) to allow adequate time for the foregoing events to take place.

## ORDER

Based on the foregoing, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for conditional class action certification and preliminary approval of class action settlement (Doc. No. 86) is GRANTED;

2. The proposed class and subclasses are conditionally certified for purposes of settlement only;

   a. The Class is defined as follows: All persons who have been employed in California by Defendants as hourly-paid or "non-exempt" employees, whether directly or through an employment agency or a professional services organization, at any time during the period from August 22, 2013 through May 24, 2019;

   b. The Waiting Time Penalty Subclass is defined as follows: All persons who have been employed in California by Defendants as hourly-paid or "non-exempt" employees, whether directly or through an employment agency or a professional services organization, at any time during the period from August 22, 2014 through May 24, 2019 and whose employment with Defendants has been terminated at any time during this period;

   c. The Wage Statement/PAGA Penalty Subclass is defined as follows: All persons who have been employed in California by Defendants as hourly-paid or "non-exempt" employees, whether directly or through an employment agency or a professional services organization, at any time during the period from August 22, 2016 through May 24, 2019.

3. The notice plan set forth in the settlement agreement is approved;

4. The parties shall implement the schedule as to notice, briefing, and such set forth in the settlement agreement;

5. The Court authorizes the retention of Phoenix Settlement Administrators as the settlement administrator, pursuant to the terms set forth in the settlement agreement;

6. Setareh Law Group is conditionally designated as counsel for the class;

7. Jeremy R. Lusk is conditionally designated as the class representatives for the class;

8. The parties shall appear on March 27, 2023, 1:30 p.m. in Courtroom 2 of the United States District Court, Eastern District, Fresno Division, before the undersigned for a final settlement approval hearing, which may include consideration of the following:

   a. Timely objections to the proposed settlement by class members;

   b. Responses by class counsel and counsel for Defendants to any objections timely filed by class members;

   c. Responses by either party to provide appropriate information bearing on whether the settlement and settlement administration costs should be approved; and

   d. Responses by class counsel to any questions regarding its request for fees and costs, as well as responses relating to the application for class representative service payments.

9. Pending further order of the Court, all proceedings in this matter except those contemplated herein and in the Amended Stipulation are stayed.

IT IS SO ORDERED.

Dated:   September 30, 2022   _____

                                SENIOR  DISTRICT  JUDGE