1
2
3
4
5
6
7

8        **UNITED STATES DISTRICT COURT**

9        **EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| JEREMY R. LUSK, on behalf of himself, all others similarly situated, and the general public,<br><br>Plaintiff,<br><br>v.<br><br>FIVE GUYS ENTERPRISES LLC and ENCORE FGBF, LLC ,<br><br>Defendants. | Case No.: 1:17-cv-0762 JLT EPG<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT<br><br>ORDER GRANTING IN PART PLAINTIFF'S REQUESTS FOR ATTORNEYS' FEES AND A CLASS REPRESENTATIVE SERVICE PAYMENT<br>(Doc. 98) |

17

        Jeremy Lusk asserts Defendants Five Guys Enterprises LLC and Encore FGBF, LLC violated federal and California credit/consumer reporting laws, California wage-and-hour laws, and California unfair competition law.  Lusk now seeks final approval of a settlement reached in the action.  (Doc. 98.) In addition, Lusk seeks attorney's fees and costs from the settlement fund, costs for settlement administration, and a service payment for the class representative.  (*Id*.)  Defendants do not oppose the requests, and no class member objected to the settlement terms.  The Court found the matters suitable for decision without oral arguments, and vacated the hearing for final approval.  (Doc. 99.)

        Because Lusk satisfied his burden to demonstrate that certification of the Settlement Class is appropriate under Rule 23 of the Federal Rules of Civil Procedure—and the terms of the settlement are fair, reasonable, and adequate—the request for final approval of the Settlement is **GRANTED**.  In addition, the request for attorney fees is **GRANTED IN PART**, in the modified amount of

$240,000.00; costs are **GRANTED** in the amount of $16,657.41; and settlement administration costs are **APPROVED** in the amount of $17,500.00.  Lusk's service award payment is **GRANTED IN PART** in the modified amount of $5,000.00.

<u>**BACKGROUND**</u>

From approximately August 2016 to November 2016, Lusk worked for Defendants as a "manager in training," which was an hourly position.  (Doc. 13 at 4, ¶ 5; Doc. 37 at 2, Lusk Decl. ¶ 2.) Lusk reports he was classified as a non-exempt employee in this position.  (Doc. 13 at 4, ¶ 5.)  Lusk asserts "Defendants routinely acquire consumer, investigative consumer and/or consumer credit reports … to conduct background checks on Plaintiff and other prospective, current and former employees and use information from credit and background reports in connection with their hiring process without complying with the law."  (*Id.* at 3, ¶ 2.)  He contends Defendants failed to make proper disclosures of the reports and obtained such reports "without informing class members of their rights to request a written summary of their rights under the FCRA."  (*See id.* at 10, 16.)

Lusk asserts that as an employee of Defendants, he "was not always permitted" proper meal and rest breaks.  (Doc. 13 at 5-6, ¶¶ 11-13.)  He alleges he also "was required to perform off-the-clock as he would have to clock out but continue to perform work such as counting out his cash register which may take up to twenty minutes."  (*Id.* at 6, ¶ 15.)  Lusk contends he "was required to use his personal vehicle to travel to/from other restaurants owned by Defendants to pick up food and supplies," without reimbursed for his vehicle use.  (*Id.*, ¶ 16.)  In addition, Lusk contends he "was not timely paid all his final wages upon resignation." (*Id.*, ¶ 17.)

On May 2, 2017, Lusk initiated this action by filing a complaint in Kings County Superior Court.  (Doc. 1-1 at 5.)  Defendants filed a Notice of Removal on June 2, 2017, thereby initiating the matter in this court.  (Doc. 1.)  Lusk filed his First Amended Complaint on August 22, 2017.  (Doc. 13.) He raises the following claims on behalf of himself and others similarly situated: (1) failure to make proper disclosures in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681b(b)(2)(A); (2) failure to provide a proper summary in violation of the FCRA, 15 U.S.C. §§ 1681d(a)(1) and 1681g(c); (3) failure to make a proper disclosure, in violation of Cal. Civ. Code § 1786.16(a)(2)(B); (4) failure to make a proper disclosure, in violation of Cal. Civ. Code § 1785.20.5(a); (5) failure to provide meal

periods or compensation in lieu thereof, in violation of Cal. Labor Code §§ 226.7, 512, and 1198, and Industrial Welfare Commission Wage Order 5-2001 ("Wage Order 5"); (6) failure to provide rest periods or compensation in lieu thereof, in violation of Cal. Labor Code §§ 226.7 and 1198, and Wage Order 5; (7) failure to pay earned wages, including overtime wages, in violation of Cal. Labor Code §§ 204, 223, 510, 1194, 1197, and 1198, and Wage Order 5; (8) failure to reimburse for necessary gas and mileage expenditures, in violation of Cal. Labor Code § 2802(a); (9) failure to provide accurate itemized wage statements, in violation of Cal. Labor Code § 226; (10) failure to pay separation wages, in violation of Cal. Labor Code §§ 201-203; (11) violations of California's unfair competition law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; and (12) entitlement to civil penalties under California's Private Attorney General Act.  (*See generally* Doc. 13.)

The parties engaged in discovery, which "included formal written discovery by both Parties." (Doc. 87 at 7, Setareh Decl. ¶ 10.)  Defendants produced "almost 1,000 pages of documents," including Defendants' meal period and rest break policies, along with the relevant employee handbook, time punch records and wage statements." (*Id.*)  Class Counsel "retained an expert who analyzed the time and payroll data provided and found that 75.1% of all shifts where a meal period was required suffered some type of meal period violation and 35.8% of all shifts where a rest period was required suffered some type of rest period violation." (*Id.*)  Defendants provided "a Class List with addresses and phone numbers for putative Class Members from which Class Counsel were able to conduct multiple interviews with former employees and corroborate that each of the alleged wage and hour violations either were suffered directly or were observed happening to others." (*Id.* at 7-8, ¶ 10.)

On October 10, 2018, the parties participated in mediation with Deborah Crandall Saxe.  (Doc. 87 at 8, ¶ 11.)  Although the parties did not reach an agreement at that time, Ms. Saxe sent "a Mediator's Proposal," which the parties accepted on October 12, 2018.  (*Id.*)  Lusk moved five times for preliminarily approval of the settlement terms and conditional certification; the Court denied the first four motions and granted the fifth motion. (Docs. 36, 43, 52, 55, 61, 66, 75, 81, 86, 93.)

The Court denied the first motion because the proposed agreement failed to offer adequate relief to the class as required under Rule 23(e)(2)(C).  (Doc. 43 at 8.)  For example, the Court found the risk assessments of the lacked factual and evidentiary foundation.  The Court explained the record did not

show the parties conducted sufficient discovery to evaluate the merits of each claim.  Further, the Court found the record did not support the proposed attorney's fee award of 33% of the gross settlement.  Finally, the Court found Lusk failed to demonstrate the expenditure indemnification claim and multiple consumer reporting claims warranted certification under Rule 23(a)-(b).

The Court denied the second motion because the descriptions of the terms of its revised settlement agreement and class notice were at odds with the terms in the actual proposed settlement agreement and class notice.  (Doc. 55.)

Lusk's third motion addressed some of the concerns of the Court[1], but ultimately the Court again denied approval.  (Doc. 66.)  First, the Court found the motion did not account for all potential exposure and recovery risks related to Lusk's credit reporting, UCL, overtime wage, and meal and rest break claims, nor demonstrate why the facts and circumstances of the case warranted a reduction of the PAGA award to only 8.33% of the gross settlement amount.  Given the proposed opened-ended class period— "the period of time from August 22, 2013 through the date of Preliminary Approval of the Settlement"—the Court questioned whether the settlement accounted for the nearly two years that elapsed from the time the first motion was filed.  The third motion also failed to adequately address how the agreement's distribution scheme equitably accounted for distinctions among class members, given that some— but not all— class members worked longer shifts, were terminated, or were not reimbursed for business expenses.  Finally, the third motion did not provide sufficient evidence in support of the proposed class for purposes of certification under Rule 23(a)-(b).  (Doc. 66.)

The fourth motion resolved many of these issues[2], but again the Court expressed concerns regarding information provided by Lusk.  The fourth motion provided no analysis regarding the estimated value of the UCL claim.  The proposed class period end date of October 19, 2020 cured the

---

[1] For example, Lusk's third motion addressed the Court's earlier concern regarding the proposed attorney's fee award by reducing it from 33% off the gross settlement amount to 25% of the gross fund.  The proposed payment to Lusk as the class representative also sufficed for preliminary approval purposes.  The Court also noted the third motion generally made a prima facie case that the class should be certified for settlement purposes.

[2] The fourth motion addressed both the risks attendant to the class claims based on credit reporting statutes and unpaid wages, and the calculated number of meal and rest period violations in light of permissible recovery under Labor Code § 226.7 for such claims.  Additionally, the fourth motion revised the Settlement Notice and Claim Form by including the credit reporting statutes amongst the extended list of released claims. Furthermore, the fourth motion included evidence showing that the revised settlement was submitted to the California Labor and Workforce Development Agency for purposes of the PAGA claim, and that the proposed PAGA award was sufficient.

4

1   open-ended class period problem, but strongly suggested Lusk's claims were undervalued, because the

2   value of the class claims remained largely unchanged since the filing of the first motion.  In addition,

3   Lusk again failed to account for the distinctions among class members for the wage statement claims.

4   Finally, the fourth motion did not provide sufficient evidence to support certification under Rule

5   23(a)–(b).  (Doc. 81.)

6          The fifth motion addressed each of the Court's concerns, and the motion for preliminary

7   approval was granted on October 3, 2022.  (Doc. 93.)  The fifth motion provided analysis regarding the

8   estimated value of the UCL claim; proposed a class period end date of May 24, 2019, which was the

9   date of the hearing on Lusk's first motion for preliminary approval and the date when the parties

10  anticipated preliminary approval would be granted; proposed a distribution of settlement shares in an

11  equitable manner by allocating the shares based on each class member's dates of employment; and

12  satisfied the conditional class certification requirements set forth in Fed. R. Civ. Pro. 23(a) and (b).

13  The conditionally certified class is defined as:

14          All persons who have been employed in California by Defendants as hourly-
            paid or "non-exempt" employees, whether directly or through an employment
15          agency or a professional services organization, at any time during the period
            from August 22, 2013 through May 24, 2019.
16

17  (Doc. 93 at 24.)  A Waiting Time Penalty Subclass and a Wage Statement/PAGA Penalty Subclass

18  were also conditionally certified.  The Waiting Time Penalty Subclass is defined as:

19          All persons who have been employed in California by Defendants as hourly-
            paid or "non-exempt" employees, whether directly or through an employment
20          agency or a professional services organization, at any time during the period
            from August 22, 2014 through May 24, 2019 and whose employment with
21          Defendants has been terminated at any time during this period.

22  (*Id.*)  The Wage Statement/PAGA Penalty Subclass is defined as:

23          All persons who have been employed in California by Defendants as hourly-
            paid or "non-exempt" employees, whether directly or through an employment
24          agency or a professional services organization, at any time during the period
            from August 22, 2016 through May 24, 2019.
25

26  (*Id.*)

27          The Court appointed Jeremy Lusk as Class Representative and designated Setareh Law Group

28  as Class Counsel.  (Doc. 93 at 25.)  Phoenix Settlement Administrators was appointed as the Claims

Administrator.  (*Id*.)  In addition, the Court approved the proposed notice plan, which provided that each class member would receive notice via First-Class U.S. Mail, and the Administrator would attempt to locate any class member whose Class Notice was returned as undeliverable by working with Defendants' counsel and class counsel to find a more current address.  (*See id*.)

The "Notice of Class Action Settlement" was mailed on November 15, 2022, and informed the class members of their options to either remain a member of the class, object to the settlement, or exclude oneself from the class.  (Doc. 98-2 at 7-14.)  The Notice summarized the claims and nature of the action, defined the class and subclasses, provided instructions on how to opt-in, opt-out, or object to the settlement, and described the terms and binding effect of the settlement's release and waiver.  Class members were also informed of the proposed service award and attorney fees, how to get additional information regarding the case, and the contact information of class counsel.  (*See id*.)  Finally, class members received estimates of their individual settlement share, and a form to dispute the information used to calculate the share.  (*Id*. at 9, 13-14.)

The Administrator reports Defendants provided data that identified 2,292 individuals as class members on October 28, 2022.  (Doc. 98-2 at 2, Salinas Decl. ¶ 3.)  The Administrator conducted a National Change of Address search to update the addresses of the class members "as accurately as possible."  (*Id*. at 3, ¶ 4.)  The Administrator mailed the Notice via U.S. first class mail to all 2,292 class members on November 15, 2022.  (*Id*., ¶ 5.)  Out of the 2,292 mailed Notices, 326 were returned as undeliverable without a forwarding address.  The Administrator performed address research for these individuals, but could not update 28 addresses.  (*Id*. at 6, ¶ 6.)  The Administrator re-mailed 298 Notices to the new addresses, and 27 were returned as undeliverable a second time.  (*Id*., ¶¶ 6-7.)  Thus, it appears that 2,237 class members received the Class Notice.  The Administrator did not receive any requests for exclusion.  (*Id*., ¶ 8.)  No objections received by the Administrator or the Court.  (*See id*., ¶ 9.)

On January 24, 2023, the parties jointly requested to continue the Final Approval Hearing. (Doc. 94.)  On January 26, 2023, this case was reassigned due to the retirement of District Judge Anthony W. Ishii.  (Doc. 95.)  The Court granted the request and continued the final approval hearing to May 15, 2023.  (Doc. 96.)

On April 12, 2023, Lusk filed his unopposed Motion for Final Approval of Class Action Settlement, Attorneys' Fees, Reimbursement of Litigation Costs, and Enhancement Award.  (Doc. 98.) Because no objections were made by any Class Member, the Court found the matter suitable for decision without oral arguments, and the motion was taken under submission.  Class Counsel submitted additional briefing, including their billing records for the Court's review, on June 6, 2023.  (Doc. 101.)

**SETTLEMENT TERMS**

The parties agreed to a "gross settlement amount" ("GSA") of $1,200,000.00 that will be funded by Encore FGBF, LLC. (Doc. 87-1 at 7, Settlement ¶ 13.)  This GSA will cover payments to class members and additional payments including: a service payment up to $15,000 to Lusk as Class Representative, up to 25% of the GSA in the amount of $300,000 to Class Counsel for attorney fees; costs for Class Counsel up to $20,000; costs to the Administrator up to $30,000; and PAGA payment of $100,000.  (*Id.* at 7-8, ¶ 14 (a)-(e).)  After the permitted payments, the remaining funds—the "Net Settlement Amount" (NSA)—will be distributed to the class members.  (*Id.* at 7, ¶ 14.)

**I.      Distribution of the Net Settlement Amount**

The entire NSA will be distributed, whether or not all checks are cashed, and no money will revert to Defendants. (Doc. 87-1 at 20-21, Settlement ¶ 44.)  To fairly allocate the NSA based on each class member's dates of employment, the NSA will be distributed as follows:

- **60% of the NSA is allocated to all class members**.  The Administrator will calculate a "base settlement ratio" for each class member, by dividing each class member's work weeks by the aggregate total individual work weeks of all class members.  Each class member's "base settlement ratio" will then be multiplied by 60% of the NSA to determine the "base settlement share."  (Doc. 98 at 11; *see also* Doc. 87-1 at 9, ¶ 15(a).)

- **25% of the NSA is allocated to the Waiting Time Penalty Subclass**, which includes the class members with a claim under Labor Code Section 203.  Each member within this subclass will be assigned a "waiting time penalty subclass settlement ratio" that is determined by dividing each subclass member's individual work weeks during the Subclass Period (from August 22, 2014 through May 24, 2019) by the aggregate total individual work weeks of all subclass members during this same Period.  Each subclass member's "waiting

time penalty subclass settlement ratio" will then be multiplied by 25% of the NSA to produce each subclass member's waiting time penalty subclass share.  (Doc. 98 at 11; *see also* Doc. 87-1 at 9-10, ¶ 15(c).)

- **15% of the NSA is allocated to the Wage Statement/PAGA Penalty Penalty Subclass**, which includes class members with a claim under Labor Code Section 226 for failure to provide accurate itemized wage statements and Section 2698, *et seq*. (PAGA).  Each member in this subclass will be assigned a "wage statement/PAGA penalty subclass settlement ratio" that is determined by dividing each subclass member's individual work weeks during the Subclass Period (from August 22, 2016 through May 24, 2019) by the aggregate total individual work weeks of all subclass members during this same Period.  Each subclass member's "wage statement/PAGA penalty subclass settlement ratio" will then be multiplied by 15% of the NSA to produce each subclass member's wage statement/ PAGA penalty subclass share.  (Doc. 98 at 11-12; *see also* Doc. 87-1 at 10, ¶ 15(d).)

Accordingly, each "Settlement Share" from the NSA includes: "[t]he sum total of a Class Member's Base Settlement Share plus the Waiting Time Penalty Subclass Settlement Share, if any, plus the Wage Statement/PAGA Penalty Subclass Settlement Share, if any."  (Doc. 87-1 at 10, Settlement ¶ 16(e).)

If the Court approves the payments requested by Lusk and Class Counsel, the NSA is expected to be approximately $750,842.59.  (Doc. 98-2 at 4, Salinas Decl. ¶ 12.)  The Administrator reports that "the highest Individual Settlement Share to be paid is approximately $2,721.89, the lowest Individual Settlement Share to be paid is approximately $18.82, while the average Individual Settlement Share to be paid is approximately $327.59." (*Id.*, ¶ 13.)  If a Settlement Share is uncashed after 180 days, the money will be sent to the State of California Unclaimed Wages Fund, to be held in the name of that class member.  (Doc. 87-1 at 20-21, Settlement ¶ 44.)

## II.     Releases

The Settlement provides that Lusk and Class Members, other than those who elect not to participate in the Settlement, shall release Defendants from claims.  (Doc. 87-1 at 11, Settlement ¶ 18.)  The Settlement provides:

> Upon the entry of an order by the Court granting final approval of this
> Stipulation of Settlement, and except as to such rights or claims as may be

8

created by this Stipulation of Settlement, the Settlement Class and Each Class Member who has been identified on the Class List submitted by Defendant to the Claims Administrator, and who has not properly submitted a timely and valid request to "opt-out" or be excluded from the Action, regardless of whether that Class Member submitted a timely Claim Form and without the need to manually sign a release document, in exchange for the consideration recited in this Stipulation of Settlement, on behalf of himself or herself and on behalf of his/her current, former, and future heirs, executors, administrators, attorneys, agents, and assigns, shall fully release and discharge Defendants, FIVE GUYS ENTERPRISES, LLC and ENCORE FGBF, LLC, and their parents, predecessors, successors, subsidiaries, affiliates, partners, and trusts, employment agencies and professional employer organizations, and their employees, officers, agents, attorneys, insurers, stockholders, fiduciaries, other service providers, and assigns (collectively hereinafter the "Releasees"), from any and all claims, demands, rights, liabilities, and causes of action of any kind whatsoever, that have been, or that could have been, asserted against the Releasees, whether or not presented, based on the primary rights or the facts alleged at any point in time in this Action during the Class Period (the "Released Claims"). The Released Claims expressly include, without limitation, all claims for unpaid wages, including without limitation overtime wages, off-the-clock claims, minimum wage claims, claims for failure to timely pay wages, both during employment and after termination of employment, claims for failure to keep accurate and complete payroll records, claims for failure to provide accurate and complete wage statements, claims relating to meal periods and rest breaks, claims for wage premiums, penalties, and interest; claims for penalties, including, but not limited to, recordkeeping penalties, wage statement penalties, minimum-wage penalties, missed meal-period and rest-break penalties, waiting-time penalties, penalties under the Private Attorneys General Act; premiums or costs and attorneys' fees and expenses, and any claim arising from the claims described above under applicable federal, state, local or territorial law; all such claims arising under the California Labor Code (including, but not limited to, sections 201, 202, 203, 204, 223, 226, 226.7, 510, 512, 1194, 1197, 1194.2, 1197, 1197.1, 1198, 2802); the wage orders of the California Industrial Welfare Commission (including the Minimum Wage Order and Wage Orders 1); the Private Attorneys General Act, California Labor Code section 2698, et seq.; California Business and Professions Code section 17200 et seq.; the Fair Credit Reporting Act, Investigative Consumer Reporting Agencies Act, Consumer Credit Reporting Agencies Act; the Fair Labor Standards Act, 29 U.S.C. § 201 et seq.; the California common law of contract; and federal common law.

(Doc. 87-1 at 11, ¶ 18.)

The release for Lusk encompasses more claims than those identified for the settlement class members in that he agreed to a "general release," including any claims known and unknown against Defendants, not just those claims constrained to the facts alleged in the FAC.  (*Id.* at 12, ¶ 19.)

### III.    Service of the Class Notice Packets and Responses Received

The "Notice of Class Action Settlement" (the "Notice") explained to Class members they did "not have to do anything" to receive their Settlement Share.  (Doc. 98-1 at 7.)  Class Members were also provided a form to dispute the number of workweeks identified to calculate the Settlement Share.

1    (*Id.* at 13-14.)  Together the Notice and dispute form completed the "Notice Packet" served upon Class

2    Members.  (*See* Doc. 98-2 at 3, ¶ 5 [identifying the documents served].)

3          Jarrod Salinas, a case manager for Phoenix Settlement Administrators, reports that Defendants

4    provided data for 2,292 Class Members, including "names, last known mailing addresses, Social

5    Security numbers, dates of employment, and workweeks for each Class Member … during the Class

6    Period."  (Doc. 98-2 at 2, Salinas Decl. ¶ 3.)  The Administrator processed the mailing addresses and

7    updated information with the National Change of Address Database, which "provides updated

8    addresses for any individual who has moved in the previous four (4) years and notified the U.S. Postal

9    Service of their change of address."  (*Id.* at 4.)  Mr. Salinas reports the Notice Packet was mailed on

10   November 15, 2022, to Class Members, who were informed any objections or requests for exclusion

11   were required to be postmarked no later than December 30, 2022.  (*Id.* at 3, ¶¶ 5-9; *see also id.* at 11.)

12   After locating updated addresses and re-mailing, 55 Notice Packets remained undeliverable.  (*Id.*, ¶ 6.)

13   A total of 2,237 class members—about 97.6% of the Settlement Class—received the Class Notice.

14   (*See id.*)  The Administrator did not receive any requests for exclusion or objections.  (*See id.*, ¶ 9.)

15                          **APPROVAL OF A CLASS SETTLEMENT**

16          When parties settle the action prior to class certification, the Court has an obligation to "peruse

17   the proposed compromise to ratify both the propriety of the certification and the fairness of the

18   settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  Approval of a class settlement is

19   generally a two-step process.  First, the Court must assess whether a class exists.  *Id.* (citing *Amchem*

20   *Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)).  Second, the Court must "determine whether the

21   proposed settlement is fundamentally fair, adequate, and reasonable."  *Id.* (citing *Hanlon v. Chrysler*

22   *Corp.*, 150 F.3d 1011, 1026 (9th Cir. 2998)).  The decision to approve or reject a settlement is within

23   the Court's discretion.  *Hanlon*, 150 F.3d at 1026.

24   **I.      Certification of a Settlement Class[3]**

25          Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure, which

26   provides that "[o]ne or more members of a class may sue or be sued as representative parties on behalf

27   _____

28   [3] Because the proposed class was only conditionally certified upon preliminary approval of the Settlement, final
     certification is required.

                                          10

of all." Fed. R. Civ. P. 23(a). Parties seeking class certification bear the burden of demonstrating the elements of Rule 23(a) are satisfied, and "must affirmatively demonstrate … compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Doninger v. Pacific Northwest Bell, Inc.*, 563 F.2d 1304, 1308 (9th Cir. 1977). If an action meets the prerequisites of Rule 23(a), the Court must consider whether the class is maintainable under one or more of the three alternatives set forth in Rule 23(b). *Narouz v. Charter Communs., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).

### A.    Rule 23(a) Requirements

The prerequisites of Rule 23(a) "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *General Telephone Co. of the Southwest. v. Falcon*, 457 U.S. 147, 155-56 (1982). Certification of a class is proper if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These prerequisites are generally referred to as numerosity, commonality, typicality, and adequacy of representation. *Falcon*, 457 U.S. at 156.

#### 1.    Numerosity

This prerequisite requires the Court to consider "specific facts of each case and imposes no absolute limitations." *General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980). Although there is not a specific threshold, joining more than one hundred plaintiffs is impracticable. *See Immigrant Assistance Project of Los Angeles Cnt. Fed'n of Labor v. INS*, 306 F.3d 842, 869 (9th Cir. 2002); *see also Gay v. Waiters' & Dairy Lunchmen's Union*, 549 F.2d 1330, 1332 n.7 (9th Cir. 1977) (finding a proposed class with 110 members met the numerosity requirement). Lusk reports there are 2,292 settlement class members. (Doc. 98 at 10; Doc. 98-2 at 3-4, Salinas Decl. ¶ 11.) In addition, Class Counsel estimated there were 2,077 Class Members in the "Waiting Time Penalty Subclass" and 1,879 Class Members in the "Wage Statement/PAGA Penalty Subclass." (*See* Doc. 98-1 at 4, Setareh Decl. ¶ 12 [estimating the liability based upon the number of putative class members, their work weeks, and shifts].) Therefore, joinder of all identified class members as plaintiffs is impracticable, and the numerosity requirement is satisfied.

### 2.      Commonality

Rule 23(a) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).

To satisfy the commonality requirement, the plaintiff must demonstrate common points of facts and

law.  *See Wal-Mart Stores*, 564 U.S. at 350.  Thus, "commonality requires that the class members'

claims depend upon a common contention such that determination of its truth or falsity will resolve an

issue that is central to the validity of each claim in one stroke," and the "plaintiff must demonstrate the

capacity of classwide proceedings to generate common answers to common questions of law or fact

that are apt to drive the resolution of the litigation."  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581,

588 (9th Cir. 2012) (internal quotation marks, citations omitted).

Lusk alleges common questions of law and fact regarding Defendants' alleged failure to abide

by state wage-and-hour laws, FCRA, and related California background check laws.  Specifically, Lusk

identified the following common questions of fact and law:

> whether Defendants procured a background check report on Plaintiff and
> putative class members with non-compliant disclosure forms, whether
> Defendants provided legally compliant meal periods and rest breaks to Class
> Members; whether Defendants paid employees for all time worked; whether
> Defendants properly reimbursed employees for business expenses incurred
> when they used their personal vehicles to perform errands for Defendants,
> whether Defendants violated the itemized wage statement provisions of Labor
> Code section 226 by not providing accurate information as to wages; and
> whether Defendant's policies and practices violated Labor Code section 203
> and Business & Professions Code sections 17200 et seq., and PAGA.

(Doc. 86 at 46.)  Because it appears resolution of the issues—such whether Defendants' policies

violated federal and state laws—would apply to the claims of each of the Class Members, the Court

finds the commonality requirement is satisfied for purposes of settlement.

### 3.      Typicality

This requirement demands that the "claims or defenses of the representative parties are typical

of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  A claim or defense is not required to

be identical, but rather "reasonably coextensive" with those of the absent class members.  *Hanlon*, 150

F.3d at 1020.  "The test of typicality is whether other members have the same or similar injury, whether

the action is based on conduct which is not unique to the named plaintiffs, and whether other class

members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d

497, 508 (9th Cir. 1992) (internal quotation marks, citation omitted); *see also Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (the typicality requirement is satisfied when named plaintiffs have the same claims as other members of the class and are not subject to unique defenses).

Lusk "worked for Defendants in California and was subject to the same policies regarding meal and rest breaks, wage calculations, and derivative wage and hour claims as the class members." (Doc. 87 at 31, Setareh Decl. ¶ 29.)  In addition, Lusk observes he raised "the same claims as the putative class members and has alleged no other individual claims in this matter." (Doc. 86 at 47-48.) Class Counsel report they conducted interviews that corroborated Lusk's allegations concerning the wage and hour violations.  (Doc. 87 at 8, Setareh Decl. ¶ 10.)  Because Lusk was subjected to the same company policies and pay procedures as the class members, the Court finds the typicality requirement is satisfied for purposes of settlement.  *See Hanon*, 976 F.2d at 508; *Kayes*, 51 F.3d at 1463.

### 4.    Fair and Adequate Representation

Absentee class members must be adequately represented for judgment to be binding upon them.  *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940).  Accordingly, this prerequisite is satisfied if the representative party "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  "[R]esolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (citing *Hanlon*, 150 F.3d at 1020).

#### a.    *Class representative*

Lusk asserts he "devoted a substantial amount of [his] time, both before this lawsuit was filed and also during its litigation to ensure a fair result for the employee class." (Doc. 37 at 2, Decl. ¶ 6.) Lusk reports he "worked diligently with counsel to prepare the action, traveled to and attended the mediation, sat for a deposition, and conferred with counsel regarding settlement negotiations." (Doc. 98 at 28, citing Doc. 37 at 2-3, Lusk Decl. ¶¶ 5-13, Doc. 98-1 at 21, Setareh Decl. ¶ 47.)  Shaun Setareh, counsel for Lusk and the class, believes Lusk "contributed significantly to the prosecution and ultimate success of the litigation." (Doc. 98-1 at 21, ¶ 47.)  According to Mr. Setareh, Lusk "has pursued the interests of the Class above his own interests." (*Id.* at 8, ¶ 22.)

Neither party identified conflicts between Lusk and the Settlement Class members.  (*See* Doc. 98-1 at 8, Setarah Decl. ¶ 22.)  Based upon the information provided, Lusk has actively endeavored to prosecute claims on behalf others similarly situated.  Moreover, the interests of Lusk are aligned with those of the class members: to maximize the recovery for the alleged violations.  Thus, it appears Lusk has fairly and adequately represented the interests of the Settlement Class.

> b.    *Class counsel*

The law firm of Setareh Law Group has extensive experience in litigating wage and hour class action matters in California.  (Doc. 86 at 48; Doc. 98-1 at 8-12, ¶¶ 23-25.)  Shaun Setareh reports that he has practiced law since 1999, and has "actively practiced civil litigation for the entirety of that time period."  (Doc. 98-1 at 8, Decl. ¶ 23.)  Mr. Setareh notes he and the attorneys the firm "have been involved as lead class counsel, co-lead class counsel, and other levels of involvement in over 100 wage-and-hour, consumer, and antitrust class action cases."  (*Id.*, ¶ 24.)  In addition, Mr. Setareh indicates that "Setareh Law Group has more than 250 Westlaw-citable opinions," including "several noteworthy appellate decisions."  (*Id.* at 8-9, ¶ 24; *see also id.* at 9-12 [identifying cases from the state and federal courts].)  Mr. Setareh reports he received "the California Lawyer of the Year" award from the *Daily Journal*, which he attributes to his work in *Troester v. Starbucks Corporation*, 4 Cal.5th 829 (2018).  (*Id.* at 9, ¶ 24(a).)

Defendants agreed to the appointment of Setareh Law Group as Class Counsel for the Settlement Class.  (*See* Doc. 87-1 at 6, Settlement ¶ 6 [defining Class Counsel as "Shaun Setareh and William M. Pao of Setareh Law Group" in the agreement].)  The reported litigation experience supports a conclusion that counsel prosecuted the action vigorously on behalf of the Settlement Class.  In addition, Class Counsel do not appear to have any conflicts with the class.  Therefore, Setareh Law Group satisfies the adequacy requirement.

**B.    Certification of a Class under Rule 23(b)(3)**

For the foregoing reasons, the prerequisites of Rule 23(a) are satisfied by the Settlement Class. However, the class may only be certified if it is maintainable under Rule 23(b).  Fed. R. Civ. P. 23(b); *see also Narouz*, 591 F.3d at 1266.  Lusk asserts certification of the settlement class is appropriate under Rule 23(b)(3).  (Doc. 86 at 48-50.)

14

Under Rule 23(b)(3), a class is maintainable if (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  These are referred to as the "predominance" and "superiority" requirements.  *See Hanlon*, 150 F.3d at 1022-23; *see also Wal-Mart Stores*, 564 U.S. at 363 ("(b)(3) requires the judge to make findings about predominance and superiority before allowing the class").

### 1.    Predominance

The predominance inquiry focuses on "the relationship between the common and individual issues" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Hanlon*, 150 F.3d at 1022 (citing *Amchem Prods.*, 521 U.S. at 623).  "[A] central concern of the Rule 23(b)(3) predominance test is whether 'adjudication of common issues will help achieve judicial economy.'"  *Vinole v. Countrywide Home Loans,* 571 F.3d 935, 944 (9th Cir. 2009) (quoting *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1189 (9th Cir. 2001)).

Lusk asserts, "common issues that may predominate over individual issues in this litigation." (Doc. 86 at 47; *see also* Doc. 87 at 31, Setareh Decl. ¶ 31.)  According to Lusk, such issues include:

> (1) whether Defendants furnished a legally compliant disclosure form before obtaining a background check on Plaintiff and putative class members; (2) whether Defendants uniformly failed to provide Class Members with legally compliant meal periods and rest breaks; (3) whether Defendants required or permitted employees to work off the clock; (4) whether Defendants properly reimbursed employees for business expenses for the use of their personal vehicles during work hours; (5) whether Defendants provided putative Class Members with itemized wage statements that were inaccurate in violation of Labor Code § 226; (6) whether Defendants failed to pay all overtime wages due and payable to former employees within the times specified under the California Labor Code; (7) whether Defendants conduct violates Business & Professions Code sections 17200 *et seq*., and PAGA.

(*Id.*) These common questions focus on the conduct of the Defendants, and will require relatively minor individualized determinations as to the extent of each class member's harm.  For example, individual determinations may be required to determine overtime worked, breaks missed, and expenses incurred by each class member, but liability findings as to the nature and legality of Defendants' policies and practices would be common to the class.  Defendants' time and payroll records also provide common proof related to the scope and frequency of the alleged meal and rest

break violations.  (*See* Doc. 86 at 47.)

Furthermore, Class Counsel's interviews with several putative class members corroborated Lusk's contention that employees were subject to the same relevant policies and procedures.  (Doc. 87 at 7-8; Doc. 86 at 48.)  This indicates that "broad employer policies" existed that "impact[ed] many workers at once."  *Sepulveda v. Wal-Mart Stores, Inc.*, 237 F.R.D. 229, 247 (C.D. Cal. 2006).  Based upon the information provided, the Court finds adjudication of the claims via a class action promotes judicial economy because the claims are based upon company, class-wide policies and procedures.

### 2.    Superiority

The superiority inquiry requires a determination of "whether objectives of the particular class action procedure will be achieved in the particular case."  *Hanlon*, 150 F.3d at 1023 (citation omitted).  This tests whether "class litigation of common issues will reduce litigation costs and promote greater efficiency."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  Pursuant to Rule 23(b)(3), the Court must consider four non-exclusive factors to determine whether a class is a superior method of adjudication, including (1) interests of class members, (2) other pending litigation, (3) the desirability of concentrating claims in one forum, and (4) difficulties with the management of the class action.  *Id.; see also James v. Uber Techs. Inc.*, 338 F.R.D. 123, 143 (C.D. Cal. 2021) (indicating the factors identified in Rule 12(b)(3) address the "superiority" analysis).

#### a.    Class members' interest in individual litigation

The Court is directed to consider "the class members' interests in individually controlling the prosecution or defense of separate actions."  Fed. R. Civ. P. 23(b)(3)(A).  This factor is most relevant when class members "suffered sizeable damages or [have] an emotional stake in the litigation."  *McKenzie v. Fed. Express Corp.*, 275 F.R.D. 290, 301 (C.D. Cal. 2011).  The Ninth Circuit explained that "[w]here damages suffered by each putative class member are not large, this factor weighs in favor of certifying a class action."  *Zinser*, 253 F.3d at 1190.

The Administrator reports there were no requests for exclusion or objections.  (Doc. 98-2 at 3, Salinas Decl. ¶ 8.)  There is no indication that any Class Members have any desire to control the prosecution of this action or proceed with individual litigation.  In addition, the damages suffered by class members are not particularly large, as the Administrator estimates "the highest Individual

Settlement Share to be paid is approximately $2,721.89, the lowest Individual Settlement Share to be paid is approximately $18.82, while the average Individual Settlement Share to be paid is approximately $327.59."  (*Id.* at 4, Salinas Decl. ¶ 13.)  It is unlikely that individuals would pursue small claims.  *See Zinser*, 253 F.3d at 1190; *see also Bee, Denning, Inc. v. Capital Alliance Group*, 31 F.R.D. 614, 629-30 (S.D. Cal. 2015) (finding that a $500 recovery was "unlikely to incentivize the average claimant to incur the opportunity costs of time, effort, and attention to pursue her claim on an individual basis"); *Thieriot v. Celtic Ins.*, 2011 WL 1522385, at *4 (N.D. Cal. Apr. 21, 2011) (the average payment of $2,462 supported finding the class action was superior to individual cases).  As this Court previously observed: "When the individual claims of class members are small, the class action facilitates the spreading of the litigation costs among the numerous injured parties."  *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 451 (E.D. Cal. 2013) (internal quotation marks, citation omitted).  Therefore, the factor weighs in favor of certification.

### b.   Other litigation

Next, the Court considers "the extent and nature of any litigation concerning the controversy already begun by or against class members."  Fed. R. Civ. P. 23(b)(3)(B).  The parties have not identified any other litigation related to the claims addressed raised by Lusk or encompassed in this Settlement.  Therefore, this factor weighs in favor of class certification.

### c.   Concentration in one forum

Third, the Court must consider "the desirability or undesirability of concentrating the litigation of the claims in the particular forum."  Fed. R. Civ. P. 23(b)(3)(C).  There is no suggestion the Eastern District is an undesirable forum for the matter, which raises wage and hour claims under California law—as well as FCRA claims— on behalf of employees throughout the state.  *See United States ex rel. Terry v. Wasatch Advantage Grp., LLC*, 327 F.R.D. 395, 419 (E.D. Cal. 2018) (finding the factor weighed in favor of certification where the proposed class was compromised of individuals located in California and involved "California state law claims").  Moreover, as this Court previously explained, when "parties … agreed on a proposed Settlement Agreement, the desirability of concentrating the litigation in one forum is obvious."  *Wright v. Linkus Enters.*, 259 F.R.D. 468, 474 (E.D. Cal. 2009) (internal quotation marks, citation omitted).  Therefore, this factor weighs in favor of certification.

### d.      Management of the action

Finally, the Court must consider "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D). The Supreme Court explained that, in general, "manageability … encompasses the whole range of practical problems that may render the class format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974). Because the parties reached an agreement for the claims and identified the Settlement Class, it does not appear there are any problems with managing the action. *See Espinosa v. Ahearn*, 926 F.3d 539, 556-57 (9th Cir. 2019) ("manageability is not a concern in certifying a settlement class where, by definition, there will be no trial"); *see also Spann v. J.C. Penney Corp.*, 214 F.R.D. 312, 318 (C.D. Cal. 2016) ("settlement obviates the need for a manageable trial"). Further, the Court need not speculate as to manageability if the case proceeded to trial. *See Amchem Prods.*, 521 521 U.S. at 620 ("with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems"). Consequently, this factor weighs in favor of certification.

## II.      Evaluation of the Settlement Terms

Settlement of a class action requires approval of the Court, which may be granted "only after a hearing and on finding that [the settlement] is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Approval is required to ensure settlement is consistent with the plaintiff's fiduciary obligations to the class. *See Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 996 (9th Cir. 1985). Toward that end, "Congress and the Supreme Court amended Rule 23(e) to set forth specific factors to consider in determining whether a settlement is 'fair, reasonable, and adequate.'" *Briseño v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021); *see* Fed. R. Civ. P. 23(e)(2) (effective Dec. 1, 2018). Rule 23(e)(2) now directs the Court to consider whether:

> (A)  the class representatives and class counsel have adequately represented the class;
> (B)  the proposal was negotiated at arm's length;
> (C)  the relief provided for the class is adequate, taking into account:
>        (i) the costs, risks, and delay of trial and appeal;
>        (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>        (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>        (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

18

Fed. R. Civ. P. 23(e)(2); *see also Briseño*, 998 F.3d at 1023-24.  The Ninth Circuit determined this

revision to Rule 23 requires courts "to go beyond [its] precedent." *Briseño*, 998 F.3d at 1026.[4]

### A.    Representation of the Class

To determine adequacy of representation under Rule 23(e)(2), the Court may consider whether

the interests of the named plaintiff are "aligned with the interests of the Class Members." *See Cottle v.*

*Plaid Inc.*, 240 F.R.D. 356, 376 (N.D. Cal. 2021).  In addition, a finding that "Class Counsel are

experienced and competent" supports a conclusion that the class is adequately represented. *Id.; see*

*also In re Pac. Enters. Sec. Litig.,* 47 F.3d 373, 378 (9th Cir. 1995) ("Parties represented by competent

counsel are better positioned than courts to produce a settlement that fairly reflects each party's

expected outcome in litigation.").  Thus, the adequacy analysis under Rule 23(e)(2) is "redundant of

the requirements of Rule 23(a)(4) and Rule 23(g), respectively." *Mandalevy v. Bofi Holding, Inc.*,

2022 WL 1556160, at *6 (S.D. Cal. May 17, 2022) (quoting 4 William B. Rubenstein, Newberg on

Class Actions § 13:48 (5th ed. 2020)).

Lusk interests appear aligned with those of Class Members, as they share a common interest in

challenging the alleged wrongful policies.  In addition, Class Counsel are clearly experienced in class

action litigation.  (Doc. 98-1 at 8-12, Setareh Decl. ¶¶ 23-25.)  Because Lusk carried the burden to

show the adequacy prerequisite was satisfied under Rule 23(a), the Court finds the requirement under

Rule 23(e)(2) is also satisfied. *See Flores v. Dart Container Corp.*, 2021 WL 1985440, at *5 (E.D. Cal.

May 17, 2021) ("Because the Court has found that the proposed class satisfies Rule 23(a)(4) for

purposes of class certification, the adequacy factor under Rule 23(e)(2)(A) is also met").

---

[4] Previously, the Ninth Circuit identified several factors to determine whether a settlement agreement is "fair, reasonable, and adequate," including:

> the strength of plaintiff's case; the risk, expense, complexity, and likely duration of further
> litigation; the risk of maintaining class action status throughout the trial; the amount offered
> in settlement; the extent of discovery completed, and the stage of the proceedings; the
> experience and views of counsel; the presence of a governmental participant; and the reaction
> of the class members to the proposed settlement.

*Staton*, 327 F.3d at 959 (citation omitted).  Although Lusk refers to the factors under the Ninth Circuit precedent (Doc. 98 at 14-15), the Court focuses its analysis on the factors enumerated in Rule 23.  *See Briseño*, 998 F.3d at 1026; *Kim v. Allison*, 8 F.4th 1170, 1178-79 (9th Cir. 2021) (explaining the failure to address the factors identified under the amended Rule 23 will not survive appellate review); *see also Herrera v. Wells Fargo Bank, N.A.*, 2021 U.S. Dist. LEXIS 170195, at *21 (C.D. Cal. June 8, 2021) ("The goal of [amended Rule 23(e)] is … to focus the [district] court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal" [quoting Fed. R. Civ. P. 23(e)(2), 2018 Advisory Committee Notes]).

### B.      Negotiation of the Settlement

Under Rule 23, the Court must consider whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B).  The Ninth Circuit also "put[s] a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution" in evaluating a proposed class action settlement. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009).  The inquiry of collusion addresses the possibility that the settlement agreement is the result of either "overt misconduct by the negotiators" or improper incentives of class members at the expense of others.  *Staton*, 327 F.3d at 960.  The Ninth Circuit observed that "settlement class actions present unique due process concerns for absent class members" because the "inherent risk is that class counsel may collude with the defendants, tacitly reducing the overall settlement in return for a higher attorney's fee."  *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (internal quotation marks, citations omitted). Thus, the Court must consider whether the process by which the parties arrived at their settlement is truly the product of arm's length bargaining—as Lusk asserts (Doc. 98 at 15)— or the product of collusion or fraud.  *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015).

When a class action settlement agreement is reached prior to a class being certified, district courts must be watchful "not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 94; *see also Briseño*, 998 F.3d at 1023.  These "more subtle signs" of collusion include: (1) "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded"; (2) the existence of a "clear sailing" arrangement, which provides "for the payment of attorneys' fees separate and apart from class funds" and "carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class"; and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund."  *Id.* (internal quotations, citations omitted).

#### 1.      Whether there is a disproportionate distribution to counsel

The Settlement provides that Class Counsel may request attorneys' fees up to $300,000, which is 25% of the GSA.  (Doc. 87-1 at 7, Settlement ¶ 14(a).)  The typical range of acceptable attorneys'

fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the benchmark.  *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000).  Because the fees requested are equal to the benchmark amount set by the Ninth Circuit, the Settlement Agreement does not provide a disproportionate distribution to Class Counsel.  *See Millan v. Casvade Water Servs.*, 310 F.R.D. 593, 612 (E.D. Cal. 2015) (finding no disproportionate distribution where class counsel was to receive fees within the range approved by the Ninth Circuit).

### 2.    Existence of a "clear sailing" agreement

In general, a "clear sailing" provision is one in which the parties agree to the "payment of attorneys' fees separate and apart from class funds."  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 947. However, the Ninth Circuit recognized also a "clear sailing" arrangement exists when a defendant expressly agrees not to oppose an award of attorneys' fees up to an agreed upon amount. *Lane*, 696 F.3d at 832; *In re Bluetooth Headset Prods.*, 654 F.3d at 947.

Defendants agreed that Class Counsel may seek an award of 25 of the Gross Settlement Amount, plus additional amount for costs.  (Doc. 87-1 at 8, ¶ 14(a); *see also* Doc. 87 at 9, Setareh Decl. ¶ 12 ["Defendants will not oppose Class Counsel's application for fees up to the amount of $300,000.00 and costs…"].)  Thus, the agreement includes a version of a "clear sailing agreement." Nevertheless, the existence of a clear sailing provision is not necessarily fatal to approval.  *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 948; *see also In re Toys R Us-Delaware, Inc.–Fair and Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 458 (C.D. Cal. 2014) ("a clear sailing agreement is one where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling").  Rather, "when confronted with a clear sailing provision, the district court has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class." *Id*. (citing *Staton*, 327 F.3d at 954).

As discussed below, the Court finds an award from the common fund is appropriate, and the fees to be awarded are reasonable in light of the time expended and results obtained.  This factor does not mandate a finding of collusion and does not weigh against final approval of the settlement.  *See Swain v. Anders Group, LLC*, 2023 WL 2976368, at *10 (E.D. Cal. Apr. 17, 2023) (finding a clear

sailing provision did not weigh against final approval where the fees were "reasonable based on evidence submitted by class counsel"); *see also Singh v. Roadrunner Intermodal Servs. LLC*, 2019 WL 316814 at \*7-8 (E.D. Cal. Jan 24, 2019) (not finding collusion between the parties, despite a clear sailing agreement, where the fee award was analyzed and determined to be reasonable).

### 3.   Whether there is a reversion to Defendant

Finally, the parties did not arrange for any unawarded fees to revert to Defendant.  Instead, funds from uncashed settlement will be sent to the State of California Unclaimed Wages Fund to be held in the name of the class member.  (Doc. 87-1 at 20-21, ¶ 44.)  Because the entire Net Settlement Amount will be paid to Class Members, this factor does not support a finding of collusion.

### 4.   Findings on collusion

Based upon the factors set forth by the Ninth Circuit, the Court finds the proposed settlement "appears to be the product of serious, informed, non-collusive negotiations."  *See In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079-80 (N.D. Cal. 2007).  Thus, this factor under Rule 23 supports final approval of the class settlement.

### C.   Relief Provided to the Class

The Ninth Circuit observed "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'"  *Officers for Justice v. Civil Serv. Commission*, 688 F.2d 615, 624 (9th Cir. 1982) (citation omitted).  When analyzing an agreement, the Court should examine "the complete package taken as a whole," and the proposed settlement is "not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators."  *Officers for Justice*, 688 F.2d at 625, 628.

Class Counsel performed a damages assessment "[f]ollowing review of the payroll and timekeeping data provided by Defendants and applicable law."  (Doc. 87 at 10, Setareh Decl. ¶ 16.)  Mr. Setareh reports they "determined that the value of the[] claims before considering statutory and civil penalties to be approximately $2,935,317.85."  (*Id.*, emphasis omitted.)  The potential waiting time penalties under Labor Code § 203 totaled $1,207,958.40; and the potential wage statement penalties under Labor Code § 226 totaled $680,383.33.  (*Id.* at 12.)  Further, Class Counsel determined the maximum potential PAGA penalties for all claims raised totaled $8,367,500.00.  (*Id.* at 13.)  With

these calculations, Class Counsel estimated the total maximum potential recovery for all claims and related penalties totaled $13,191,159.58. (*Id.*) Thus, the gross settlement fund of $1,200,000.00 represents approximately 9.1% of the maximum possible recovery calculated by Class Counsel.

Notably, the Ninth Circuit observed: "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459. The recovery in this action is consistent with other approved settlements. *See, e.g., In re Omnivision Techs.*, Inc., 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (approving a settlement that was "just over 9% of the maximum potential recovery asserted by either party"); *Deaver v. Compass Bank*, 2015 WL 8526982, at *7 (N.D. Cal. Dec. 11, 2015) (finding a settlement that equaled "10.7 percent of the total potential liability exposure, before any deductions for fees, costs, or incentive awards" was "fair and reasonable"); *Ma v. Covidien Holding, Inc.*, 2014 WL 360196, at *5 (C.D. Cal. Jan. 31, 2014) (finding a settlement worth 9.1% of the total calculated value of the wage and hour action "within the range of reasonableness"); *see also Maciel et al., v. Bar 20 Dairy, LLC,* 2021 WL 1813177, at *6 (E.D. Cal. May 6, 2021) (settlement of approximately 3% of the maximum damages found to be fair and adequate); *Perez v. CVS Health Corp.*, 2021 WL 2402950, at *6 (E.D. Cal. June 11, 2021) (granting final approval of a settlement where the gross fund of "$1,850,000 represent[ed] approximately 2.5% of the class's potential maximum recovery as estimated by plaintiff"). Thus, the percentage recovered on behalf of the class members does not weigh against approval of the Settlement.

After the anticipated maximum deductions from the gross settlement fund, the Administrator reports that $750,842.59 will be dispersed to Class Members. (Doc. 98-2 at 4, Salinas Decl. ¶¶ 12.) As noted above, the Administrator estimates the average payment for Class Members is $326.59 and the highest payment will be $2,721.89. (*Id.* at 5, ¶ 12.) Analyzing the factors identified in Rule 23—as discussed below—the Court finds the amount offered and relief provided to the Settlement Class supports final approval of the Settlement.

### 1. Costs, risks, and delays

A "central concern" evaluating a proposed class settlement "relate[s] to the cost and risk involved in pursuing a litigated outcome." *Feltzs v. Cox Comm's Cal., LLC*, 2022 WL 2079144 at *9

(C.D. Cal. Mar. 2, 2022), quoting Fed. R. Civ. P. 23(e), 2018 Advisory Committee Notes [modification in original].)  Approval of settlement is "preferable to lengthy and expensive litigation with uncertain results."  *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004).  If the settlement were to be rejected, the parties would have to engage in further litigation, including seeking class certification and discovery on the issue of damages.

The parties agree the action involves "highly disputed claims."  (Doc. 87-1 at 5, Settlement § F.)  Class Counsel reports the parties engaged in discovery, and Defendants produced "almost 1,000 pages of documents," including Defendants' meal period and rest break policies, along with the relevant employee handbook, time punch records and wage statements."  (Doc. 87 at 7, Setareh Decl. ¶ 10.)  Class Counsel also "retained an expert who analyzed the time and payroll data provided and found that 75.1% of all shifts where a meal period was required suffered some type of meal period violation and 35.8% of all shifts where a rest period was required suffered some type of rest period violation."  (*Id.*)  Lusk was deposed, and Defendants produced his "entire personnel file, payroll and timekeeping records, including policies and agreements he signed and acknowledged, copies of its relevant company written policies, and time-keeping records and paycheck data and records."  (Doc. 87-1 at 4, Settlement § C; Doc. 98 at 12, Setareh Decl. ¶ 26.)  In addition, Defendants provided "a Class List with addresses and phone numbers for putative Class Members from which Class Counsel were able to conduct multiple interviews with former employees and corroborate that each of the alleged wage and hour violations either were suffered directly or were observed happening to others."  (Doc. 87 at 7-8, Setareh Decl. ¶ 10.)  The parties agree that during the mediation process they were able to evaluate the risks related to the action.  (*See* Doc. 87-1 at 4, Settlement §§ D-E.)

Lusk also acknowledges the risks related to his claims, particularly "in light of the defenses raised by Defendants, including that their meal and rest period policies were legally compliant and that they provided breaks in accordance with California law."  (Doc. 98 at 17, citing Setareh Decl. ¶¶ 8-9 [Doc. 98-1 at 2-3].)  According to Lusk, "Defendants' denial of liability, paired with their diligent opposition to class treatment, spotlight the risks of continued litigation and favor granting final approval to the proposed Settlement."  (*Id.* at 18, citing Setareh Decl. ¶¶ 13-20 [Doc. 98-1 at 7-8].)  In addition, Lusk contends litigation of the claims "would require substantial additional discovery and

pre-trial motions (including motions for certification and decertification), as well as the consideration, preparation, and presentation of voluminous documentary and testimonial evidence." (*Id.* at 19.) Furthermore, even after a class was certified, "Class Members might be required to testify at individual damages mini- trials." (*Id.*) Thus, Lusk argues that "further litigation would involve risk, expense, delay, and burden on Class Members." (*Id.*, emphasis omitted.)

Employment law class actions are, by their nature, time-consuming and expensive to litigate. *Hightower v. JPMorgan Chase Bank, N.A.*, 2015 WL 9664959 at *6 (C.D. Cal. Aug. 4, 2015). If the Settlement is rejected, the parties would have to engage in further litigation, including seeking class certification and discovery on the issue of damages. The time and expense of continued litigation could outweigh any additional recovery. On the other hand, the proposed settlement provides for immediate recovery on the claims presented by Lusk on behalf of the class. Due to the acknowledged risk of the claims, costs of future litigation that may reduce the recovery to class members, and delay in payments if the settlement is not approved, this factor weighs in favor of final approval. *See Rodriguez*, 563 F.3d at 966 (risk, expense, complexity and duration of litigation supports settlement); *Curtis-Bauer v. Morgan Stanley & Co., Inc.*, 2008 WL 4667090, at *4 (N.D. Cal. Oct. 22, 2008) ("Settlement avoids the complexity, delay, risk and expense of continuing with the litigation and will produce a prompt, certain, and substantial recovery for the Plaintiff class.").

### 2.   Method of distribution

"[T]he goal of any distribution method is to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible." *Hilsley v. Ocean Spray Cranberries, Inc.*, 2020 WL 520616 at *7 (S.D. Cal. Jan. 31, 2020) (citing "Final approval criteria—Rule 23(e)(2)(C)(ii): Distribution method," 4 Newberg on Class Actions § 13:53 (5th ed.)). "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims." Fed. R. Civ. P. 23(e), 2018 Advisory Committee Notes. "A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." *Id*.

Class Members are not required to take any action, such as submitting a claim form, to receive a settlement share. (*See* Doc. 98-2 at 7 [informing Class Members: "If you want to receive a monetary

payment from the settlement, you do not have to do anything"]; *see also* Doc. 98-1 at 8 ["the NSA will be distributed to Class Members without the need for a claim form"].)  Rather, class members only needed to take specific actions if they wished to opt-out, objected to any of the terms of the settlement, or disputed the amount of their individual share.  Because Class Members are not required to submit a claim form, the proposed method of distribution will facilitate payment for legitimate claims and is not "unduly demanding" upon Class Members.  Thus, this factor weighs in favor of final approval.  *See Jackson v. Fastenal Co.*, 2021 WL 5755583 at *11 (E.D. Cal. Dec. 3, 2021) (finding "the proposed method of distributing relief is effective, and weighs in favor of a finding that the settlement agreement is fair, reasonable and adequate" where the class members did not have to file a claim).

### 3. Attorneys' fees

Pursuant to Rule 23, "courts must scrutinize 'the terms of any proposed award of attorney's fees.'" *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 607 (9th Cir. 2021) (quoting Fed. R. Civ. P. 23(e)(2)(C)(iii). The Ninth Circuit explained, "the new Rule 23(e) makes clear that courts must balance the 'proposed award of attorney's fees' vis-à-vis the 'relief provided for the class' in determining whether the settlement is 'adequate' for class members." *Id.*, quoting *Briseño*, 998 F.3d at 1024.

The fees to which the parties agreed are within the range of acceptable attorneys' fees, and are equal to the benchmark identified by the Ninth Circuit.  *See Powers*, 229 F.3d at 1256.  The parties have not identified when Class Counsel shall receive a payment from the gross settlement fund.  (*See generally* Doc. 98.)  However, the agreement indicates the Administrator shall mail settlement shares to Class Members within ten days of receiving the funds from Defendants, after final approval.  (*See* Doc. 87-1 at 20, ¶ 43.)  Because Class Members will receive their shares shortly after the funds are received— and Class Counsel will also be paid after final approval— the timing of the payments does not weigh against approval.  *See Perks v. ActiveHours, Inc.*, 2021 WL 1146038, at *6 (N.D. Cal. Mar. 25, 2021) (finding the timing of payments did not weigh against approval where both class counsel and class members were to receive payments after final approval).  Accordingly, the Court finds the amount of fees and the timing of payments from the gross settlement fund do not away against final approval.

### 4. Agreement required to be identified

The Court must consider any agreement that is required to be identified under Rule 23(e)(3).

Fed. R. Civ. P. 23(e)(2)(C)(iv).  Specifically, "parties seeking approval must file a statement identifying any agreement made in connection with the proposal."  Fed. R. Civ. P. 23(e)(3).  The parties have not identified any agreement, and the Court is unaware of any such agreement.  Thus, this factor does not weigh against final approval.

### D.     Treatment of Class Members

Rule 23 requires the Court to consider whether the proposed settlement "treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2)(D).  "A distribution of relief that favors some class members at the expense of others may be a red flag that class counsel have sold out some of the class members at the expense of others, or for their own benefit."  *Hilsley*, 2020 WL 520616 at *7 (citation omitted).

The parties agreed that Class Members who did not request exclusion from the Settlement will receive a *pro rata* share of the NSA.  As noted above, 60% of the NSA will be allocated to all Class Members on a *pro rata* basis according to each member's number of individual work weeks for all claims with 4-year statute of limitations (for unpaid wages, meal and rest period premiums, and expense reimbursement under the Labor Code and as extended by the UCL); 25% of the NSA will be allocated to members of the Waiting Time Penalty Subclass on a *pro rata* basis, according to each member's number of individual work weeks during the Waiting Time Penalty Subclass Period; and 15% of the NSA will be allocated to members of the Wage Statement/PAGA Penalty Subclass on a *pro rata* basis, according to each member's number of individual work weeks during the Wage Statement/PAGA Penalty Subclass Period.  (Doc. 98 at 11-12.)

Because the Settlement provides a *pro rata* distribution to Class Members based upon their workweeks, the agreement treats Class Members equitably. *See Cooks v. TNG GP*, 2021 WL 5139613 at *4 (E.D. Cal. Nov. 4, 2021) (observing the calculation of payments to class members "on a pro-rata basis based on the number of compensable workweeks each member worked … is fair and treats class members equitably"); *see also Gomez-Gasca v. Future AG Mgmt. Inc.*, 2020 WL 6149688 at *4 (N.D. Cal. Oct. 20, 2020) (approving an agreement including "pro rata allocation based on the number of workweeks the class member performed work during the Class Period"); *In re Regulus Therapeutics Sec. Litig.*, 2020 WL 6381898 at *5 (S.D. Cal. Oct. 29, 2020) (finding a pro rata distribution plan was

equitable and weighed in favor of approving the settlement terms).  Therefore, the distribution plan supports final approval.

**E.      Views of Counsel**

As stated above, Class Counsel has extensive experience in wage and hour class action litigation, and they believe "the Settlement Agreement is fair, reasonable, and adequate, and is in the best interest of the Settlement Class in light of all known facts and circumstances, including the risk of significant delay and uncertainty associated with litigation of this type, as well as the various defenses asserted by Defendants."  (Doc. 98-1 at 3, Setareh Decl. ¶ 9.)  The Settlement also provides: "The Parties and their respective counsel believe and warrant that this Agreement reflects a fair, reasonable, and adequate settlement of the Action and have arrived at this Agreement through arms-length negotiations, considering all relevant factors, current and potential."  (Doc. 87-1 at 23, ¶ 57.)  These opinions of counsel are entitled to significant weight and support approval of the Settlement.  *See Nat'l Rural Telecomms.*, 221 F.R.D. at 528 ("Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation"); *Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013) ("the trial court is entitled to, and should, rely upon the judgment of experienced counsel for the parties.").

**F.      Reaction of Class Members to the Proposed Settlement**

"[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class action settlement are favorable to the class members."  *Nat'l Rural Telecomms.*, 221 F.R.D. at 529; *see also Cottle*, 340 F.R.D. at 376 (observing the court may assess the reaction of class members by considering "how many class members submitted … objections" at the final approval stage).

Lusk agreed to the terms of settlement and executed the agreement.  (Doc. 87-1 at 24.)  After receiving the Notice, Class Members reacted favorably to the proposed settlement terms by not requesting exclusion or submitting objections.  This "absence of a negative reaction[] strongly supports settlement."  *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010); *see also Taylor v. Populous Group, LLC*, 2023 WL 139724, at *3 (S.D. Cal. Jan 9, 2023) (finding the class members' reaction to the settlement—after notice of the settlement terms and "an opportunity to

express their reactions"—supported final approval where no objections to the Settlement were filed);

*Manzo v. McDonalds Rests. of Cal., Inc.*, 2022 WL 4586236, at *8 (E.D. Cal. Sept. 29, 2022) ("[t]he

lack of any objection weighs in favor of final approval of the settlement").  Accordingly, this factor

weighs in favor of final approval.

**III.    Conclusion**

The factors identified under Rule 23 and by the Ninth Circuit weigh in favor of final approval

of the Settlement, and the terms of the Settlement are fair, reasonable, and adequate.  Therefore, the

request for final approval of the Settlement Agreement is **GRANTED**.

**APPROVAL OF PAGA SETTLEMENT**

California adopted its Private Attorney General Act "to supplement enforcement actions by

public agencies, which lack adequate resources to bring all such actions themselves." *Arias v. Superior

Court*, 46 Cal. 4th 969, 986 (2009).  PAGA allows individual plaintiffs "to bring a civil action to

collect civil penalties for Labor Code violations previously only available in enforcement actions

initiated by the State's labor law enforcement agencies."  *Caliber Bodyworks, Inc. v. Superior Court*,

134 Cal. App. 4th 365, 374 (2005); *see also* Cal. Lab. Code § 2699(a); *Urbino v. Orkin Servs. of Cal.,

Inc.*, 726 F.3d 1118, 1121 (9th Cir. 2013).  Thus, a PAGA plaintiff acts "as the proxy or agent of the

state's labor law enforcement agencies."  *Arias*, 46 Cal. 4th at 986.

Pursuant to PAGA, an "aggrieved employee" may bring an action for civil penalties for labor

code violations on behalf of himself and other current or former employees.  Cal. Lab. Code § 2699(a).

PAGA defines an "aggrieved employee" as "any person who was employed by the alleged violator

and against whom one or more of the alleged violations was committed."  *Id*.  A judgment in a PAGA

action "binds all those, including nonparty aggrieved employees, who would be bound by a judgment

in an action brought by the government."  *Arias*, 46 Cal. 4th at 986.

To bring an action under PAGA, an aggrieved employee must first provide written notice to the

employer and the Labor and Work Force Development Agency.  Cal. Lab. Code § 2699.3(a)(1).

Recovery under PAGA is limited to civil penalties, and the civil penalties must be allocated with 75%

directed to the LWDA and 25% to aggrieved employees.  *Id.* § 2699(i).  Any proposed settlement of

PAGA claims must be submitted to the LWDA, and a trial court must "review and approve" any

settlement of PAGA claims.  *Id.* § 2699(l)(2); *see also Haralson v. U.S. Aviation Servs. Corp*., 383 F. Supp. 3d 959, 971 (N.D. Cal. 2019) (because settling a PAGA claim "compromises a claim that could otherwise be brought be the state," it requires that a court "review and approve any settlement of any civil action pursuant to [PAGA]") (citation omitted).

Although there is no binding authority establishing the standard of review for PAGA settlements, California district courts "have applied a Rule 23-like standard, asking whether the settlement of the PAGA claims is 'fundamentally fair, adequate, and reasonable in light of PAGA's policies and purposes.'"  *Haralson*, 383 F. Supp. 3d at 972.  This standard is derived principally from the LWDA itself.  *See O'Connor v. Uber Techs., Inc*., 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016). The LWDA indicated:

> It is thus important that when a PAGA claim is settled, the relief provided for under the PAGA be genuine and meaningful, consistent with the underlying purpose of the statute to benefit the public and, in the context of a class action, the court evaluate whether the settlement meets the standards of being "fundamentally fair, reasonable, and adequate" with reference to the public policies underlying the PAGA.

*Id.* (citation omitted).  When a proposed settlement involves overlapping class action and PAGA claims, courts may employ a "sliding scale" to determine if the proposed settlement is "fundamentally fair, reasonable, and adequate with reference to the public policies underlying the PAGA."  *O'Connor*, 201 F. Supp. 3d at 1134; *see also Haralson*, 383 F. Supp. 3d at 972 (following *O'Connor*); *Cooks*, 2020 WL 5535397 at *9-10 (same).  "[W]here the settlement for the rule 23 class is robust, the purposes of PAGA may be concurrently fulfilled."  *Cooks*, 2020 WL 5535397 at *10 (quoting *O'Connor*, 201 F. Supp. 3d at 1134).

Class Counsel report they submitted the revised class and PAGA settlement to the LWDA as required by the Labor Code on July 25, 2022.  (Doc. 87 at 32, Setareh Decl. ¶ 34.)  The Administrator reports there are 2,034 aggrieved employees.  (Doc. 98-2 at 4, Salinas Decl. ¶ 14.)  Therefore, approximately 89% of the class members also are aggrieved employees under PAGA.  (*See id.* at 3-4, Salinas Decl. ¶¶ 11, 14.)  The settlement of $1,200,000.00 appears sufficiently robust—with more than $750,000.00 going to Class Members—such that the Court finds the purposes of PAGA to address the alleged labor violations are fulfilled by the proposed agreement.  Of the $100,000.00 designated in

civil penalties under PAGA, the settlement properly designates 75% of the amount to the LWDA and the remaining 25% to the aggrieved employees.  (Doc. 87-1 at 8, ¶ 14(e).)  Accordingly, the Court finds that approval of the PAGA payment is also appropriate.  *See Perez v. CVS Health Corp.*, 2021 WL 2402950, at *7 (E.D. Cal. June 11, 2021) (finding a $100,000 PAGA payment from a settlement of $1,850,000 was "fair, reasonable, and adequate in light of the public policy goals of PAGA"); *Garcia v. Gordon Trucking, Inc.*, 2012 WL 5364575, at *7 (E.D. Cal. Oct. 31, 2012) (approving a $10,000 PAGA penalty for a California class with a $3.7 million gross settlement fund)

## **REQUEST FOR ATTORNEYS' FEES**

Pursuant to the Settlement, Class Counsel may seek attorney's fees in the amount of 25 % of the Gross Settlement Amount, or $300,000.00.  (Doc. 87-1 at 7, Settlement ¶ 14(a).)  Class Counsel assert this amount is "fair and reasonable."  (Doc. 98 at 24;  *see also id.* at 18-27.)  Defendants do not oppose this fee request from the gross settlement fund.

## **I.     Legal Standards**

"[A] district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement."  *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003).  Thus, a court "may not uncritically accept a fee request," but must review the time billed and assess whether it is reasonable in light of the work performed and the context of the case.  *Common Cause v. Jones*, 235 F.Supp.2d 1076, 1079 (C.D. Cal. 2002); *see also McGrath v. County of Nevada*, 67 F.3d 248, 254 n.5 (9th Cir. 1995) (a court may not adopt representations regarding the reasonableness of time expended without independent review); *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 (9th Cir. 1984) (remanding an action for a thorough inquiry on the fee request when "the district court engaged in the 'regrettable practice' of adopting the findings drafted by the prevailing party wholesale" and explaining a court should not "accept[] uncritically [the] representations concerning the time expended").

The Court has discretion to use either a lodestar or percentage of the common fund calculation to evaluate a fee request.  *Named Plaintiffs & Settlement Class Members v. Feldman (In re Apple Inc. Device Performance Litig.)*, 50 F.4th 769, 786 (9th Cir. 2022).  The Ninth Circuit observed that "either method may… have its place in determining what would be reasonable compensation."  *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).  Whether the Court applies the lodestar or

1  percentage method, the fees awarded must comply with Rule 23 and be "fundamentally fair, adequate,

2  and reasonable." *Staton*, 327 F.3d at 963 (quoting Fed.R.Civ.P. 23(e)).

3  **A.    Lodestar method**

4  The lodestar method calculates attorney fees by "by multiplying the number of hours reasonably

5  expended by counsel on the particular matter times a reasonable hourly rate." *Florida*, 915 F.2d at 545

6  n.3 (citing *Hensley*, 461 U.S. at 433). The product of this computation, the "lodestar" amount, yields a

7  presumptively reasonable fee. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013);

8  *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008). Next, the Court may adjust the

9  lodestar upward or downward using a "multiplier" considering factors adopted by the Ninth Circuit:

10
11  (1) the time and labor required, (2) the novelty and difficulty of the questions
    involved, (3) the skill requisite to perform the legal service properly, (4) the
    preclusion of other employment by the attorney due to acceptance of the case,
12  (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time
    limitations imposed by the client or the circumstances, (8) the amount involved
    and the results obtained, (9) the experience, reputation, and ability of the
13  attorneys, (10) the "undesirability" of the case, (11) the nature and length of the
    professional relationship with the client, and (12) awards in similar cases.[5]

14

15  *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975); *Quesada v. Thomason*, 850 F.2d

16  537, 539 (9th Cir. 1988) (indicating the Court should "consider[] some or all twelve relevant criteria

17  set forth in *Kerr*" to determine whether to deviate from the lodestar)

18  **B.    Percentage from the common fund**

19  As the name suggests, under this method, "the court makes a fee award on the basis of some

20  percentage of the common fund." *Florida*, 915 F.2d at 545 n. 3. "The typical range of acceptable

21  attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25%

22  considered the benchmark." *Vasquez v. Coast Valley Roofing*, 266 F.R.D. 482, 491 (E.D. Cal. 2010);

23  *see also In re Apple Inc. Device Performance Litig.*), 50 F.4th 769, 786 (noting the Ninth Circuit

24  established "[t]he benchmark percentage is 25%" of the common fund).

25  To evaluate whether the requested percentage is reasonable, courts may consider a number of

26  factors, including: (1) the results obtained for the class; (2) the risks undertaken by class counsel,

27

28  ---
    [5] The Ninth Circuit has since determined the "desirability" of a case is no longer a relevant factor. *Resurrection Bay Conservation Alliance v. City of Seward*, 640 F.3d 1087, 1095, n.5 (9th Cir. 2011) (citation omitted).

including the complexity of the issues; (3) the length of the professional relationship between class counsel and the plaintiffs; and (5) the market rate, with a lodestar cross-check.  *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1048-1050 (9th Cir. 2002); *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). The percentage awarded as fees may be adjusted below or above the benchmark, but the Court's reasons for adjustment must be clear.  *Graulty*, 886 F.2d at 272; *see also In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) ("courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure").

### C.      Fee applicant's burden

Notably, the Court must consider similar factors under both the lodestar method and awarding a percentage of the common fund.  *See Kerr*, 526 F.2d at 70; *Vizcaino*, 290 F.3d at 1048-1050.  With either method, the fee applicant bears the burden of establishing that the fees and costs were reasonably necessary to achieve the results obtained.  *See Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1119 (9th 2000).  Therefore, a fee applicant must provide records documenting the tasks completed and the amount of time spent.  *Hensley v. Eckerhart*, 461 U.S. 424, 424 (1983); *Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 945-46 (9th Cir. 2007).  "Where the documentation of hours in inadequate, the district court may reduce hours accordingly."  *Hensley*, 461 U.S. at 433.

## II.      Evaluation of the Fees Requested

Class Counsel contend that the attorneys' fee award is reasonable under the common fund doctrine.  (Doc. 98 at 19-24.)  Under the "common fund" doctrine, attorneys who create a common fund for a class may be awarded fees from that fund.  *Hanlon*, 150 F.3d at 1029; *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole").  An award from the common fund "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense," and application of the doctrine is appropriate "when each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf."  *Boeing Co.*, 444 U.S. at 478.  Because the Settlement applies a *pro rata* distribution formula to

determine the amount paid to each Class Member, the Court agrees application of the common fund doctrine is appropriate.

Significantly, when fees are to be paid from a common fund, as here, the relationship between the class members and counsel "turns adversarial." *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994). The Ninth Circuit observed:

> [A]t the fee-setting stage, plaintiff's counsel, otherwise a fiduciary for the class, has become a claimant against the fund created for the benefit of the class. It is obligatory, therefore, for the trial judge to act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is.

*Id.* at 1302 (internal quotation marks, citation omitted). As a result, the district court must assume a fiduciary role for the class members in evaluating the reasonableness of a request for fees from the common fund. *Id.*; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009) ("when fees are to come out of the settlement fund, the district court has a fiduciary role for the class").

### A.   Time and labor required

Class counsel report they "expended considerable time and resources in litigating this matter." (Doc. 98 at 22.) In total, Class Counsel worked 460.2 hours on work related to this action. (*Id.* at 25, citing Setareh Decl. ¶ 31 [Doc. 98-1 at 15].) Mr. Setareh reports the tasks performed included:

> conducting the initial investigation of the case and developing the facts and theories regarding the off-the-clock claims, meal and rest break claims, and background check claims, drafting pleadings, conducting formal and informal discovery to obtain from Defendants the applicable employment policies, pay policies, timekeeping policies, meal and rest break policies, and class data, analyzing time and pay records, performing a damage analysis, defending Plaintiff's deposition, conducting a review of the record, working with an expert to analyze the data produced by Defendants, and preparing a thorough mediation brief and damages analysis in preparation for mediation, travelling throughout California including to hearings in this matter; engaging in contentious arm's-length negotiation at the mediation, and working with Defendants to prepare the Settlement Agreement, related forms, and approval motions.

(Doc. 98-1 at 14, Decl. ¶ 29.) Class Counsel have not identified any evidence that they were precluded from other work because of the demands of this action. Accordingly, the Court finds this factor would not support an upward departure from the benchmark.

### B.   Results obtained for the Class

The result achieved for the class is a major factor to be considered in making a fee award.

*Hensley*, 461 U.S. at 436; *Wilcox v. City of Reno*, 42 F.3d 550, 554 (9th Cir. 1994).  The Ninth Circuit observed that "[e]xceptional results are a relevant circumstance" to support an adjustment from the benchmark award.  *Vizcaino*, 290 F.3d at 1048; *see also Resnick v. Frank (In re Online DVD-Rental Antitrust Litigation)*, 779 F.3d 934, 954-55 (9th Cir. 2015) (observing that "the extent to which class counsel achieved exceptional results for the class" is a proper factor for a court evaluating "a request for attorneys' fees that was calculated using the percentage-of-recovery method" [internal quotation marks, citation omitted].)

Class Counsel assert that "an excellent result was achieved on behalf of the class." (Doc. 98 at 19, emphasis omitted.)  Class Counsel observe: "Based on information provided by Defendants during the litigation, as well as other investigation, Plaintiffs' counsel estimates that the liability exposure on the unpaid wages and reimbursement claims is $2,935,317.85 without considering statutory and civil penalties." (*Id.* at 21, citing Setareh Decl. ¶ 12 [Doc. 98-1 at 6].)  However, when statutory penalties and maximum PAGA penalties are included, the "total maximum potential recovery" was $13,191,159.58. (Doc. 98-1 at 6-7, ¶ 12.)  The gross settlement of $1,200,000 is approximately 9.1% of the total calculated maximum recovery, and this result is not exceptional.  *See Atiqui v. Calnet, Inc.*, 2017 WL 11645624, at *7 (C.D. Cal. Aug. 22, 2017) (a settlement that was "10% of the maximum net recovery for class members … would not be so exceptional as to justify a departure from the benchmark").  Indeed, this Court previously indicated the recovery of even 30% of a defendant's maximum liability exposure was not "exceptional." *See, e.g., Monterrubio*, 291 F.R.D. at 466 (finding "the circumstances of the litigation simply do not lead the Court to conclude that the result is 'exceptional'" where the recovery for the class equaled "30% of Plaintiff's calculation of Defendant's maximum liability exposure"); *Ontiveros*, 303 F.R.D. at 373 (expressing doubt that a settlement totaling one-half to one-third of the maximum potential recovery amount was exceptional).  Nevertheless, the results obtained for the class—who will receive immediate monetary relief—support an award equal to the benchmark.  *See Atiqui*, 2017 WL 11645624, at *7.

### C.   Risks undertaken by counsel

The risk undertaken is an important factor in determining the fee award.  *Chemical Bank v. City of Seattle*, 19 F.3d 1297, 1299-1301 (9th Cir. 1994).  The Supreme Court explained, "the risk of loss in

a particular case is a product of two factors: (1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits." *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992).  When class counsel undertake an "extremely risky" action, an upward departure from the benchmark is appropriate. *Vizcaino*, 290 F.3d at 1048.  For example, the Ninth Circuit determined an award above the benchmark was appropriate where "counsel pursued [the] case in the absence of supporting precedents," and "[t]wice plaintiffs lost in the district court — once on the merits, once on the class definition — and twice counsel succeeded in reviving their case on appeal." *Id.*, 290 F.3d at 1048.

Class Counsel assert "there are significant risks" in this action.  (Doc. 98 at 19.)  For example, Class Counsel observe there was "a risk that Defendants could have obtained summary judgment as to Plaintiff's claims," because "Defendants contend that their timekeeping, meal and rest break, and expense reimbursement policies are legally compliant…" (*Id.* at 20.)  In addition, Class Counsel acknowledge there was a "risk that class certification could have been denied by way of contested motion," because "[c]ourts have found that similar classes do not satisfy predominance for class certification purposes." (*Id.* at 19, 23.)  According to Class Counsel: "while Plaintiff believes that his claims are amenable to class treatment for purposes other than settlement, Defendants fully intended to contest any motion for class certification and the possibility that class certification might be denied factored into Plaintiff's evaluation of the inherent risks of further litigation." (*Id.* at 20.)  Class Counsel also note that "even if the Court granted class certification, prevailing at trial would require further risky litigation and likely involve an expensive battle of the experts." (*Id.*)  Finally, Class Counsel contend Defendants could be expected to "appeal any verdict favorable to the class, resulting in further delay and the risk that a favorable verdict would be overturned on appeal." (*Id.*)

Significantly, the risks identified by Class Counsel to support the fee request are not unique to this action, but rather apply to generally to class action litigation.  Such risks support a fee award equal to the benchmark.  *See Vizcaino*, 290 F.3d at 1048; *see also Sebastian v. Sprint/United Mgmt. Co.*, 2019 WL 13037010, at *7 (C.D. Cal. Dec. 5, 2019) (finding the plaintiff did not identify any risks that "set [the] case apart from other wage-and-hour class actions" and the "recitation of ordinary—average—risks … counsels in favor of approving the fee award at the benchmark"); *Mortley v. Express Pipe & Supply Co.*, 2019 WL 13030315, at *5 (C.D. Cal. May 29, 2019) (finding the plaintiff's

assertion that "wage and hour class actions are risky because they are hard to certify" was insufficient to support an upward departure from the benchmark, because the plaintiff failed "to show how the risks he faced were significant or unique in relation to other similar class actions"). Accordingly, this factor supports the fees requested by Class Counsel.

### D.   Financial risk related to contingent fee

Class Counsel contend, "Ninth Circuit and California state courts regard circumstances in which class counsel's work is wholly contingent as a factor weighing in favor of approving a negotiated fee award that approximates market rates." (Doc. 98 at 23, citing *Ketchum v. Moses*, 24 Cal.4th 1122, 1132-33 (2001).)

Notably, the Ninth Circuit suggested the distinction between a contingency arrangement and a fixed fee alone does not merit a departure from the benchmark. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 n.7 (9th Cir. 2011) ("whether the fee was fixed or contingent" is "no longer valid" as a factor in evaluating reasonable fees); *but see In re Online DVD-Rental Antitrust Litigation*, 779 F.3d at 954-55 (finding the contingent nature of litigation remains a relevant factor to evaluate a request from the common fund). Regardless, risks associated with the contingent nature of the fee support an award equal to the benchmark. *See Correa v. Zillow, Inc.*, 2021 WL 4925394, at *6 (C.D. Cal. June 14, 2021) (standing alone, "the attorneys' contingent risk… does not justify an upward departure of the benchmark"); *Clayton v. Knight Transp.*, 2013 WL 5877213, at *8 (E.D. Cal. Oct. 30, 2013) (acknowledging the contingent nature was "an important factor," but finding an award equal to the benchmark was appropriate where "the risks associated with this case are no greater than [those] associated with any other wage and hour action"). Accordingly, the Court finds this factor supports the fees requested by Class Counsel.

### E.   Complexity of issues and skill required

The Court may also consider whether the complexity of issues and skills support a fee request. *See Vizcaino,* 290 F.3d at 1048-1050; *In re Pac. Enters. Sec. Litig.,* 47 F.3d 373, 379 (9th Cir. 1995) (finding no abuse of discretion in adjusting a fee from the benchmark based upon "the complexity of the issues and the risks"); *see also Ross v. Bar None Enters.*, 2015 WL 1046117, at *9 (E.D. Cal. Mar. 10, 2015) ("Courts have recognized that the novelty, difficulty and complexity of the issues involved

are significant factors in determining a fee award" [citation omitted]).

Class Counsel acknowledge this action was not so complex as to justify an upward departure from the benchmark, and assert the "complexity of legal issues was a neutral factor."  (Doc. 98 at 22.) Furthermore, there is no evidence before the Court to support a conclusion that the skill required to litigate this case would support an upward departure.  Therefore, the Court agrees this factor supports an award equal to the benchmark.

### F.    Length of the professional relationship

Class counsel initiated this action on behalf of Lusk in 2017, and it appears the professional relationship has lasted approximately six years.  The duration of the professional relationship may warrant an award below the benchmark.  *See Six Mexican Workers v*, 904 F.2d at 1311 (finding "the 25 percent standard award" was appropriate although "the litigation lasted more than 13 years").

### G.    Lodestar crosscheck and market rate

As noted above, the Court may perform a lodestar cross-check to evaluate whether the fees requested are reasonable.  *Indirect Purchaser Class v. Erwin (In re Optical Disk Drive Prods. Antitrust Litig.*), 959 F.3d 922, 933 (9th Cir. 2020) ("we have encouraged courts using the percentage-of-recovery method to perform a cross-check by applying the lodestar method to confirm that the percentage-of-recovery amount is reasonable"); *see also In re Apple Device Performance Litig.*, 50 F.4th 769, 786 (9th Cir. 2022) (also encouraging a lodestar crosscheck "when utilizing the percentage-of-recovery method").  The lodestar is calculated by multiplying the time "reasonably expended" by counsel by "a reasonable hourly rate."  *Florida*, 915 F.2d at 545 n. 3 (citing *Hensley*, 461 U.S. at 433).

#### 1.    Time expended

In general, the first step in determining the lodestar is to determine whether the number of hours expended was reasonable.  *Fischer*, 214 F.3d at 1119.  When the lodestar is used as a cross-check for a fee award, the Court is not required to perform an "exhaustive cataloguing and review of counsel's hours."  *See Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 451 (E.D. Cal. 2013) (citation omitted).  However, the Court has the discretion to review submitted time sheets to determine whether the time expended was reasonable.  *See In re Washington Public Power Supply System Securities Litigation*, 19 F.3d 1291, 1298 (9th Cir.1994) (concluding the district court acted within its

1   discretion in reducing the lodestar for unnecessary and duplicative work).

2        The Court has reviewed the billing records provided by Class Counsel. (Doc. 101 at 4-19.) The

3   reported 460.2 hours included: investigation of the case and claims; preparation of the pleadings;

4   communications with Lusk and opposing counsel; discovery; mediation; and preparation of the motions

5   for approval of the settlement.  However, the Court's review of the billing records to determine the tasks

6   undertaken by the law firm also revealed the inclusion of clerical tasks and a significant amount of time

7   billed for internal communications.

8                                    a.     *Clerical tasks*

9        The Supreme Court determined that "purely clerical or secretarial tasks should not be billed at

10   a paralegal or [lawyer's] rate, regardless of who performs them."  *Missouri v. Jenkins*, 491 U.S. 274,

11   288 n.10 (1989).  As a result, courts eliminate clerical tasks from lodestar calculations.  *See, e.g.,*

12   *Nadarajah v. Holder*, 569 F.3d 906, 921 (9th Cir. 2009); *Marquez v. Harper Sch. Dist.,* 546 F. App'x

13   659, 660 (9th Cir. 2013) ("[t]he district court was within its discretion" when it declined to award fees

14   for clerical tasks); *Harris v. L & L Wings, Inc.,* 132 F.3d 978, 985 (4th Cir. 1997) (approving the

15   deduction of hours spent on secretarial tasks from the lodestar calculation); *see also Weeks v. Kellogg*

16   *Co.*, 2013 WL 6531177, at *32 (C.D. Cal. Nov. 23, 2013) ("In calculating the lodestar, courts typically

17   exclude time spent on clerical or ministerial tasks because such tasks are properly considered part of

18   an attorney's overhead and are reflected in his or her hourly rate.").  Such tasks may include, but are

19   not limited to, "creating indexes for a binder; filing emails, memoranda, and other correspondence;

20   updating the case calendar with new dates; copying, scanning, and faxing documents; and filing or

21   serving documents." *Moore v. Chase, Inc*., 2016 WL 3648949, at *3 (E.D. Cal. July 7, 2016), citing

22   *Prison Legal News v. Schwarzenegger*, 561 F.Supp.2d 1095, 1102 (N.D. Cal. 2008).

23                                  i.     *Calendaring*

24        This Court and others in the Ninth Circuit indicated calendaring deadlines is a clerical task that

25   should not being included in a fee award.  *See, e.g., Hill v. Comm'r of Soc. Sec*., 428 F. Supp. 3d 253,

26   265 (E.D. Cal. 2019) (observing clerical staff could "easily" complete "calendaring of court dates" and

27   reducing the fee award); *Campbell v. AMTRAK*, 718 F.Supp.2d 1093, 1105 (N.D. Cal. 2010) (deducting

28   calendaring as clerical work from the fee award); *Doran v. Vicorp Rests., Inc.*, 407 F.Supp.2d 1120,

1125 (C.D. Cal. 2005) (noting "calendaring court dates" is clerical and reducing the fee award). Likewise, tasks related to scheduling are clerical, non-compensable tasks.  *See Soler v. County of San Diego,* 2021 WL 2515236, at *10 (S.D. Cal. June 18, 2021) (identifying "time spent scheduling ... [as] clerical tasks non-compensable at any billing rate").

Lilit Ter-Astvatsatryan billed for calendaring case deadlines on April 14, 2018; April 26, 2018; May 2, 2018; September 10, 2018; December 17, 2018; and December 17, 2018.  (Doc. 101 at 5-6, 8, 10.)  For example, Ms. Ter-Astvatsatryan billed 0.25 hour to calendar the "new class cert deadlines" and 0.25 hour to calendar the "deadline to dismiss."  (*Id.* at 8, 10.)  In total, Ms. Ter-Astvatsatryan billed 1.6 hours for calendaring.  (*Id.* at 5-6, 8, 10.)  Likewise, Nolan Dilts billed 0.1 hour for calendaring a phone call.  (*Id.* at 17.)  This time will be deducted from the lodestar calculation.

<em>ii.     Communications with the Court</em>

This Court and others have declined to award fees for communicating with the Court—such emailing or calling courtroom deputy—due to the clerical nature of the task. *See, e.g., Miller v. Schmidt*, 2017 WL 633892, at *7 (E.D. Cal. Feb. 15, 2017) (agreeing with the party opposing the fee request that "communicating with the Court staff and court reporters is purely clerical work" and excluding the time billed for communications with the courtroom deputies from a fee award); *Robinson v. Plourde*, 717 F. Supp. 2d 1092, 1099-1100 (D. Haw. 2010) ("communication with court staff, scheduling, and corresponding regarding deadlines, are clerical and not compensable [tasks]"); *Comcast of Illinois X v. Kwak*, 2010 WL 3781768, at *6 (D. Nev. Sept. 20, 2010) (declining to award fees for "ministerial tasks such as contacting court staff for scheduling reasons or noting due dates").

Stacey Shim billed 0.2 hour to email the court on September 14, 2017; and 0.2 hour to "call [the] court to confirm telephonic appearance" on September 18, 2017.  (Doc. 101 at 4.)  Similarly, William M. Pao billed 0.25 for sending an email to the courtroom deputy on February 21, 2019.  (*Id.* at 11.)  This time shall be deducted from the lodestar, for a total deduction of 0.65 hours.

<em>b.     Internal communications and review of co-counsel's work</em>

As noted above, a fee applicant "should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary."  *Hensley*, 461 U.S. at 434.  The Ninth Circuit has "recognized that 'the participation of more than one attorney does not necessarily constitute

40

an unnecessary duplication of effort.'" *McGrath v. County of Nevada*, 67 F.3d 248, 256 (1995) (quoting *Kim v. Fujikawa*, 871 F.2d 1427, 1435 n.9 (9th Cir. 1989)).  However, in general, counsel should not bill for attending the same meetings, internal communications, and communicating with each other, as such time is unnecessary.  *See*, *e.g.*, *In re Mullins*, 84 F.3d 459, 467 (D.C. Cir. 1996); *Robinson v. Plourde*, 717 F.Supp.2d 1092, 1099 (D. Haw. 2010).

This Court previously observed, "many courts have ... reduced fee awards for time spent in 'interoffice conferences' or other internal communications."  *Gauchat-Hargis v. Forest River, Inc.*, 2013 WL 4828594 at *3 (E.D. Cal. Sept. 9, 2013) (citing, *e.g.*, *Mogck v. Unum Life Ins. Co. of Am.*, 289 F.Supp.2d 1181, 1194 (S.D. Cal 2003) [reducing selected time entries because attorneys "billed an inordinate amount of time for interoffice conferences"]; *Coles v. City of Oakland*, 2007 WL 39304, at *10 (N.D. Cal. Jan. 4, 2007) ["claiming a disproportionate number of hours for communication between attorneys may indicate unreasonable overstaffing such that a reduction in hours is appropriate"]); *see also In re Durossette, 2012 Bankr*. LEXIS 6110, 2012 WL 9123382 at *3 (E.D. Cal. Aug. 23, 2012) (finding a reduction of time appropriate in part due to the amount of time reported for preparation of internal memos).  Notably, a review of the billing records from Setareh Law Group reveals a significant amount of the time billed for internal communications and discussions.  (*See* Doc. 101 at 49-19.)

For example, William Pao billed 0.25 hours for a meeting with Shaun Setareh on November 27, 2017; and Mr. Setareh also billed 0.25 hours for the meeting with Mr. Pao.  (Doc. 101 at 4.)  On March 19, 2018, Ashley Batiste billed 0.35 hour to for a discussion with Mr. Pao, who also billed 0.5 hour for the same meeting.  (*Id.* at 5.)  March 10, 2018, Ms. Batiste billed 1.0 hour for a discussion with Mr. Setareh, who also billed 1.0 hour for the meeting.  (*Id.* at 6.)  On August 27, 2019, Mr. Setareh and Alexandra McIntosh each billed 0.25 hour for a meeting with one another regarding a notice of settlement of another action involving Five Guys.  (*Id.* at 12.)  The following date, Mr. Pao and Mr. Setareh each billed 0.5 hour for a discussion regarding the settlement the other action.  (*Id.*)  On September 27, 2022, Nolan Dilts billed 0.8 hour to discuss the case with Mr. Pao and Mr. Setareh, and Mr. Setareh billed 0.8 hour for the same meeting.  (*Id.* at 18.)  These are only a handful of examples, because the billing records show more than 67 hours—approximately 15% of the total billed hours—

41

were billed for internal communications and discussions.[6]  (*See* Doc. 101 at 4-19.)

Although the Court declines to identify each of the in-firm meetings and email exchanges within Setareh Law Group, the amount of time billed for such internal communications strongly indicates overbilling.  *See Gauchat-Hargis*, 2013 WL 4828594 at *3; *Mogck*, 289 F.Supp.2d at 1194; *In re Durossette*, 2012 WL 9123382 at *3.  Given the significant amount of time billed for internal communications, the Court exercises its discretion to reduce the lodestar by ten percent for purposes of its lodestar calculation. *See Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008) (the Court has the authority to impose "a small reduction, no greater than ten percent—a 'haircut'—based on its exercise of discretion"); *see also Cosby v. Autozone, Inc*., 2016 WL 1626997 at *5 (E.D. Cal. Apr. 25, 2016) (reducing the lodestar calculation by ten percent); *Avila v. Olivera Egg Ranch, LLC*, 2010 WL 1404397, at 6 (E.D. Cal. Apr. 6, 2010) (imposing a ten percent haircut on fees based on the "inefficiencies in th[e] method of staffing").  Accordingly, the lodestar will be reduced by ten percent after calculating the total, with the prior identified deductions for clerical tasks.

## 2.    Hourly rates

The Court must also determine whether the hourly rates are reasonable to calculate the lodestar.  *See Florida*, 915 F.2d at 545 n.3.  The Supreme Court explained attorney fees are to be calculated with "the prevailing market rates in the relevant community."  *Blum v. Stenson*, 465 U.S. 886, 895-96 and n.11 (1984).  In general, the "relevant community" for purposes of determining the prevailing market rate is the "forum in which the district court sits."  *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008).  Thus, when a case is filed in the Eastern District of California, this District "is the appropriate forum to establish the lodestar hourly rate…"  *See Jadwin v. County of Kern*, 767 F.Supp.2d 1069, 1129 (E.D. Cal. 2011).

The fee applicant bears a burden to establish that the requested rates are commensurate "with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."  *Blum*, 465 U.S. at 895 n.11.  The applicants meet this burden by producing "satisfactory evidence—in addition to the attorney's own affidavits—that the requested

---

[6] Due to the significant number of billing entries, the Court declines to identify each and every entry billed by counsel to "Communicate (in firm)" and the related description.  (*See* Doc. 101 at 4-19.)

1  rates are in line with those prevailing in the community for similar services by lawyers of reasonably

2  comparable skill, experience and reputation." *Id.*; *see also Chaudhry v. City of Los Angeles*, 751 F.3d

3  1096, 1110-11 (9th Cir. 2014) ("Affidavits of the plaintiffs' attorney[s] and other attorneys regarding

4  prevailing fees in the community … are satisfactory evidence of the prevailing market rate").  The

5  Court may apply "rates from outside the forum ... 'if local counsel was unavailable, either because

6  they are unwilling or unable to perform because they lack the degree of experience, expertise, or

7  specialization required to handle properly the case.'" *Barjon v. Dalton*, 132 F.3d 496 (9th Cir. 1997)

8  (quoting *Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992)).

9              *a.      Experience of counsel*

10            Mr. Setareh reports that he was admitted to the bar in 1999.  (Doc. 98-1 at 8, ¶ 23.)  Similarly,

11  he reports that H. Scott Leviant, a former senior attorney at Setareh Law Group, has been practicing

12  law in California for approximately 24 years.  (*Id.* at 17, ¶ 36.)  William Pao, currently a senior

13  attorney at the firm, "has been a licensed, practicing attorney in California for 21 years."  (*Id.* at 18, ¶

14  37.)  Jose Patino was admitted to practice in 2010 and has been practicing law for approximately 13

15  years.  (*Id.*, ¶ 38.)  Min Ha "Stacey" Shim was admitted to the bar in 2015, and she has approximately

16  8 years of experience.  (*Id.* at 19, ¶ 39.)  Ashley Batiste, Alexandra McIntosh, and Lilit Ter-

17  Astvatsatryan —who were admitted to the California Bar between December 2017 and June 2018—

18  have been practicing law approximately five years.[7]  Finally, Mr. Setareh reports that Nolan Dilts was

19  admitted to practice in 2019, and Maxim Gorbunov was admitted to practice in November 2021.  (*Id.*

20  at 20-21, ¶¶ 43-44.)

21            *b.      Rates applied by counsel*

22            Class Counsel applied hourly rates ranging from $325 per hour for the associate who was

23  admitted to the bar in 2021, to $925 per hour for the attorneys admitted to practice approximately 20

24  years.  (Doc. 98 at 25.)  Class Counsel do not assert the requested rates are aligned with the market rate

25

26  [7] Mr. Setareh reported Ashley Batiste "has been a licensed, practicing attorney in California for 7 years," but also reported
    she was admitted in 2018.  (Doc. 98-1 at 19, ¶ 40; *see also id.* at 15, ¶ 31.)  To clarify the discrepancy, the Court reviewed
27  the admission information on the website of the California Bar, which is subject to judicial notice. *See Davis v. Hollins Law*,
    25 F.Supp.3d 1292, 1298 n. 5 (E.D. Cal. 2014) (the Court "may take judicial notice of the State Bar of California's website
    regarding attorneys' dates of admission to the Bar").  The California Bar website indicates Ms. Batiste was admitted on
28  December 7, 2017.  The California Bar also indicates Lilit Ter-Astvatsatryan was admitted on May 9, 2018; and Alexandra
    McIntosh was admitted on June 5, 2018.  Thus, the Court takes judicial notice of these facts. *See id.*; Fed. R. Evid. 201(b).

1   within the Eastern District, or provide any evidence of hourly rates of other attorneys in the

2   community.[8]   However, Mr. Setareh asserts, "These rates are in line with those charged by experienced

3   class action lawyers who practice on a national scale and within the range of those approved by other

4   courts in similar circumstances."  (Doc. 98-1 at 16, Setareh Decl. ¶ 34, citing *Spano v. Boeing Co*.,

5   2016 WL 3791123, at *3 (S.D. Ill. Mar. 31, 2016).)  Mr. Setareh contends the Laffey Matrix may be

6   applied with adjustments, explaining:

> That rate is derived from the Washington, D.C. area and requires a costs of living
> correction for Los Angeles. Using federal statistics for average attorney salaries,
> attorney pay is 3.14% lower in Los Angeles, compared to Washington, D.C.,
> indicating a 3.14% downward adjustment to the Laffey Matrix is appropriate.
> [Citation.] However, using federal employee pay tables, federal employee wages
> are 1.58% higher in Los Angeles, compared to Washington, D.C., indicating a
> 1.58% upward adjustment to the Laffey Matrix is appropriate. [Citation.]  Thus,
> something in the range of a 1.58% locality increase to a 3.14% locality reduction
> appears appropriate here. Applying an adjustment factor of -1.56%, the locality
> corrected Adjusted Laffey Matrix hourly rate for attorneys with 20 years of
> experience is $904.66.

13   (*Id.*, internal citations and footnotes omitted.)

14       Mr. Setareh also reports the hourly rate of $925 "was approved in 2022 in *Spears, et al. v.*

15   *Healthnet of California, Inc*., Sacramento Superior Court Case No. 34-2017-00210560-CU-OE-GDS,

16   and in 2023 in *Williams v. Perdue Farms Inc., et al*., U.S. District Court for the Northern District of

17   California Case No. 3:19-CV-07671-MMC."  (Doc. 98-1 at 17, ¶ 35; *see also id.* at 18, ¶ 36.)  Mr.

18   Setareh states: "My last billing rate of $900 was approved in 2021 *in Rosales v. Loomis Armored US,*

19   *LLC*, Santa Clara Superior Court Case No. 18CV326826. My prior billing rate of $850 was approved

20   in 2019 in *Valadez v. Stater Bros. Markets*, State of California for the County of San Bernardino, Case

21   No. CIVDS1701283."  (*Id.* at 17, ¶ 35.)  Mr. Setareh observes the Northern District of California also

22   approved of his hourly rate of $750 in 2018.  (*Id.*)

23       Significantly, Class Counsel cite many cases from *other* forums to support the assertion the

24   Court should adopt the hourly rates identified.  However, the matter is now pending in the Eastern

25   District, and the identified actions from the Northern District and the state courts do not assist this

26   Court.  Moreover, the Eastern District "has repeatedly declined to adopt the Laffey matrix, as it only

27

28   ——————————————
[8] Class Counsel do not argue that local counsel was unavailable, or that the Court should apply rates from other forums.

surveys prevailing rates in the Washington, D.C. legal community and does not directly correlate to hourly rates for attorneys and paralegals in other parts of the country." *Cabardo v. Patacsil*, 2022 WL 956951, at *3 (E.D. Cal. Mar. 29, 2022) (citations omitted); *see also Hassine v. Johnson*, 53 F.Supp.3d 1297, 1307 (E.D. Cal. 2014) (rejecting application of the Laffey Matrix adjusted "to reflect the 'Los Angeles market rate'" because it was not the relevant legal community for an action filed in the Eastern District, and there was "no evidence as to the prevailing market rate for similar legal services in Fresno, California"); *Chapman v. Jacobs*, 2019 WL 4259765, at *4 (E.D. Cal. Sept. 9, 2019) (declining to use the Laffey Matrix to determine a reasonable hourly rate because "it is not an accurate tool to assess market rates in this district") *aff'd*, 836 Fed. App'x 606 (9th Cir. 2021).  Therefore, the Court declines to use the Laffey Matrix in this action—even with the adjustments suggested— particularly where Class Counsel have offered no evidence that the Laffey Matrix rates are aligned with the market rate in this forum.  *See Blum*, 465 U.S. at 895 n.11; *Chaudhry*, 751 F.3d at 1110-11.)

### c.    Adjustments

This Court has performed a comprehensive survey of fees awarded in the Eastern District, and finds current hourly rates range from $200 to $750, with hourly rates exceeding $600 reserved for attorneys who have been practicing approximately 30 years.  *See, e.g., Cianchetta v. BMW of N. Am., LLC*, 2022 WL 2160556, at *6 (E.D. Cal. June 13, 2022) (reducing the hourly rate for attorneys in their first year of practice to $200); *Seebach v. BMW of N. Am., LLC*, 2020 WL 4923664 at *3 (E.D. Cal. Aug. 21, 2020) (awarding the hourly rates of $200 for an attorney who had been admitted to practice less than two years, and $505 for an attorney "with roughly 20 years of experience" in 2020); *Aoki v. Gilbert*, 2022 WL 956949, at *2 (E.D. Cal. May 29, 2022) (finding "450 an hour [was] a reasonable rate for an attorney with fifteen years of experience" [citation omitted]); *Siafarikas v. Mercedez- Benz USA, LLC*,  2022 WL 16926265, at *3 (E.D. Cal. Nov. 10, 2022) (approving the hourly rate of $250 for an attorney "who has practiced law for three years" and $500 for an attorney who had practiced law for 21 years); *Garybo v. Leonardo Bros*, 2021 WL 449350, at *5 (E.D. Cal. Sept. 30, 2021) (adopting the recommended hourly rate of $500 for attorneys who were admitted to practice for 20 years or more to calculate a lodestar); *Mostajo v. Nationwide Mut. Ins. Co.*, 2023 WL 2918657, at *11 (E.D. Cal. Apr. 12, 2023) (approving of "hourly rates ranging from $650 through $750" for "attorneys with over thirty

years of experience" to calculate a lodestar); *Cooks v. TNG GP*, 2021 WL 5139613, at *6 (E.D. Cal. Nov. 4, 2021) (calculating the lodestar using the rate of $695 for attorneys with 30 years' experience, and reducing the hourly rate for attorneys in their first year of practice to $200). With these parameters in mind, the hourly rates must be adjusted to those of the local forum.

Time for the attorneys who have been practicing law approximately 20 years or more—including Shaun Setareh, H. Scott Leviant, and William Pao—will be calculated at the rate of $525 per hour. The rate for Jose Patino, who has been practicing law for approximately 13 years, will be adjusted to $450 per hour. For Stacey Shim, who has been practicing law for about 8 years, the hourly rate of $400 is applied. The hourly rates for attorneys who have been practicing approximately five years—including Ashley Batiste, Alexandra McIntosh, and Lilit Ter Astvatsatryan— are adjusted to $300. The rate of $275 per hour is applied for Nolan Dilts, and $200 per hour for Maxim Gorbunov, who has been practicing law for less than two years.

### 3. Calculation and cross-check

Based upon the survey of fees awarded in the Eastern District and the Court's own knowledge, these adjusted rates are reasonable and align with prevailing local market rates. *See Cianchetta*, 2022 WL 2160556, at *6; *Garybo*, 2021 WL 449350, at *5; *see also Ingram v. Oroudjian,* 647 F.3d 925, 928 (9th Cir. 2011) (concluding "the district court did not abuse its discretion either by relying, in part, on its own knowledge and experience" to determine reasonable hourly rates). With the deductions for clerical tasks and hourly rate adjustments set forth above, the lodestar preliminarily totals $197,106.25:

| Counsel | Time | Rate | Lodestar |
|---|---|---|---|
| Shaun Setareh | 35.0 | $525 | $18,375.00 |
| H. Scott Leviant | 30.8 | $525 | $16,170.00 |
| William M. Pao | 123.05 | $525 | $64,601.25 |
| Jose Patino | 120.85 | $450 | $54,382.50 |
| Stacey Shim | 11.8 | $400 | $4,720.00 |
| Ashley Batiste | 41.9 | $300 | $12,570.00 |
| Alexandra McIntosh | 7.0 | $300 | $2,100.00 |
| Lilit Ter-Astvatsatryan | 46.05 | $300 | $13,815.00 |
| Nolan Dilts | 27.9 | $275 | $7,672.50 |
| Maxim Gorbunov | 13.5 | $200 | $2,700.00 |
| *Preliminary Total* | | | $197,106.25 |

However, as discussed above, the Court finds a deduction of ten percent is appropriate, particularly due

to the number of internal communications, which comprised approximately 15% of the billed time. This results in a deduction of $19,710.63.  Consequently, the lodestar in the action totals **$177,395.62**. Because the fees requested exceed the adjusted lodestar by over $120,000.00, the lodestar cross check fails to support the fees requested by Class Counsel.

### III.    Amount of Fees to Be Awarded

As discussed above, Class Counsel faced few risks and did not face complicated factual and legal issues related to the merits of this action, although preliminary approval of the settlement was denied several times.  Class Counsel were not precluded from other work, and the short duration of the professional relationship also supports a downward adjustment from the benchmark.  Finally, the lodestar—which is a presumptively reasonable fee—supports a downward adjustment.[9]  *See Gonzalez*, 729 F.3d at 1202; *Camacho*, 523 F.3d at 978.

In light of the factors discussed above, a reduction to 20% of the common fund—a total of $240,000.00— is appropriate.  This percentage from the common fund remains within the range of acceptable fees in the Ninth Circuit.  *See Graulty*, 886 F.2d at 272 (observing that fee awards from a common fund "range from 20 percent to 30 percent of the fund created"); *Barbosa v. Cargill Meat Solutions Corp*., 297 F.R.D. 431, 448 (E.D. Cal. 2013) ("The typical range of acceptable attorneys' fees in the Ninth Circuit is 20 percent to 33.3 percent of the total settlement value"); *see also Six Mexican Workers*, 904 F.2d at 1311 (awarding "the 25 percent standard award" where "the litigation lasted more than 13 years, obtained substantial success, and involved complicated legal and factual issues").  The Court finds the modified amount is fair, reasonable, and adequate as required under Rule 23. Accordingly, the request for fees is **GRANTED** in the modified amount of $240,000.00.

### REQUESTS FOR COSTS

### I.    Litigation Costs

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund."  *Ontiveros v. Zamora*, 303 F.R.D. 356, 375 (E.D. Cal. 2014) (citation omitted).  Generally, reimbursement of taxable costs is

---

[9] Notably, even if the lodestar were not reduced by ten percent, the fees sought by Class Counsel would exceed the lodestar amount by more than $100,000.00.

governed by 28 U.S.C. § 1920 and Federal Rule of Civil Procedure 54.  Attorneys may recover reasonable expenses that would typically be billed to paying clients in non-contingency matters.  *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994).  In addition, costs may be awarded under California law to an employee who prevails on a PAGA claim.  *See* Cal. Lab. Code § 2699(g).

Pursuant to the Settlement, Class Counsel was authorized to seek up to $20,000 from the gross fund for litigation expenses.  (Doc. 87-1 at 8, ¶ 14(b).)  Class Counsel now seek litigation expenses in the amount of $16,657.41.  (Doc 98 at 24.)  The itemized costs include filing fees, mediation fees, expert costs, PACER charges, and travel expenses for a deposition and mediation.  (Doc. 98-1 at 24.) Costs including "filing fees, mediator fees …, ground transportation, copy charges, computer research, and database expert fees … are routinely reimbursed" in class action cases.  *Alvarado v. Nederend*, 2011 WL 1883188 at *10 (E.D. Cal. Jan. May 17, 2011); *Rodriguez v. Dannell Custom Harvesting, LLC*, (E.D. Cal. 2018) ("Reasonable expenses may be awarded for travel, postage, telephone, fax, notice, online legal research fees, mediation fees, filing fees and photocopies"); *see also In re Immune Response Sec. Litig.*, 497 F.Supp.2d 1166, 1177 (S.D. Cal. 2007) ("The reimbursement for travel expenses, both under 28 U.S.C. § 1920 and Rule 54(d), is within the broad discretion of the Court" [citation omitted]).  Because the costs requested are reasonable and do not exceed the amount authorized, the request for litigation costs is **GRANTED** in the amount of $**16,657.41**.

## II.     Costs of Settlement Administration

The parties agreed the Administrator shall receive expenses related to administering the Settlement from the gross settlement fund for its duties.  (Doc. 87-1 at 13, ¶ 23.)  Mr. Salinas reports the duties of Phoenix for administration include:

> (i) preparing, printing, and mailing the Notice of Class Action Settlement and the Dispute Form ("Notice"); (ii) responding to inquiries from Class Members; (iii)calculating the number of weeks each Class Member worked during the period from August 22, 2013 to May 24, 2019 ("Class Period") and the number of pay checks that each Aggrieved Employee worked during the time period from August 22, 2016 to May 24, 2019 ("PAGA Period"); (iv) determining the validity of letters indicating a request to be excluded from the Class Settlement ("Requests for Exclusion"), written objections to the Class Settlement ("Objections"), and/or dispute regarding the number of Workweeks submitted by Class Members; (v) calculating the Net Settlement Amount and the Individual Settlement Shares to Class Members; (vi) calculating and issuing the Individual Settlement Payments and distributing them to Settlement Class Members and Individual PAGA Payments to Aggrieved Employees; (vii) issuing the payment to Class Counsel for attorneys' fees and costs, the Enhancement Payment to Plaintiff, and the

1
2

employer/employee payroll taxes to the appropriate taxing authorities; and (viii)
such other tasks as set forth in the Settlement Agreement or as the Parties
mutually agree or as the Court orders.

3    (Doc. 98-2 at 2, Salinas Decl. ¶ 2; *see also* Doc. 87-1 at 13, Settlement ¶ 23.)  Mr. Salinas reports that

4    "Phoenix's costs associated with the administration of this matter are $17,500.00," which "includes all

5    costs incurred to date, as well as estimated costs involved in completing the settlement distribution."

6    (Doc. 98-2 at 4-5, ¶ 16.)  Plaintiff now seeks approval of a payment of $17,500.00 for the

7    Administrator, based upon the agreement of the parties and report of Mr. Salinas.  (Doc. 98 at 28.)

8        Based upon the information provided regarding the tasks performed by the Administrator— and

9    the continuing responsibilities with the calculation of the settlement shares, issuance and mailing of

10   those settlement payments, and any necessary tax reporting on such payments—the Court finds the

11   requested costs are reasonable.  Therefore, the request for **$17,500.00** for administration expenses is

12   **GRANTED**.

13                    <u>**CLASS REPRESENTATIVE PAYMENT**</u>

14        A class representative may "receive a share of class recovery above and beyond [his] individual

15   claim" with a service payment, also known as an "incentive payment."  *China Agritech, Inc. v. Resh*,

16   138 S.Ct. 1800, 1811 n.7 (2018); *see also Staton*, 327 F.3d at 977 ("named plaintiffs … are eligible for

17   reasonable incentive payments").  However, incentive payments for class representatives are *not* to be

18   given routinely.  The Ninth Circuit observed: "[i]f class representatives expect routinely to receive

19   special awards in addition to their share of the recovery, they may be tempted to accept suboptimal

20   settlements at the expense of the class members whose interests they are appointed to guard."  *Staton*,

21   327 F.3d at 975 (citations omitted).  Further, "'excessive payments to named class members can be an

22   indication that the agreement was reached through fraud or collusion.'"  *Id.* (citation omitted).

23   <u>**I.     Awarding a Service Payment**</u>

24        The Ninth Circuit has emphasized that "district courts must be vigilant in scrutinizing all

25   incentive awards."  *Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157, 1165 (9th Cir. 2013).  In

26   evaluating a request for a service payment to a class representative, the Court must consider: "'the

27   actions the plaintiff has taken to protect the interests of the class, the degree to which the class has

28   benefitted from those actions, the amount of time and effort the plaintiff expended in pursuing the

                                    49

litigation,' and any financial or reputational risks the plaintiff faced." *Named Plaintiffs & Settlement Class Members v. Feldman (In re Apple Inc. Device Performance Litig.)*, 50 F.4th 769, 786 (9th Cir. 2022) (quoting *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1057 (9th Cir. 2019)); *see also Staton* 327 F.3d at 977.  Further, payments may recognize a plaintiff's "willingness to act as a private attorney general." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).

The Settlement provides that Lusk may apply for a service award "not more than Fifteen Thousand Dollars and No Cents." (Doc. 87-1 at 8, ¶ 14(c).)  The Settlement explains the service payment is "to compensate him for initiating the Action, performing work in support of the Action, and undertaking the risk of liability for attorneys' fees and expenses in the event he was unsuccessful in the prosecution of the Action." (*Id.*)  Lusk now requests the Court approve a service payment of $15,000. (Doc. 98 at 28.)

### A.   Time expended

The Eastern District has awarded service payments for "substantial efforts taken as a class representative when the plaintiff has undertaken at least 30 to 40 hours of work." *Greer v. Dick's Sporting Goods, Inc.*, 2020 WL 5535399, at *4 (E.D. Cal. Sept. 15, 2020) (internal quotation marks, citation omitted); *see also Emmons v. Quest Diagnostics Clinical Laboratories, Inc.*, 2017 WL 749018, at *8 (E.D. Cal. Feb. 27, 2017) (awarding payments when each plaintiff reported "approximately 30-40 hours assisting their attorneys in the prosecution of this lawsuit" [modification adopted]).  With the initial motion for preliminary approval, Lusk estimated that he "provided well over 50 hours of my time during the course of this litigation to ensure a good outcome for the best interests of the class." (Doc. 37 at 3, Lusk Decl. ¶ 13.)  This amount of time supports approval of a service payment.[10]

### B.   Actions taken to benefit the class

Lusk reports that he "devoted a substantial amount of [his] time, both before this lawsuit was filed and also during its litigation to ensure a fair result for the employee class." (Doc. 37 at 2, ¶ 6.) According to Lusk, his "participation began with bringing certain issues that are involved in this matter

---

[10] Previously, the Court indicated that it was "Lusk's burden to present … evidence before the final approval hearing" regarding the work expended on the matter. (Doc. 93 at 15, n. 7; *see also* Doc. 66 at 20.)  Nevertheless, Lusk did not submit additional evidence of his time or work on the litigation.  The Court declines to speculate as to the additional, unidentified time Lusk may have expended on the action.  Accordingly, the Court will base its analysis only upon the 50 hours reported.

to … counsel's attention, and explaining the factual background that was used to prosecute the claims in this case." (*Id.* at 2-3, ¶ 7.) Lusk reported that he "reviewed documents" in his possession, "provided relevant documents to [his] counsel," and "explained those documents and related facts to … counsel to assist them in their review." (*Id.* at 3, ¶ 8.) He also "assisted in identifying potential witnesses, including other employees." (*Id.*) Lusk was deposed, "participated in the full day mediation," and reviewed the settlement agreement. (*Id.*, ¶¶ 10-12.)

Notably, Lusk likely would have taken many of these actions even if proceeding with individual claims. For example, Lusk would likely have submitted to a deposition if he brought the claims on his own behalf only. In addition, he would have assisted with discovery even if the action was not filed on behalf of a class. On the other hand, his actions—including assisting with discovery, reviewing documents, and attending the mediation— undoubtedly benefitted Class Members, who will receive an average payment of $338.50. Therefore, the identified actions support a service payment for Plaintiff.

### C.    Workplace retaliation

The Court may consider whether the named plaintiff has "reasonable fears of workplace retaliation" in evaluating a request for a service payment. *Staton*, 327 F.3d at 977. However, this Court observed previously that when a class representative was a former employee, retaliation by the defendant was not possible. *See Torcia v. W.W. Grainger, Inc.*, 304 F.R.D. 256, 280 (E.D. Cal. 2014). Because Lusk cannot suffer workplace retaliation from Defendants, this factor does not support a service payment.

### D.    Reputational risk

Class Counsel assert that Lusk "faced the possibility of worsened career prospects from having sued an employer in a wage-and-hour class action…." (Doc. 98-1 at 21, Setareh Decl. ¶ 47.) Notably, if Lusk elected file *individual* claims rather than a class action, his name also would have been on the complaint as the plaintiff. Regardless, any difficulty obtaining future employment due to Lusk's status as a named plaintiff lacks evidentiary support and is speculative. The Ninth Circuit observed: "the trial court is not bound to, and should not, accept conclusory statements about 'potential stigma' and 'potential risk,' in the absence of supporting evidence." *See Wilson v. Telsa, Inc.*, 833 Fed. App'x 59, 62 (9th Cir. 2020) (quoting *Clark v. Am. Residential Servs. LLC*, 175 Cal. App. 4th 785, 805 (2009)).

The Ninth Circuit determined a court did not abuse its discretion in reducing a requested class representative payment from $10,000 to $5,000 based on the speculative "risk of reputational injury." *Id.* This factor does not support the requested service payment for Lusk.

### E.      Financial risk

Class Counsel observe that Lusk undertook the risk of "potential cost award against him if the litigation were lost." (Doc. 98-1 at 21, Setareh Decl. ¶ 47.) Courts in the Ninth Circuit have repeatedly acknowledged such a financial risk supports an incentive payment to a class representative. *See, e.g., Vasquez,* 266 F.R.D. at 491 ("Class Representatives undertook the financial risk that, in the event of a judgment in favor of Defendant in this action, they could have been personally responsible for any costs awarded in favor of Defendant."); *Wilson v. Metals USA, Inc.,* 2021 WL 516585, at *9 (E.D. Cal. Feb. 11, 2021) (noting the plaintiffs asserted that "by initiating this case, they assumed the risk of a judgment against them and personal liability for an award of costs to defendant in the event of an adverse outcome, and finding the identified financial risk "weighs in favor of granting an incentive award"); *Jones v. Abercrombie & Fitch Trading Co.,* 2018 U.S. Dist. LEXIS 198001, at *26 (C.D. Cal. Nov. 19, 2018) (considering the named plaintiffs "assumed financial risk for paying costs if the case had been lost" in awarding service payments); *Pierce v. Rosetta Stone, Ltd.,* 2013 WL 5402120, at *7 (N.D. Cal. Sept. 26, 2013) ("[T]he Class Representatives undertook a financial risk that, in the event of a judgment in favor of Defendant, they may have been personally responsible for any costs awarded in favor of Defendant."). Thus, this factor supports a service payment to Lusk.

### F.      Willingness to act as private attorney general

Incentive payments may recognize a named plaintiff's "willingness to act as a private attorney general." Rodriguez, 563 F.3d at 958-59. Here, Lusk acted as a private attorney general, which will result in payments to the LWDA and aggrieved employees under PAGA. Accordingly, this factor supports a service payment for the class representative.

## II.      Reasonableness of Plaintiff's request

Considering the factors set forth above—including the actions taken by Lusk on behalf of the class, the time expended, benefit to the Class, his financial risk, and willingness to serve as a private attorney general—an incentive award is appropriate. In determining the amount to be awarded, the

Court may consider the actions undertaken by the class representative, the fairness of the hourly rate, and how large the incentive award is compared to the average award class members expect to receive. *See, e.g., Ontiveros v. Zamora*, 303 F.R.D 356, 366 (E.D. Cal. Oct. 8, 2014) (evaluating the hourly rate the named plaintiff would receive to determine whether the incentive award was appropriate); *Rankin v. Am. Greetings, Inc.*, 2011 WL 13239039, at *2 (E.D. Cal. July 6, 2011) (noting the incentive award requested was "reasonably close to the average per class member amount to be received); *Alvarado*, 2011 WL 1883188 at *10-11 (considering the time and financial risk undertaken by the plaintiff). Notably, a service payment of $5,000 for the class representative "is presumptively reasonable" in the Ninth Circuit. *Richardson v. THD At-Home Servs.*, 2016 WL 1366952, at *13 (E.D. Cal. Apr. 6, 2016); *see also see also Gonzalez v. NCI Group, Inc.*, 2023 WL 373252, at *9 (E.D. Cal. Jan. 24, 2023) ("Courts routinely find rewards in the amount of $5,000 to be reasonable"); *Bellignhausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015) (observing that in the Northern District, "a $5,000 payment is presumptively reasonable").

### A.     Actions of the class representative

In *Alvarado*, this Court noted the class representatives "(1) travelled from Bakersfield to Sacramento for mediation sessions (2) assisted Counsel in investigating and substantiating the claims alleged in this action; (3) assisted in the preparation of the complaint in this action; (4) produced evidentiary documents to Counsel; and (5) assisted in the settlement of this litigation." *Id.*, 2011 WL 1883188 at *11. Also, the Court noted the plaintiffs "undertook the financial risk that, in the event of a judgment in favor of Defendant in this action, they could have been personally responsible for the costs awarded in favor of the Defendant." *Id.* In light of these facts, the Court found an award of $7,500 for each plaintiff was appropriate for the time, efforts, and risks undertaken. *Id.* Likewise, in *Bond*, the Court found approved payments of $7,500 for the named plaintiffs who: "(1) provided significant assistance to Class Counsel; (2) endured lengthy interviews; (3) provided written declarations; (4) searched for and produced relevant documents; (5) and prepared and evaluated the case for mediation, which was a full day session requiring very careful consideration, evaluation and approval of the terms of the Settlement Agreement on behalf of the Class." *Bond*, 2011 WL 2648879, at *15.

Similarly, the Northern District determined class representatives failed to justify incentive

awards of $10,000 although the plaintiffs reported "they were involved with the case by interacting with counsel, participating in conferences, reviewing documents, and attending the day-long mediation that resulted in the settlement." *Wade v. Minatta Transport Co.*, 2012 U.S. Dist. LEXIS 12057, at *3 (N.D. Cal. Feb. 1, 2012).  On the other hand, the Northern District determined a service award of $10,000 was appropriate for a class representative who "sat for depositions, met with attorneys and coworkers throughout the life of the case, withstood five years of litigation, and was in the unique position of still being employed by Converse, Inc. at the commencement of the lawsuit against his employer." *Chavez v. Converse, Inc.*, 2020 WL 10575028, at *1, 7 (N.D. Cal. Nov. 25, 2020).

Lusk's actions are comparable to the plaintiffs in *Alvarado*, *Bond*, and *Wade*, although Lusk also had his deposition taken.  However, Lusk seeks a service payment that twice the service payments awarded to those class representatives.  Further, Lusk seeks an award greater than what was approved for Chavez, who was in the "unique position" of being a current employee of the defendant while a class representative.  This factor does not support a conclusion that the service payment requested by Lusk is fair or reasonable.

**B.      Fairness of the hourly rate**

Courts have considered the hourly rate of compensation for a class representative.  *See, e.g., Ontiveros*, 303 F.R.D. at 366; *Moss v. USF Reddaway*, 2018 WL 5099291, at *11 (C.D. Cal. Feb. 15, 2018); *Pappas v. Naked Juice Co of Glendora, Inc.*, 2014 WL 12382279, at *14-15 (C.D. Cal. Jan. 2, 2014). In doing so, the courts declined to issue service awards where the hourly rate for the tasks completed in the action was excessive or unreasonable.  *See, Ontiveros*, 303 F.R.D. at 366; *Moss*, 2018 WL 5099291, at *11; *see also Pappas, Inc.*, 2014 WL 12382279, at *14-15.

For example, this Court criticized a requested award because the award would have compensated the class representative "at a rate of $73.80 per hour."  *Ontiveros*, 303 F.R.D. at 366. In evaluating the reasonableness of the award, the Court noted Ontiveros was paid $15 per hour while employed by the defendant.  *Id.* at 366, n.3.  The Court explained that "[i]ncentive awards should be sufficient to compensate class representatives to make up for financial risk … for example, for time they could have spent at their jobs."  *Id.* at 366 (citing *Rodriguez*, 563 F.3d at 958-59.  The Court found an award of "$50 per hour fairly compensate[] the named plaintiff for his time," and rounded

the $13,500 total up to $15,000 to "incorporate[] an extra incentive to participate in litigation."  *Id.*

Similarly, the Central District declined to approve service payments to the class representatives where the proposed amount resulted in "extremely high hourly rates."  *Moss*, 2018 WL 5099291, at *11.  The court observed the requested award of $25,000 for each of the class representatives, Moss and Watkins, was "the equivalent of a payment of approximately $210 per hour Moss and $470 per hour Watkins."  *Moss*, 2018 WL 5099291, at *11.  Therefore, the court reduced the proposed award to $14,000 to each class representative.  *Id.*

Lusk has not provided any information regarding the pay he received as an employee of Defendants.  (*See generally* Doc. 37 at 2-3.)  The requested service payment to Lusk—based upon the reported 50 hours that he spent on the matter—would result in an hourly rate of more than $300, which is excessive.  *See Ontiveros*, 303 F.R.D. at 366; *Moss*, 2018 WL 5099291, at *11; *see also Pappas, Inc.*, 2014 WL 12382279, at *14-15 (reducing the service awards to $58 per hour for each class representative).  If the Court were to adopt the $50 hourly rate approved in *Ontiveros*, the service award would be reduced to $2,500.  This factor does not support a service payment in the amount requested.

## C.  Comparison of the award to those of the Class Members

The Ninth Circuit indicated the Court may consider the "proportion of the [representative] payment[s] relative to the settlement amount, and the size of each payment."  *In re Online DVD-Rental Antitrust Litig.,* 779 F.3d 934, 947 (9th Cir. 2015); *see also Spann v. J.C. Penney Corp.,* 211 F. Supp. 3d 1244, 1265 (C.D. Cal. 2016); *see also Emmons,* 2017 WL 749018 at *9 (E.D. Cal. Feb. 27, 2017) (awarding class representative payments of $8,000, 14.5 times the average award and 0.3% of the gross settlement of $2.35 million); *Patel v. Trans Union, LLC,* 2018 WL 1258194, *3, 7-8 (N.D. Cal. Mar. 11, 2018) (awarding enhancement payment of $10,000, which was 25 times the average award and 0.125 % of the gross settlement).  For example, in *Rankin*, the Court found a service award of $5,000 was reasonable, observing "the sum is reasonably close to the average per class member amount to be received."  *Id.*, 2011 WL 13239039, at *2.

The requested service payment for Lusk is 1.25% of the gross settlement fund.  In addition, the requested payment is more than 44 times the expected average award of $338.50 for class members, and over 5 times the highest estimated payment of $2,721.89.  (*See* Doc. 98-2 at 4, Salinas Decl. ¶ 13

[identifying the lowest share amount as $18.82 and the highest as $2,721.89, with the average calculated to be $327.59].)  Given the significant disparity between the average award and Lusk's requested service payment—as well as the percentage of the settlement fund— this factor does not support the amount requested, and instead favors a reduction to the service award.

### III.   Amount Awarded

A "substantial effort" by a plaintiff is necessary to support a service payment of $10,000 or more.  *See Coburn v. City of Sacramento,* 2020 WL 7425345, at *8 (E.D. Cal. Dec. 17, 2020); *see also Amaro v. Gerawan Farming Inc.*, 2020 WL 6043936, at *10 (E.D. Cal. Oct. 12, 2020) (awarding a payment of $10,000 to plaintiffs who spent over 370 hours each during the course of the litigation on tasks such as "talking to co-workers, assisting class counsel, attending the mediation, and organizing class members to keep them apprised of the status of [the] case"); *Valentine v. Rehab. Ctr. of Santa Monica Holding Co. GP,* 2021 U.S. Dist. LEXIS 243660, at *13-14 (C.D. Cal. Dec. 20, 2021) (finding the class representative failed to justify a service enhancement of $10,000, though the plaintiff reported 59.5 hours, during which she "was deposed, worked closely with [class] counsel, assisted in the preparation of pleadings, provided factual information and assisted in identifying potential witnesses").

Because the factors discussed above support an incentive award— and the actions of Lusk clearly benefited Class Members—a service payment is appropriate.  As noted above, the application of a $50 hourly rate to the 50 hours reported by Lusk would result in a service payment of $2,500.  There is no evidence indicating Lusk was required to travel for his deposition or mediation, or that the tasks undertaken were particularly burdensome for Lusk.  On the other hand, Lusk released all other potential claims related to his employment with Defendants and such a release may support an increase in the service payment.  *See Ontiveros*, 303 F.R.D. at 366.

A service payment of $5,000 for Lusk is appropriate in light of the time expended, tasks taken, benefit to the class, and the sacrifice of his potential claims.  *See Ontiveros*, 303 F.R.D. at 366; *see also Flores v. ADT LLC*, 2018 WL 6981043 (E.D. Cal. Mar. 19, 2018) (awarding the "presumptively reasonable" service payment of $5,000 to a plaintiff who "contributed between 50 and 55 hours in assisting in the prosecution").  Though this amount remains approximately 15 times more than the average payments to class members, it is less than double of the highest expected payment.  The Court

finds a service payment in the modified amount is fair, reasonable, and adequate. *See Gonzalez*, 2023 WL 373252, at *9 (noting service awards of $5,000 are routinely found reasonable); *see also Vasquez*, 266 F.R.D at 490-491 (finding the requested payment of $5,000 was "reasonable and appropriate"). Thus, the request for a service payment to Lusk as class representative is **GRANTED** in the modified amount of **$5,000.00**.

### CONCLUSION AND ORDER

Based upon the foregoing, the Court finds the class settlement is fair, adequate, and reasonable. The factors set forth under Rule 23 and Ninth Circuit precedent weigh in favor of final approval of the settlement agreement. Accordingly, the Court **ORDERS**:

1.   Plaintiff's motion for final approval of the Settlement (Doc. 98) is **GRANTED**.

2.   Certification of the Settlement Class is **GRANTED**, and the class is defined as follows:

> All persons who have been employed in California by Defendants as hourly-paid or "non-exempt" employees, whether directly or through an employment agency or a professional services organization, at any time during the period from August 22, 2013 through May 24, 2019.

The Waiting Time Penalty Subclass is defined as:

> All persons who have been employed in California by Defendants as hourly-paid or "non-exempt" employees, whether directly or through an employment agency or a professional services organization, at any time during the period from August 22, 2014 through May 24, 2019 and whose employment with Defendants has been terminated at any time during this period.

The Wage Statement/PAGA Penalty Subclass is defined as:

> All persons who have been employed in California by Defendants as hourly-paid or "non-exempt" employees, whether directly or through an employment agency or a professional services organization, at any time during the period from August 22, 2016 through May 24, 2019.

3.   The PAGA award of $100,000.00 from the Gross Settlement Amount— including payment of $75,000.00 to California's Labor and Workforce Development Agency, with the remainder distributed to aggrieved employees— is **APPROVED**.

4.   The request for a class representative service payment for Lusk is **GRANTED IN PART,** in the modified amount of $**5,000.00**.

5.     Class counsel's motion for fees is **GRANTED IN PART**, in the modified amount of 20% of the gross settlement amount, which totals $**240,000.00**.

6.     Class counsel's request for costs is **GRANTED** in the amount of $16,657.41.

7.     Settlement administration costs in the amount of $**17,500.00**, to be paid from the gross settlement amount, are **APPROVED**.

8.     The action is **DISMISSED** with prejudice, with each side to bear its own costs and attorneys' fees except as otherwise provided by the Settlement and ordered by the Court.

9.     The Clerk of Court is **DIRECTED** to close this action.

10.     The Court retains jurisdiction to consider any further applications arising out of or in connection with the Settlement.

IT IS SO ORDERED.

Dated:   **June 22, 2023**

UNITED STATES DISTRICT JUDGE

58